UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JAMES GEMELAS, On Behalf of Himself and All Others Similarly Situated | ) ) ) ) | No. CV-08-236 |
|  | ) | JUDGE DAN A. POLSTER |
| Plaintiff, | ) ) | CLASS ACTION |
|  | ) | |
| v. | ) ) | SECOND AMENDED CLASS ACTION COMPLAINT |
| THE DANNON COMPANY, INC., | ) ) | |
| Defendant. | ) ) | |
|  | ) ) | |
|  | ) | Jury Demand Endorsed Hereon |

Plaintiff, James Gemelas, by and through his attorneys, brings this Second Amended Class Action Complaint on behalf of himself and others similarly situated against Defendant, The Dannon Company, Inc. ("Dannon"). Based on personal knowledge, information and belief, Plaintiff alleges:

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction over this case pursuant to 28 U.S.C. §1332(d)(2).

-1-

2.     This controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action whereby members of the Class are citizens of states different from the state where Dannon is a citizen.

3.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: the unlawful acts and consumer transactions giving rise to this action occurred in the Northern District of Ohio, Eastern Division; Dannon is authorized to and does business in this district; Dannon has used the laws within this district; Dannon has done substantial business in this district in that it has promoted, marketed, distributed and sold the products at issue in this district; and there is personal jurisdiction over Dannon in this district.

## DESCRIPTION OF THE PARTIES TO THIS ACTION

4.     At all times relevant to this matter, Plaintiff, James Gemelas, resided and continues to reside in the Northern District of Ohio, Eastern Division.

5.     Plaintiff brings this action on behalf of himself and other similarly situated consumers in the United States to enjoin and correct Dannon's false and misleading promotion of certain yogurt products, as more fully described herein, and to obtain legal, equitable and other monetary relief for those who have purchased certain yogurt products from the Defendant.

6.     Defendant Dannon is incorporated in the State of Delaware, and is a citizen of the state of New York, where its headquarters are located.

7.     Dannon is registered to do business in the State of Ohio and does business in the State of Ohio.

8.     Dannon is a wholly owned subsidiary of Groupe Danone S.A., a French company that is also known as Danone Group.

9.     Dannon advertises and sells its yogurt and fermented milk products throughout Ohio and the United States, including the brands that are the subject

of this lawsuit, known as Activia and DanActive (hereinafter "Yogurt Products").

10.    Plaintiff alleges violations of the Ohio Consumer Sales Practice Act, the Ohio Deceptive Trade Practices Act (and, alternatively, the consumer protection acts and unfair trade practices acts of the various states of the United States), and breach of express warranty created by Defendant's promotions, advertising and labeling.

11.    At all times relevant, Plaintiff heard and saw various Dannon promotions, commercials and advertisements for the Yogurt Products.

12.    In reliance on the representations made in said promotions, commercials and advertisements, Plaintiff purchased the Dannon Yogurt Products.

## FACTUAL ALLEGATIONS IN SUPPORT OF PLAINTIFF'S SECOND AMENDED COMPLAINT

### Introduction

13.    Dannon manufactures, markets and sells the Yogurt Products. Through an extensive and comprehensive nationwide marketing campaign, Dannon claims that the Yogurt Products are "clinically proven" to provide healthy people with health benefits that other yogurt products cannot. Dannon claims in its advertising that these exclusive health benefits result from its proprietary strains of "probiotic" bacteria that are unique to the Yogurt Products. For marketing purposes, Dannon refers to these claims as the Yogurt Products' "core benefit claims." Dannon's representations are false, misleading, deceptive and unfair.

14.    Dannon's own studies, including those conducted or funded by it or its parent, Danone Group, fail to support this advertising message, and a number of them flatly contradict Dannon's claims. It is not proven that Dannon's

proprietary strains of probiotic bacteria deliver the unique health benefits claimed in its advertising campaign. Nonetheless, as a result of Dannon's deceptive advertising campaign, Dannon charges a premium for the Yogurt Products.

15. Dannon's misleading marketing campaign begins with deceptive names for its proprietary strains of bacteria. These names sound scientific, and imply that the Yogurt Products deliver the specific claimed health benefits. Dannon's exhaustive advertising campaign builds on this deception.

16. In February 2006, Dannon began marketing Activia. On its label and in its other advertisements, Dannon stated and continues to state that with the "natural culture *Bifidus* Regularis, Activia eaten every day is clinically proven to help regulate your digestive system in two weeks." It advertised and continues to advertise that because of this proprietary "probiotic" bacteria, Activia is "proven" to improve one's "intestinal rhythm" and "regulate your digestive system."

17. While scientists have not agreed on a common definition, the Food and Agricultural Division of the United Nations and the World Health Organization define probiotics as "live microorganisms which when administered in adequate amounts, confer a health benefit on the host." There is no scientific consensus about whether healthy people benefit from probiotic bacterial supplements. If probiotic bacteria do have any health benefits for healthy people, they must survive the digestive tract in sufficient quantities to achieve the possible benefit. However, there is no consensus on the quantities of probiotics people might require to achieve a probiotic effect, if probiotics have any such effect in healthy people. No scientific study has demonstrated that the bacteria Dannon puts in the Yogurt Products is probiotic.

