UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JAMES GEMELAS, et al., ) | Case No. 1:08-cv-00236 |
|     Plaintiffs, ) | |
| vs. ) | <u>CLASS ACTION</u> |
| THE DANNON COMPANY, INC., ) | |
| Defendant. ) | Judge Dan Aaron Polster |

<u>OBJECTION TO CLASS ACTION SETTLEMENT
AND REQUEST FOR ATTORNEYS' FEES, AND
NOTICE OF INTENT TO APPEAR</u>

Class members Robert Falkner, Wanda Cochran, Grace M. Cannata, Danette Loeffler, Michelle Ritchey, William (Buck) Price, Brad Henry and Sheila Lodwick[1] ("Objectors") hereby object to the proposed class action settlement and request for attorneys' fees. Objectors purchased Activia, Activia Light, DanActive and DanActive Light products during the class period.

I.     <u>NOTICE OF INTENT TO APPEAR</u>

Objectors hereby give notice that they intend to appear and argue at the fairness hearing scheduled for June 23, 2010 at 12:00 p.m. in the United States District Court for the Northern District of Ohio.

II.     <u>THE PROPOSED SETTLEMENT DOES NOT CREATE A
COMMON FUND</u>

The Notice states that a $35 million "fund" is being created to pay the claims of

---

[1] Robert Falkner resides at 20826 Almar Rd. Shaker Heights, Ohio 44122; Sheila Lodwick resides at 13113 Spring Blossom Trail, Chesterland Ohio 44026; Wanda Cochran resides at 1044 Alta Vista Road, Louisville Kentucky 40205; Grace M Cannata resides at 23200 Bryden Rd. Beachwood Ohio 44122; Danette Loeffler resides at 15807 Valleyview Ave. Cleveland Ohio 44135; Michelle Ritchey lives at 4932 SW 19th St., Gainesville Florida 32608; Brad Henry resides at 6343 Spokane Ave, Chicago Ill. 60646, and William (Buck) Price resides at 4017 SW 28th Terrace Gainesville, Florida 32608.

1

class members in amounts between $15 and $100. Furthermore, the Notice advises of an additional $10 million cash fund that will be available if the claims filed exceed the $35 million amount. In fact, the use of the words "settlement fund" is not justified for either of these amounts, as the settlement does nothing more than require Defendant to give security for any and all claims submitted by members of the class in amounts between $15 to $100. If the claims rate in this case holds true to the historical average noted by numerous Federal courts, the amount paid to members of the class will be much less than either $45 million or $35 million in cash. See Sylvester v. CIGNA Corp., 39 F.Supp.2d 34, 52 (D. Me. 2005):

> Unfortunately, when this matter first came before the Court for preliminary approval in July, 2004, the Court was not independently aware (nor did any proponent of the settlement bring to the Court's attention) what the parties and the settlement administrator already knew – namely, that the 'claims made' settlements regularly yield response rates of 10% or less.

There is nothing in the facts of this case that would indicate that the claims rate is going to be significantly higher than the historical average. This means that the amount of cash that will be claimed and paid to class members is certainly unknown at this time, and may well be much less than $35 million; indeed, the amount claimed may be **less than** the $10 million in attorneys' fees to be requested.

The $45 million in potential cash is clearly not a "fund" for the following reasons:

1. The last $10 million of said "fund" will never be paid unless claims exceed $35 million (which in all likelihood they will not).

2. As to the $35 million "fund", no monies will ever be paid except those that are actually claimed through written claim forms received from class members. As to this "cash fund", any unclaimed amount of the **cash** will revert back to the Defendant. The charitable donations are not cash (but likely unused product of the Defendant), and they are not being paid to the class members.

2

>If it were truly a cash fund, the entire $35 million would be distributed among the class members who filed claims.

The settlement could, and should, be amended to provide some minimum guaranteed payment, or "floor", that the Defendant will have to pay regardless of the claims rate. If the claims submitted do not reach the floor, then the difference between the amounts claimed and the amount of the floor can be distributed in cash *pro rata* to those who have filed claims; or, that amount of **cash** could be distributed to appropriate charities in the form of a *cy pres*, as was done in the case of Moulton v. U.S. Steel Corp., 581 F.3d 344 (6th Cir. 2009). Objectors suggest that this floor be set at the amount of at least $25 million. This would cause the Defendant to make a known payment amount (actual payment in cash) in consideration for release of the class' claims; it would also constitute an actual cash fund out of which a percentage attorney fee could be awarded.