18.    Using the term as a marketing tool, without regard to whether it actually delivers any probiotic benefits, Dannon defines the bacteria in its Yogurt Products as probiotic, which it claims will "bring health benefits to their host."

19.    Less than a year following the release of Activia, in January 2007, Dannon launched DanActive.  Dannon follows the very same formula for DanActive that it uses for Activia.  On its label and in its other advertisements, it stated and continues to state that "[o]nly DanActive has *L. casei Immunitas*.  It is clinically proven to help strengthen your body's defenses" and to improve the body's "immune system."  On each package label and container, Dannon prominently prints "IMMUNITY."

20.    Dannon's nationwide advertising campaign has been massive and comprehensive, spending far more than $100 million to convey these deceptive messages to consumers throughout the United States.  Described as a "360-degree marketing plan," Dannon conveyed and continues to convey its deceptive claims about the Yogurt Products primarily through television commercials, but also through other media, including newspapers, magazines, direct mail, the Internet, in-store sampling, point of sale displays, and on the Yogurt Products' labels and labeling.  On the Internet, Dannon's Activia is the number one paid listing in the results for "yogurt" on Google.

21.    Through this massive campaign, Dannon has conveyed one message: Dannon's proprietary bacteria strains provide the Yogurt Products with clinically proven health benefits that other yogurt products do not.  Each person who has purchased the Yogurt Products has been exposed to Dannon's misleading advertising message multiple times.

22.    Dannon's advertising and marketing campaign is designed to cause consumers to buy the Yogurt Products as a result of this deceptive message, and

Dannon has succeeded. As a result of this campaign, Dannon's "probiotic" launch has been one of the most successful product launches in recent food-industry history. For example, in the first year, Activia reached sales numbers that less than one-tenth of one percent of all new foods and beverages achieve in their first year in the marketplace.

### Dannon's Claims About Activia

23. On October 19, 2005, Dannon announced the February 2006 release of Activia, "trailblazing a new way to help Americans improve their intestinal rhythm." Dannon was "thrilled to introduce the first-of-its-kind probiotic yogurt in the U.S. clinically proven to help regulate your digestive system." Since that time, Dannon has consistently conveyed the message to consumers throughout the United States that its proprietary probiotic bacteria is "clinically proven" to deliver health benefits to healthy people – claims which are not substantiated.

24. In early 2006 Dannon began promoting Activia utilizing various media outlets, including, but not limited to radio, print advertisement and internet websites, as well as on the label on Activia. By far, however, the predominant media outlet has been on television through commercials. Television commercials for Activia have aired at saturation levels regularly across the country since the launch of Activia. The first television advertisements began in February 2006 on broadcast networks and on cable channels that skew more heavily towards female viewers, such as the Lifetime channel and Food Network.

25. Dannon's marketing claims that with the "natural culture *Bifidus* Regularis, Activia eaten every day is clinically proven to help regulate your digestive system in two weeks." A typical commercial states:

> Jamie Lee Curtis: I used to think Yogurt was all the same, until I did a little reading in the yogurt aisle. If you experience occasional irregularity, you should

know that only one yogurt, Activia, contains Bifidus Regularis and is clinically proven to help regulate your digestive system.

Announcer: ***With the natural culture Bifidus Regularis, Activia eaten every day is clinically proven to help regulate your digestive system in two weeks.***

Jamie Lee Curtis: Activia's a good read.  You'll love how the story ends.

Another typical commercial states:

First Student: Hey, you feel like going out?

Second Student: I'm bloated, irregular.

First Student: Probably stress from exams.  Look how it makes us eat.  [*Shows partially eaten pizza and spaghetti.*]

Second Student: So how come you're okay?

First Student: I eat Activia, every day.

Announcer: Introducing smooth delicious ***Dannon Activia, with the natural culture Bifidus Regularis, it's clinically proven to help naturally regulate your digestive system in two weeks.***

First Student: It's good.  I feel great. [*Shown eating Activia.*]

Announcer: Help naturally regulate your digestive system in two weeks.

First Student: Come on, let's get out of here.  [*Caption "Two weeks later" displayed with students looking fresh and energetic.*]

The bolded tag lines in these two sample commercials appear throughout the various versions of commercials.  Television commercials for Activia have aired regularly across the country since its nationwide launch in February 2006.

26. "*Bifidus* Regularis" is Dannon's trademarked name for the proprietary *Bifidodbacterium animalis* subsp. *animalis* strain DN-173-010, a strain of bifidobacterium.  The Latinate of "Regular" implies scientific significance.  Activia's label appears as:



27.    Inside every Activia label, Dannon also prominently claims: "**CLINICALLY PROVEN** to help in two weeks, when eaten daily" and "contains natural probiotic culture – **Bifidus Regularis**™ – only in Activia®."