### III. IF THE PERCENTAGE OF FUND METHOD IS UTILIZED BY THIS COURT, ATTORNEYS' FEES SHOULD NOT EXCEED 25% OF THE AMOUNT ACTUALY RECEIVED BY THE CLASS.

This is a "claims made" settlement, so the only "fund" that can result is the amount of cash that is actually paid to class members who file claims. Federal courts have generally followed the Federal Judicial Center guidelines and endeavored to accurately value claims-made settlements when awarding attorneys' fees. They do not simply use the amount made available to the class when calculating a percentage attorneys' fee, but they wait for the claims to come in and calculate the fee based upon the amount actually paid out to the class members. See e.g., In re Compact Disc Minimum Advertised Price Litig., 370 F.Supp.2d 320 (D. Me. 2005)(awarding attorneys' fees of 3% of value of redeemed coupons which was 30% of claimed lodestar).

3

> Recognizing that percentage of funds is the preferred method of assessing fees in a settlement like this, with lodestar analysis providing only a check, I can effectively gauge appropriate attorney fees only if I know the total value of the settlement. But although I am satisfied that the coupon settlement has value to the class, I am not confident of the redemption rate that has been projected and thus of the settlement's total value. Therefore, I have determined to delay awarded of attorney fees until experience shows how many vouchers are exercised and thus how valuable the settlement really is.

In re Compact disc Minimum Advertised Price Antitrust Litig., 292 F. Supp.2d 184 189-90 (D. Me. 2003) (Hornby, D.J.).

The procedure urged by class counsel has been universally rejected by federal courts, and was termed a "fiction" and "pure fantasy" by the Northern District of California. In Yeagley v. Wells Fargo & Co., 2008 U.S. Dist. LEXIS 5040 (N.D. al. 2008), the court confronted the task of valuing a settlement for the purpose of awarding attorneys' fees:

> Class counsel contend that the Court must consider the amount Wells Fargo could have paid under the settlement in determining the common fund for the purpose of attorney's fees. They argue that under the Ninth Circuit's decision in Williams v. MGM-Pathe Communications Co., 129 F.3d 1026 (9th Cir. 1997), the court must find that since 3.8 million class members could have made a claim for a free tri-merged credit report, the value of the recovery, that is, the common fund, is at least $114 million … Williams does not require this court to adopt the fiction that the settlement is worth $114 million … Williams, in contrast, was a settlement of a securities-fraud class action for $4.5 million in cash …
>
> Class counsel's $114 million figure is pure fantasy. Counsel does not offer a shred of evidence that suggests that the parties reasonably believed that Wells Fargo would actually pay anything near that

4

> amount, and the Court finds that they did not … To award class counsel the same fee regardless of the claim participation rate, that is, regardless of the enthusiasm of the class for the benefits purportedly negotiated on their behalf, would reduce the incentive in future cases for class counsel to create a settlement which actually addresses the

> needs of the class.  In this case, for example, the one percent claim
> rate demonstrates that the brochure did not effectively educate the
> claim members about the importance of credit reports and monitoring
> their credit … Common sense dictates that a reasonable fee in a class
> action settlement is a fee that takes into account the actual results
> obtained.

Id. at *20-28.  The court in Yeagley went on to award class counsel a fee of $325,000, or 25% of the value of claimed settlement benefits plus attorneys' fees, a figure that was Approximately one-third of class counsel's claimed lodestar.   See also Managing Class Action Litigation: A Pocket Guide for Judges, Federal Judicial Center 2005.

The Supreme Court in Boeing Co. v. Van Gemert, 444 U.S. 472 (1980), distinguished its holding in that case from settlements like the one currently before this Court.