28.    Beginning in the fall of 2006 and offered periodically to reinforce the deceptive message, Dannon touted a money-back guarantee which it named the "Activia Challenge," promising that Activia "works or it's free."  Dannon's "it works or it's free" claim adds to the deception because such marketing results in a placebo effect on consumers, irrespective of any actual probiotic effect. Money back guarantees, or "MBG's" as they are known in the advertising industry, is a well established marketing tool used to convince consumers of its message – such guarantees do not lead to the return of product from unhappy customers.    A typical example of a television commercial which includes Dannon's "MBG" promotion is:

| | |
|---|---|
| 1st Woman: | Sometimes I feel irregular and bloated. |
| 2nd Woman: | Does that ever happen to you? |
| 3rd Woman: | Not lately.  I took the Activia challenge. |
| 4th Woman: | Eat it every day for two weeks. |
| 5th Woman: | It works or it's free. |

| Announcer: | Seems everyone's talking about the Activia two week challenge. ***Activia with the natural culture Bifidus Regularis is clinically proven to help naturally regulate your digestive system in two weeks.*** |
| --- | --- |
| 6th Woman: | Mmmmm, heard about the Activia challenge? |
| 7th Woman: | I told you.  [Laughter] |
| Announcer: | Activia, it works or it's free. |

29.     Dannon also conveys the message that Activia cures a wide range of common digestive problems.  It explains that Activia with *Bifidus* Regularis will improve the "digestive issues" reported by 87% of the general population, including "bloating, heaviness, and difficult and painful defecation."

30.     Throughout its advertisements, Dannon bolsters its "clinically proven" claim by referencing scientific studies.  For example, one commercial explains that to find out whether Activia works, "you can check out any of the multiple clinical studies that have been conducted – just log on to activia.com." Dannon's website then identifies studies that purport to constitute the clinical proof.

31.     Danone Group admits that Activia provides no proven additional health benefits to the average healthy individual.   Nevertheless, Dannon deceptively claimed and continues to claim that "Activia is for anyone who wants to help naturally regulate their digestive system."  The Activia label states that Activia is "**CLINICALLY PROVEN** to help in two weeks, when eaten daily" and "contains natural probiotic culture—**Bifidus Regularis**—only in Activia," that Activia is a "delicious way to help naturally regulate your digestive system," and that "Activia is scientifically proven to help reduce long intestinal transit time."

32.     Dannon charges 30% to 50% more for Activia because of these claims.

**Dannon's Claims About DanActive**

33.     After at least six years of market research and less than a year following the release of Activia, in January 2007, Dannon launched DanActive nationwide, a "probiotic drink that is clinically proven to help strengthen your body's defense system." DanActive comes in 100 ml "daily dose" bottles.

34.     As with Activia, Dannon promises that DanActive provides "clinically proven" health benefits that other similar products cannot because it contains proprietary probiotic bacteria not found in other food products. In its television commercials, it states: "Only DanActive has *L. casei Immunitas*, and is clinically proven to help strengthen your body's defenses." *L. casei Immunitas* is Dannon's trademarked *Lactobacillus casei* strain DN-114 001. Just as with its use of "Regularis" in Activia, Dannon Latinates "immunity" to imply scientific meaning. A typical commercial states:

> Mother:     Between exams, after school activities, and tons of homework, my kid never stops.
>
> Announcer: Your kids have a hectic life and don't always eat right, and you don't want their defenses to be weak. Delicious DanActive can help strengthen them. ***Only DanActive has L. casei Immunitas cultures and is clinically proven to help strengthen your body's defenses.***
>
> Mother:     And a little strengthening can really help.
>
> Announcer: Help strengthen your family's bodies' defenses.

Another commercial states:

> Announcer: Did you know that lack of sleep may also weaken your body's defenses? Between the stress of working, raising kids and finding time for friends, you don't get enough sleep. And all that can challenge your body's defenses. But you can help strengthen them with DanActive. About 70% of your immune system is in your digestive tract. ***Only DanActive has L. casei Immunitas and is clinically proven to strengthen your body's defenses.*** DanActive, helps strengthen your body's defenses.

35.    In each commercial also appear the written words "clinically proven."

36.    Inside DanActive labels and labeling, Dannon repeats: "Clinically Proven To Help Strengthen Your Body's Defenses."   Dannon further conveys and reinforces this claim by prominently placing on every label the word "IMMUNITY":

 

37.    DanActive labels and labeling also claim: "About 70% of your immune system is in your digestive tract.  This is where DanActive goes to work with the exclusive *L. casei Immunitas*™ cultures."  The labeling for DanActive further states:

**DanActive™ is Clinically Proven to Help
Strengthen Your Body's Defenses.**

**What is DanActive™?**

DanActive™ is a delicious, probiotic dairy drink that is clinically proven to help strengthen your body's defense system.