> The District Court explicitly ordered that "plaintiffs in behalf of
> all members of the plaintiff class … shall recover as their damages
> herein from the defendants the principal sum of $3,289,359 together
> with interest …" **Nothing in the court's order made Boeing's
> liability for this amount contingent upon the presentation of
> individual claims.**  Thus, we need not decide whether a class-
> action judgment that simply requires the defendant to give
> security against all potential claims would support a recovery
> of attorneys' fees under the common-fund doctrine.

Boeing, 444 U.S. at 479 n. 5 (emphasis added).

This settlement is identical to the one the Supreme Court expressly exempted from its holding in footnote 5 in Boeing.  Here, Defendant has agreed to give security against claims filed by class members, up to a maximum of $45 million, but experience shows that much less than that is likely to be claimed.

The Sixth Circuit has refused to calculate attorneys' fees on a percentage of the final methodology where no true common fund is created.  See Geier v. Sundquist, 372 F.3d 784, 789 (6th cir. 2004).  Where a court is purporting to award attorneys' fees under

5

a common fund method, the first inquiry is whether a common fund has been created, and whether attorneys' fees will be taken from that fund.  Geier, 372 F.3 at 790.  In this case, the answer to both of those questions is no.

This case is clearly distinguishable from cases in which any remainder of unclaimed **cash** is paid to a *cy pres* recipient, in **cash**, with the result that no amount of the settlement **cash** reverts to the defendant.  See, e.g., Moulton v. U.S. Steel Corp., supra (unclaimed settlement funds paid to public schools).  Here, any amount of the **cash** that is not paid to the class through the claims process will revert back into the pocket of Defendant.

Ideally, the Court should defer ruling on class counsel's attorneys' fees until the claims deadline, or October 1, 2010.  This delay of approximately 3 ½ months after the fairness hearing will be well worth the wait, as it will permit the Court to make an accurate fee award based upon the amount that the class actually receives, rather than the fiction of the "ceiling" agreed to by Defendant, and will insure that class counsel's fee is no more than a reasonable 25% of the total amount paid out by Defendant.

6

**IV.    ANY FEE AWARDED PRIOR TO KNOWING THE SIZE OF THE "FUND" PAID TO THE CLASS MUST BE LIMITED TO A LODESTAR CALCULATION.**

As there is no "settlement fund" that can be accurately quantified prior to knowing the claims data, any fee awarded at this time should be limited to a lodestar calculation.  And based on the very recent United States Supreme Court case, Perdue v. Kenny A. ex rel. Winn, --- U.S. ---, 2010 WL 1558980, at *8 (April 21, 2010), the Court should be reluctant to award any multiplier of the lodestar unless a judgment is made that

the hourly rates applied are inadequate.  Although this recent decision related to a statutory fee award under 42 U.S.C. §1988, <u>Perdue</u> has been interpreted and applied more generally to apply to a class action settlement of this type.  In fact, in this very district, <u>Perdue</u> has been applied by U.S. District Court Judge James Gwin to apply to a "claims made" settlement similar to this case:

> As the Supreme Court has recently cautioned, however, courts should hesitate to employ a multiplier, especially when the factors supporting a multiplier have already been considered in the underlying lodestar calculation.  <u>Perdue v. Kenny A. ex rel. Winn</u>, --- U.s. ---, 2010 WL 1558980, at *8 (April 21, 2010).  Although decided in the context of statutory fee shifting under 42 U.S.C. Section 1988, <u>Perdue</u> nevertheless provides persuasive caution that multipliers must be reserved for 'rare' and 'exceptional' circumstances.  <u>Id.</u>  Although this Court does not read <u>Perdue</u> to prohibit the use of multipliers in class actions, the case does suggest that enhancements are atypical and should not duplicate the same considerations affecting the lodestar rate.
>
> <u>Shannon Van Horn et al. v. Nationwide Property & Casualty Ins. Co., et al.</u>, Case No. 1:08-605 (N.D. Ohio, 2010), Docket No. 308, p. 10.

In that case, which was a claims-made class action settlement, Judge Gwin awarded a lodestar multiplier of approximately 1.2.  Any multiplier awarded in this case should not exceed 1.2.

7

**V.    THE TERMS OF THE PROPOSED SETTLEMENT ARE INADEQUATE AND WORTH MUCH LESS THAN REPRESENTED IN THE NOTICE**.

The proposed settlement is inadequate and misleading for the following reasons:

A.    The class consists of **past** purchasers who have either overpaid for the product, or been falsely induced to purchase the product in the first place.  Those class members have been financially damaged, and have a clear claim for money damages.