**How does DanActive™ work?**

DanActive™ goes to work directly in your digestive tract, where about 70% of your immune system is located.

### What makes DanActive™ work?

A key ingredient in DanActive™ is its exclusive *L. casei Immunitas*™ culture.  Each bottle of DanActive™ contains 10 billion *L. casei Immunitas*™ cultures.  These cultures remain active in the digestive tract where they have a positive effect on your digestive tract's immune system.  Evidence from many studies demonstrate that daily consumption of DanActive™ with *L. casei Immunitas*™ helps strengthen your body's defenses.

### What are probiotics?

The word probiotic literally means "for life."  Essentially, a probiotic is a culture that, if eaten in sufficient quantities, gives health benefits beyond basic nutrition.

38.    Dannon claims that DanActive will improve everyone's immune system, including those of young children, older children, adults and seniors. For example, an advertisement on danactive.com represents that DanActive helps the daily lives of the whole family:

- Sam, 6 years old, reports "My mom says DanActive helps our bodies stay alert against challenges."



-12-

- Claire, 12 years old, has a stressful and hectic lifestyle because of homework and chores, but she stays healthy because "DanActive helps me strengthen my body's defenses."



- Rachel, 36 years old, has a mother's typical life of "kids, traffic, work, stress, groceries, home" where "[e]ven eating and sleeping seem to become secondary."  But, she stays fit and healthy because "DanActive helps me keep my balance and my defenses at their best."



- Grandparents Anne and Louis are at a "vulnerable" age and "take DanActive to help strengthen [their] body's natural defenses."



39.     Dannon also represents in its advertising that DanActive is clinically and scientifically proven to benefit students under the stress of exams, build seniors' resistance to infections, and improve the body's "defense response" during periods of "intense exercise." These statements are not adequately supported by the scientific evidence or otherwise substantiated.

40.     Dannon claims that DanActive is for "everybody who wishes to help strengthen his body's defenses." However, there is no adequate support for this claim. In fact, one of Dannon's own studies concluded that DanActive was just like traditional yogurt.

41.     The above stated claims regarding DanActive are not adequately supported by the scientific evidence, are unsubstantiated, false and misleading.

42.     Dannon deceptively claimed and continues to claim "Each bottle of DanActive contains 10 billion *L. casei Immunitas* cultures [and that] these cultures remain active in the digestive tract where they have a positive effect on your digestive tracts immune system." Dannon's own study does not support this claim.

## Dannon's Own Substantiation Demonstrates the Falsity of Its Claims

43.     Dannon's own studies, including those conducted or funded by its parent, Danone Group, do not support Dannon's claims.

44.     According to a June 2006 report on probiotics published by the American Academy of Microbiology – a project which received financial support from Dannon itself – "there is no conclusive evidence that altering the microbiota of a healthy human adult is beneficial." The report, entitled "Probiotic Microbes: The Scientific Basis," was prepared by the American Academy of Microbiology, a leadership group of the American Society of Microbiology, which is the leading professional association of microbiologists.

45.    Dannon deceptively conveys the marketing message that the Yogurt Products have been clinically proven by "many studies" to deliver unique benefits, and by citing to 25 to 30 clinical studies, depending on when the claim was made.  Outside of the context of marketing, Dannon concedes it does not even have this many studies.

46.    A typical example of Dannon's reference to studies occurred on August 30, 2007, when Dannon aired a DanActive television advertisement that ended by stating at the top of the screen, "25 studies of DanActive and Lactobacillus Immunitas" with "Clinically proven" at the lower right.  As with the rest of the subject marketing campaign, Dannon intended to convey the message that its claims have been clinically proven by 25 scientifically reliable studies performed on humans.  Dannon claims that 30 publications substantiate its claims.  Of these 30, two were duplicate studies and one was a review, leaving 27 separate studies.  Less than half of these 27 studies were conducted on people and could possibly be called clinical studies.  (According to the National Institutes of Health, a clinical study is "a type of research study that tests how well new medical approaches work in people.") Ten of the 27 studies were conducted in animals and six were *in vitro*, meaning in neither animal nor human subjects.  Only 11 studies involved people and only four of these looked at whether DanActive could prevent illness.  None of these four studies provided by Dannon show that DanActive prevents illness in healthy adults. *In vitro* and animal testing are the basis for the majority of Dannon's "clinical" studies of DanActive.  This type of testing does not, and cannot, provide an adequate basis for the claims that Dannon makes for the effect of DanActive in people.  According to a report of a Joint FAO/WHO Working Group on Drafting Guidelines for the Evaluation of Probiotics in Food (FAO Food and Nutrition,

2002), *in vitro* tests "are not fully adequate to predict the functionality of probiotic microorganisms in the human body."

47. The fact is "there is no conclusive evidence that altering the microbiota of a healthy human adult is beneficial." *See* "Probiotic Microbes: The Scientific Basis", Report prepared by American Academy of Microbiology.