The prospective (injunctive) relief will in no way compensate for those damages.  The prospective relief benefits only an unknown class of future purchasers.  Given that the health claims as to "immunity" etc. are now called into question, it is possible, if not likely, that many of the class members will no longer purchase these products.  Therefore, this prospective relief should not be included in any calculation of benefits being provided to the actual settlement class.

  B. The injunctive relief itself is inadequate, as it is limited to only three years.  Given the important nature of these allegations, why should the Defendant be released from these obligations after some artificial, three-year period of time?  The injunctions should be permanent.

  C. As virtually no one keeps their grocery receipts for items like yogurt, there will be very few, if any, $100 claims.  In effect, the maximum claim will be $30.  Even for that $30, you must file a claim form and swear to the truthfulness thereof.  Accordingly, nowhere near $35 million is going to be claimed from this "fund".  Of course, the $35 million is not a "settlement fund" at all; it is only a guarantee to pay claims up to that amount.

  D. The "extra" $10 million will likely never be paid, because the claims will likely not exceed $35 million.

  E. Presuming that the charitable donations will be valued at the retail price, these donations will be worth much less than the cash they are replacing.  The Complaint in this case seems to indicate a mark-up in the 30%-40% range and, in fact, the "cost of production" will be even less than that.  In addition, money donated to a charity can be used for more efficiently and for more benefit (because of its liquidity) than donation of a

8

physical product like yogurt. Objectors suggest that any charity would be more interested in receiving 25 cents on the dollar in cash as compared to 100 cents at retail price for perishable yogurt. In fact, it is highly doubtful if a charity could sell the donated yogurt for 25 cents on the dollar. Accordingly, the charitable donations, which do not even go to the class members, are worth no more than 25% of the cash payments that it replaces. In other words, if $20 million in physical product is donated to charities, that product represents an equivalent cash value of no more than $5 million.

### VI. RESERVATION OF RIGHT TO SUPPLEMENT OBJECTIONS.

As the fee petition has not even been filed as of the objection deadline, objectors reserve the right to supplement these Objections as to attorneys' fees until such time as the Motion for Fees is filed.

WHEREFORE, the Objectors request the following relief from the Court:

A. That the Court sustain each and every of these Objections;

B. That the Court wait to award attorneys' fees until such time as

the Court can be told what amount was actually paid in cash to the class; or that the Court award attorneys' fees based only on the lodestar method, and not the percentage of fund method;

C. That the Court apply no multiple to the lodestar submitted by class counsel;

D. That the Court require a minimum cash payment of $25 million to the class;

E. That the three-year injunction be made permanent; and

9

    F.   That any donations of yogurt product to charities be valued at no more than 25% of the cash value they are replacing.

                                        Respectfully submitted,

                                        /s/ Edward F. Siegel
                                      Edward F. Siegel (Ohio Bar 0012912)
                                      27600 Chagrin Blvd., Suite 340
                                      Cleveland OH 44122
                                      (216) 831-3424
                                      (216) 831-6584 fax
                                      efsiegel@efs-law.com

                                      EDWARD W. COCHRAN (0032942)
                                      20030 Marchmont Road
                                      Shaker Heights, Ohio   44122
                                      216.751.5546 Voice
                                      216.751.6630 Fax
                                      edwardcochran@wowway.com

                                      Sam P. Cannata
                                      9555 Vista Way Ste. 200
                                      Garfield Hts., Ohio 44125
                                      Voice:         (216)   587-0900
                                      E-mail:scannata@snider-cannata.com


                                      Attorneys for Objectors Robert Falkner,
                                      Wanda Cochran, Danette Loeffler, Grace M.
                                      Cannata, Michelle Ritchey, William (Buck)
                                      Price, Brad Henry and Sheila Lodwick


**CERTIFICATE OF SERVICE**

       I certify that a copy of the foregoing was filed with the Court's electronic system on this 24th day of May, 2010 and was by such system filed on all other counsel of record.

                                  By:  /s/ Edward F. Siegel