48. The fact is, there is no current scientific substantiation for the claims made by Dannon regarding the beneficial health effects of the Yogurt Products. *See* Report of a Joint FAO/WHO Working Group on Drafting Guidelines for the Evaluation of Probiotics in Food (FAO Food and Nutrition, 2002): "Probiotics for human use will require substantiation of efficacy with human trials. . . . The principal outcome of efficacy studies on probiotics should be proven in human trials, such as statistically and biologically significant improvement in condition, symptoms, signs, well-being or quality of life; reduced risk of disease or longer time to next occurrence; or faster recovery from illness."

49. Dannon's claims about the benefits of DanActive are not substantiated by its own studies. Despite Dannon's advertisements and websites depicting the benefits of DanActive in healthy children and adults, few of its studies looked at healthy children and adults. The few they did were fatally flawed.

50. Similarly, Dannon's claim that DanActive benefits students under stress is not substantiated by its one study in students. Dannon claims that DanActive "helped to improve the body's production of defense cells in situation of intense intellectual stress during exams periods." In its one study, DanActive had no effect on stress, since stress increased equally in both DanActive consumers and placebo consumers. And this study provides no evidence that the effect of DanActive on key markers was significant enough to matter. The study

did not compare rates between those consuming DanActive and those consuming a placebo.

## Dannon's Marketing Success

51.     Through its marketing campaign, Dannon set out to not merely sell its Yogurt Products, but to sell them at a premium by creating a compelling story about its "probiotic" bacteria.  Dannon's Yogurt Products cost 30% to 50% more than traditional yogurt.  Because of its claims, Dannon was able to, in its own words, "justify" the premium charged for its Yogurt Products over other yogurt products.  Dannon's chief marketing officer explained: "To justify this type of price increase, you have to have a relevant offer and the marketing has to tell the story."   Franck Riboud, Danone Group's Chairman and CEO, echoed these sentiments.   The CEO stated that his goal was to "cannibalize" the regular Dannon yogurt market in exchange for the higher profit margins afforded by the so-called "blockbuster" product, Activia:

> I'm very pleased to organize a cannibalization between a plain yoghurt and Activia.   Please switch all of you from the plain yoghurt to Activia.  I will find [inaudible] solution for the plain yoghurt, but I am making more money on Activia than the plain yoghurt.

52.     Dannon's CEO acknowledged that the success of Activia depended not on the proven benefits of the product, but rather on how effective its advertising proved.  Addressing analysts, he stated:

> The success of Activia is not coming from the product itself.  The probiotic, everybody knows now about probiotic all over the world. The success is coming from the way you launch the product, how do you enrich the product, the marketing . . . .

53.     As one financial analyst wrote in describing the subject advertising campaign: "Like antioxidants, most Americans don't understand what probiotics actually do.  But, it's a great marketing word."  To accomplish this goal – persuading consumers to switch from a less expensive yogurt product – Dannon

had to paint a compelling story that all persons would enjoy the Yogurt Products' added and exclusive health benefits. The story Dannon's marketing tells is more fiction than fact.

54. Dannon spent over $100 million from January 2006 through July 2007 on the subject advertising campaign. As a result of this campaign, the sale of the Yogurt Products skyrocketed. The response from retailers and consumers has exceeded Dannon's expectations. Activia accounted for $128 million of Dannon's $678 million yogurt sales in 2006. That number was expected to reach $300 million by the end of 2007.

55. Dannon's "probiotic" yogurt advertising launch was one of the most successful product launches in recent food-industry history. For example, in the first year, Activia reached sales that less than one-tenth of one percent of all new foods and beverages achieve in their first year in the marketplace. Further, within six months of launch, Activia alone had achieved a remarkable 70% to 80% aided awareness among all consumers, not just Dannon customers.

## CLASS ACTION ALLEGATIONS

56. Pursuant to Rules 23(b) and (c) of the Federal Rules of Civil Procedure, Plaintiff brings this lawsuit on behalf of himself and the proposed plaintiff Class consisting of:

> All persons who purchased in the United States the food products marketed and distributed by Dannon under the brand names of Activia or DanActive, including any variations, formats or line extensions thereof at any time up to the date notice is provided to the Class. Excluded from the Class are Defendant's officers, directors and employees and those who purchased the products for the purpose of resale.

57. The Class comprises hundreds of thousands of consumers throughout the United States and is therefore so numerous that joinder of all members of the Class is impracticable.

58.     There are questions of law and fact common to the Class.   The common questions include:

(a)     are the claims Dannon made and is making regarding the Yogurt Products unfair or deceptive;

(b)     is Dannon making claims that the Yogurt Products have certain performance characteristics, uses or benefits that they do not have;

(c)     is Dannon making claims that the Yogurt Products are of a particular standard, quality and/or grade, when they are not;

(d)     is Dannon supplying Yogurt Products not in accordance with its representations;

(e)     has Dannon engaged in unconscionable acts or practices in connection with a consumer transaction;

(f)     did Dannon know at the time the consumer transactions took place that the consumer would not receive the benefit from the consumer product that Dannon was claiming the consumer would receive;

(g)     did Dannon knowingly make a misleading statement in connection with a consumer transaction that the consumer was likely to rely upon to his detriment;

(h)     did Dannon know or should it have known that the representations and advertisements regarding the Yogurt Products were unsubstantiated, false and misleading;

(i)     whether Dannon engaged in false or misleading advertising;

(j)     did Dannon use deceptive representations in connection with the sale of goods;

(k)     did Dannon's representations cause a likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods;

(l)     did Dannon represent that goods have a certain sponsorship, approval, characteristic, ingredient, use or benefit that they do not have;

(m)     did Dannon represent that goods are of a particular standard, quality or grade when they are of another;

(n)     did Dannon advertise goods with intent not to sell them as advertised;

(o)     did the Plaintiff and the Class members that purchased the Yogurt Products suffer monetary damages and, if so, what is the measure of said damages;

(p)     are the Plaintiff and Class members entitled to an award of punitive damages; and

(q)     are the Plaintiff and Class members entitled to declaratory and injunctive relief.

59.     Plaintiff's claims are typical of the claims of the proposed Class.

60.     Plaintiff will fairly and adequately represent and protect the interests of the proposed Class because, *inter alia*, Plaintiff's interests are not antagonistic to those of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

61.     The questions of law and fact common to the Class members, some of which are set forth above, predominate over any questions affecting only individual Class members.

62.     Adjudicating this matter as a class action is superior to other available methods for adjudication because, *inter alia,* the expense and burden of requiring consumers to individually litigate these claims would make it impracticable or impossible for them to bring their claims.

63.     This matter is manageable as a class action.

64.     Unless a class is certified, Defendant will retain monies received as a result of its conduct that was taken from Plaintiff and proposed Class members.  Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged, and the members of the Class and the general public will continue to be misled.

65.     Dannon's unlawful conduct, including the unlawful acts described herein, and its continuing unlawful acts, are generally applicable to the Class as a whole making final injunctive relief appropriate.

## FIRST CAUSE OF ACTION

### For Violations of Consumers Sales Practice Acts

66.     Plaintiff restates each and every paragraph of this Complaint as if fully set forth herein.

67.     Dannon has a duty pursuant to state consumer fraud acts, including Ohio's Consumer Sales Practice Act, Ohio Revised Code §1345 *et seq.* (the "CSPA"), and substantially similar acts in other states, not to engage in the acts and omissions alleged here.

68.     Dannon violated and continues to violate these acts, including the CSPA, by engaging in the following practices which were intended to result in, and did result in, the sale of the Yogurt Products:

(A)  by "commit[ting] an unfair or deceptive act or practice in connection with a consumer transaction."

(B)(1)   by representing that the Products have "performance characteristics . . . uses, or benefits that [they] do not have."

(B)(2)   by representing that the Products are "of a particular standard, quality, grade, style, prescription . . ." when they are not.

*       *       *

(B)(5)   by representing that the Products are being "supplied in accordance with a previous representation," when they are not.

69. Pursuant to Ohio Administrative Code 109:4-3-10 (A) (Substantiations of Claims in Advertising), "It shall be a deceptive act or practice in connection with a consumer transaction for a supplier to":

> Make any representations, claims, or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true, unless, at the time such representations, claims, or assertions are made, the supplier possesses or relies upon a reasonable basis in fact such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence which substantiates such representations, claims, or assertions of fact.

70. In conjunction with the violations set forth above, Dannon violated Ohio Adm. Code §109:4-3-10 because it cannot and has not substantiated the advertising claims made in connection with the promotion of the Yogurt Products.

71. Dannon further violated and continues to violate the CSPA and similar state laws by engaging in the following practices:

> (A) because Dannon has engaged and is engaging in "an unconscionable act or practice in connection with a consumer transaction";

> \*       \*       \*

> (B)(3) because Dannon "knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;"

> \*       \*       \*

> (B)(6) because Dannon "knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment;"

72. Dannon violated the CSPA, the similar state laws and the Ohio Administrative Code by representing through its advertisements the Yogurt Products as described above when it knew, or should have known, that the representations and advertisements were unsubstantiated, false and misleading.

73. Pursuant to the CSPA and the similar state laws, Plaintiff and the Class are entitled to rescind the consumer transactions, recover damages or other appropriate relief under Rule 23 of the Federal Rules of Civil Procedure.

74. The deceptive and unconscionable acts complained of herein have been previously declared to be deceptive or unconscionable and made available for public inspection including, but not limited to the Complaint and Judgment Entry attached as Exhibit 1, captioned *William J. Brown v. Richard M. Hartman*, Case No. 81-CV-1587, Court of Common Pleas, Mahoning County, Ohio, which is available for public inspection by the Attorney General of Ohio ("Hartman").

75. The Hartman Complaint alleged violations of the CSPA and Ohio Adm. Code 109:4-3-01 *et seq.*, because the defendant therein: misrepresented the quality, grade or standard of the dairy product offered for sale to Ohio consumers in violation of Ohio Revised Code §1345.02(B); committed unconscionable acts and practices in connection with the sale of a dairy product in violation of Ohio Revised Code §1345.03(A); knowingly made a misleading statement concerning the dairy produce on which consumers rely to their detriment and in violation of Ohio Revised Code §1345.03(B)(6). The Hartman Complaint sought a permanent injunction preventing the defendant from continuing to engage in the deceptive and unconscionable conduct in connection with the advertising of its dairy product and to make restitution to consumers who purchased the food product.

76. In Hartman, a Consent Judgment Entry was entered that permanently enjoined the dairy supplier from: misrepresenting the quality, grade or standard of all food products offered for sale to consumers; knowingly making misleading statements or opinions concerning the sale of food products; misrepresenting the uses of food products; and, placing advertisements which do not include accurate descriptions of food products being offered for sale to Ohio

consumers. In addition, the defendant in Hartman was required to make full restitution.

77. Accordingly, Dannon had notice that in connection with the sale of food products in Ohio, it is a deceptive and unconscionable act or practice to make misrepresentations regarding the quality of a food product, making misleading statements of opinion concerning a food product, misrepresenting the uses of a food product, and/or placing inaccurate advertisements regarding the description of food products being offered for sale. Dannon was further placed on notice that if it did engage in such deceptive acts, it would be required to make *full restitution* and reimburse the purchase price to Ohio consumers that purchased the food product.

78. In addition to §1345 *et seq.* of the Ohio Revised Code and the Ohio Administrative Code §109-4-3 *et seq.*, Ohio Revised Code §917.11 requires all dairy products, such as the Yogurt Products, to be labeled and branded as required by Ohio Revised Code §917 *et seq.*, and Ohio Revised Code §3715 *et seq.*

79. Specifically, Ohio Revised Code §917.05 prohibits the sale of a dairy product that is misbranded as described in Ohio Revised Code §3715.60.

80. Ohio Revised Code §3715.60 states that a food is misbranded if its label is false and misleading in any particular.

81. Ohio Revised Code §3715.52 prohibits the following acts or causing the following acts: the sale of any food that is misbranded; and, the misbranding of any food, the dissemination of any false advertisement, which is defined in Ohio Revised Code §3715.68 as an advertisement of food that is false or misleading in any manner.

82. Ohio Revised Code §§917.05, 3715.52, 3715.60 and 3715.68, all provided further notice to Dannon that mislabeling, misbranding, disseminating

false advertising in connection with the same of a food and/or dairy product was and is a violation of Ohio law.

83.     Pursuant to Ohio Revised Code §1345.09(D), Plaintiff and the Class seek an order enjoining the above-described wrongful acts and practices of the Defendant and for restitution and disgorgement.

84.     Pursuant to Section 1345.09(D), this Complaint will be served upon the Ohio Attorney General.

85.     Plaintiff and the Class reserve the right to allege further violations of Ohio's CSPA as Dannon's conduct is ongoing.

## SECOND CAUSE OF ACTION

### For Violations of Deceptive Trade Practices Acts

86.     Plaintiff restates each and every paragraph of this Complaint as if fully rewritten here in.

87.     Dannon has a duty pursuant to state deceptive trade practices acts, including Ohio's Deceptive Trade Practices Act, not to engage in unfair, false, misleading or deceptive acts and practices and untrue or misleading advertising.

88.     For the reasons discussed above, Dannon has engaged in unfair, deceptive, untrue acts and practices and misleading advertising in violation of state deceptive trade practices acts, including Ohio's Deceptive Trade Practices Act §4165.02 because Dannon:

(A)(2)  "Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods . . . ."

*        *        *

(A)(4)      "Uses  [and  has  used  in  the  past]  deceptive representations . . . in connection with goods . . . .;

*        *        *

(A)(7)  "Represents that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits…that they do not have . . . .;

*    *    *

(A)(9)  "Represents that goods . . . are of a particular standard, quality, or grade" and "they are of another";

*    *    *

(A)(11)  "Advertises goods . . . with intent not to sell them as advertised."

89.    Plaintiff and the Class reserve the right to allege other violations of the law under the deceptive trade practices acts as Dannon's conduct is ongoing.

90.    Dannon's conduct caused and continues to cause substantial injury to Plaintiff and the other Class members.  Plaintiff has suffered injury in fact and has lost money as a result of Dannon's deceptive conduct.

91.    Plaintiff and the Class seek equitable relief and to enjoin Dannon on the terms that the Court considers reasonable.

<h3 align="center">THIRD CAUSE OF ACTION</h3>

<strong>Breach of Express Warranty On Behalf of<br>Plaintiff and the Class</strong>

92.    Plaintiff restates each and every paragraph of this Complaint as if fully rewritten herein.

93.    Dannon, by affirmation of fact and/or promises set forth in its promotions, advertisements and/or labeling created an express warranty that the Yogurt Products would conform to the affirmation and/or promises.

94.    The affirmation of fact and/or promises related to the health benefits of the Yogurt Products are express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Class and Dannon.

95.    Plaintiff and the Class members performed all conditions precedent under the contract between the parties.

-26-

96.    Dannon breached the terms of the contract between the parties including the express warranties related to the health benefits of the Yogurt Products with Plaintiff and the Class by not providing the Yogurt Products in a manner that conforms to the affirmations and/or promises.

97.    Dannon's breach of this contract has directly and proximately caused the Plaintiff and the Class to suffer damages in the amount of the purchase price and the Yogurt Products.

### PRAYER FOR RELIEF

Wherefore, the representative Plaintiff, on behalf of himself and the members of the putative Class, prays for judgment against the Defendant as follows:

A.    For an order certifying this action and/or common issues raised herein as a Class Action under the appropriate provision of Federal Rule of Civil Procedure 23(a), 23(b) and 23(c); designating Class Representatives; and appointing the undersigned to serve as Class counsel;

B.    For notice of class certification and of any relief to be disseminated to all Class members and for such other further notices as this Court deems appropriated under Federal Rule of Civil Procedure 23(d)(2);

C.    For an order requiring complete and immediate disclosure of all studies, reports, analyses, data, compilations, and other similar information within the possession, custody, or control of Defendant concerning, relating to, or involving the purported health benefits of the Yogurt Products;

D.    For an order barring Defendant from destroying or removing any computer or similar records which record evidence related to the purported health benefits of the Yogurt Products;

E.      For an order barring Defendant from attempting, on its own or through its agents, to induce any putative Class member to sign any document which in any way releases any of the claims of any putative Class member;

F.      For an award of compensatory damages in the amount to be determined for all injuries and damages described herein;

G.      For an award of punitive damages to the extent allowable by law, in an amount to be proven at trial;

H.      Awarding restitution and disgorgement of Dannon's revenues to the Plaintiff and the proposed Class members;

I.      Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and pay them, restitution and disgorgement of all monies acquired by Defendant by means of any act or practice declared by the Court to be wrongful;

J.      Ordering Dannon to engage in a corrective advertising campaign;

K.      Awarding attorneys' fees and costs; and

L.      Providing such other relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  May 5, 2010              BLOOD HURST & O'REARDON, LLP.
                                 TIMOTHY G. BLOOD
                                 LESLIE E. HURST
                                 THOMAS J. O'REARDON II


                                 _____
                                     s/ Timothy G. Blood
                                 TIMOTHY G. BLOOD

-28-

600 B Street, Suite 1550
San Diego, CA 92101
Telephone: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
leslieh@bholaw.com
toreardon@bholaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
JONATHAN M. STEIN
CULLIN A. O'BRIEN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jstein@rgrdlaw.com
cobrien@rgrdlaw.com

CLIMACO, WILCOX, PECA,
 TARANTINO & GAROFOLI CO., L.P.A.
JOHN R. CLIMACO
SCOTT D. SIMPKINS
DAVID M. CUPPAGE
55 Public Square, Suite 1950
Cleveland, OH 44113
Telephone: 216/621-8484
216/771-1632 (fax)
jrclim@climacolaw.com
sdsimp@climacolaw.com
dmcupp@climaolaw.com

FRANK PISCITELLI CO., LPA
FRANK PISCITELLI (0062128)
55 Public Square, Suite 1950
Cleveland, OH 44113
Telephone: 216/931-7000
216/931-9925 (fax)
frank@piscitellilaw.com

SCOTT KALISH CO., L.L.C.
D. SCOTT KALISH
1468 West 9th Street, Suite 405
Cleveland, OH 44113
Telephone: 216/502-0570
scottkalishcollc@cs.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
JOHN J. STOIA, JR.
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jstoia@rgrdlaw.com

SHEPHERD FINKELMAN MILLER
 & SHAH, LLP
JAYNE A. GOLDSTEIN
1640 Town Center Circle, Suite 216
Weston, FL  33326
Telephone:  954/515-0123
954/515-0124 (fax)
jgoldstein@sfmslaw.com

GILMAN AND PASTOR, LLP
DAVID PASTOR
63 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Telephone:  617/742-9700
617/742-9701 (fax)
dpastor@gilmanpastor.com

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO
PAMELA GILBERT
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)
jonc@cuneolaw.com
pamelag@cuneolaw.com

Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CF/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 5, 2010.

/s/Timothy G. Blood

TIMOTHY G. BLOOD

BLOOD HURST & O'REARDON, LLP
600 B Street, Suite 1550
San Diego, CA 92101
Telephone: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com