# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| JAMES GEMELAS, On Behalf of Himself and All Others Similarly Situated,<br><br>       Plaintiff,<br><br>  vs.<br><br>THE DANNON COMPANY, INC.,<br><br>       Defendant. | No. 1:08-cv-00236<br><br>CLASS ACTION<br><br>Judge Dan Aaron Polster |

DECLARATION OF TIMOTHY G. BLOOD IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT, FOR ATTORNEYS' FEES AND EXPENSES, AND RESPONSE TO OBJECTIONS

BLOOD HURST & O'REARDON LLP
TIMOTHY G. BLOOD
LESLIE E. HURST
THOMAS J. O'REARDON II
600 B Street, Suite 1550
San Diego, CA  92101
Telephone:  619/338-1100
619/338-1101 (fax)
THE PISCITELLI LAW FIRM
FRANK PISCITELLI
55 Public Square, Suite 1950
Cleveland, OH  44113
Telephone:  216/931-7000
216/931-9925 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JONATHAN M. STEIN
CULLIN A. O'BRIEN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
CLIMACO, WILCOX, PECA, TARANTINO
  & GAROFOLI CO., L.P.A.
JOHN R. CLIMACO
SCOTT D. SIMPKINS
DAVID M. CUPPAGE
PATRICK G. WARNER
55 Public Square, Suite 1950
Cleveland, OH  44113
Telephone:  216/621-8484
216/771-1632 (fax)

I, TIMOTHY G. BLOOD, declare as follows:

1.     I am the managing partner of the law firm of Blood Hurst & O'Reardon, LLP.  My firm serves as one of Class Counsel for the Plaintiff in the above-captioned Litigation and the plaintiffs in the related actions.[1]  I have personal knowledge of the matters set forth, and if called as a witness, would be competent to testify to them.

## I.     INTRODUCTION

2.     I have acted as lead counsel in the Dannon Lawsuits since before the first action was filed on January 23, 2008 to the present.  Until December 31, 2009, I was a partner with the law firm currently known as Robbins Geller Rudman & Dowd, LLP, and continued my representation of the plaintiffs in the Dannon Lawsuits after I started my current firm.

3.     After a very active and contentious litigation with extensive discovery and motion practice, on January 23, 2009, the Parties executed a Memorandum of Understanding ("MOU") memorializing an agreement to resolve the Dannon Lawsuits.  The Settlement obligates Defendant to establish a $35 million Settlement Fund, which under certain conditions can increase to $45 million, and imposes injunctive requirements aimed at correcting the challenged advertisements.

4.     The Dannon Lawsuits were wrought with litigation risks for plaintiffs.  Dannon is a large, well-capitalized company owned by a large, multinational company, Groupe Danone.  The action challenged two important products to Groupe Danone and Dannon, and involved issues of complex microbiology, the human immune system and the human digestive system.  It also involved marketing and advertising issues arising from an extremely sophisticated marketing company,

---

[1]     All capitalized terms not defined herein shall have the same meanings set forth in the Amended Stipulation of Settlement, filed January 20, 2010 ("Stipulation" or "Settlement") (Docket Entry ("D.E.") No. 42) and the Stipulation of Amendment to Settlement and Order, entered May 24, 2010 (D.E. No. 56).

Dannon.  Further, numerous complex legal issues exist, including complex choice-of-law issues, class certification issues and many issues concerning substantive consumer protection and false advertising laws, many of which are not well developed in many states.  Further, Defendant is not merely a well-funded subsidiary of a multi-national corporation, but they collectively employ in house, or pay for teams of scientists and experts from some of the most prestigious universities in the nation for the very purpose of attempting to substantiate the scientific and medical claims at issue. Although Plaintiff believes there is no substantiation for Defendant's marketing claims, Defendant intended to proffer numerous experts from universities such as Johns Hopkins and Georgetown to testify in front of a jury regarding the scientific research concerning *inter alia*, lactobacillus and bifidobacterium bacterial strains, and their effects in the digestive tract and gut mucosa.  Defendant also vigorously argued in opposition to plaintiff's class certification motion in *Wiener* that the Products have non-uniform messages, that consumers purchase the Products for a variety of reasons unrelated to the challenged health benefits claims, and therefore a lack of consumer reliance on the advertising statements at issue precluded certification.   In support, Defendant offered expert testimony and the results of market research undertaken solely for the purpose of defeating the Dannon Lawsuits.

5.     Plaintiffs' Counsel were in an excellent position to fully evaluate both the strengths and weaknesses of their claims because they investigated and researched the allegations in the Dannon Lawsuits, briefed certification and discovery motions, reviewed approximately 943,214 pages of documents produced by Defendant and more than 28,024 pages of electronically stored information ("ESI") from subpoenaed third parties, conducted extensive investigation and analysis of facts, law and damages, retained and worked extensively with numerous experts in the fields of accounting, marketing, science, and medicine, met with the Federal Trade Commission, and worked with scientists studying similar claims in Europe.

- 2 -

6.     The proposed Settlement is a direct result of the highly skilled and innovative efforts of Class Counsel with the assistance of Plaintiffs' Counsel on behalf of Plaintiff and the Class.

## II.     HISTORY OF THE LITIGATION

### A.     History of Proceedings

#### 1.     Initial Investigations and Filings

7.     Beginning in May 2007 – more than eight months before the first Dannon Lawsuit was filed – I, my partner Thomas J. O'Reardon II, my former partner Jonathan M. Stein, and Jayne Goldstein began investigating the potential claims related to Defendant's false and deceptive marketing and advertising.  We conducted an extensive investigation, which included gathering commercials and other marketing materials and reviewing substantial scientific literature and consulting experts.  We conducted interviews with experts in the relevant scientific field and researched Defendant's marketing practices and the then-emerging probiotic food marketing trend. We held in-person, full day meetings with co-counsel from across the country, and worked with third party organizations investigating the claims at issue.

8.     On January 23, 2008, the first of the Dannon Lawsuits – *Wiener v. The Dannon Company, Inc.*, No. CV08-00415 (C.D. Cal.) – was filed in the United States District Court for the Central District of California.  The *Wiener* complaint was the result of several months of drafting, consultation with experts, and significant research into Defendant's marketing and advertising, and the purported scientific substantiation behind the claims at issue.

9.     On January 29, 2008, Plaintiff James Gemelas filed this Litigation against Defendant in this Court.  The *Gemelas* complaint was filed by Class Counsel from Piscitelli Law Firm and Climaco, Lefkowitz, Peca, Tarantino, & Garofoli Co., LPA, as well as Plaintiffs' Counsel at Scott Kalish Co., LLC.  As in *Wiener*, Plaintiff alleged that statements Defendant made in its marketing

- 3 -

and advertising materials about the purported health benefits of Activia, Activia Light, DanActive, and DanActive Light were deceptive.

10.     Shortly after *Gemelas* was filed, I contacted *Gemelas*' counsel to discuss working together in these actions to efficiently and effectively prosecute our claims.

11.     Between January 2008 and January 2009, Plaintiffs' Counsel, filed five additional similar class actions in various United States District Courts: *Bednarz v. The Dannon Company, Inc.*, No. 09-cv-00077 (D. Conn. Jan. 20, 2009); *Horne, et al. v. The Dannon Company, Inc.*, No. 09-CV-0011 (E.D. Ark. Jan. 9, 2009); *Knafla v. The Dannon Company, Inc.*, No. 08-cv-04940 (D. Minn. Aug. 15, 2008); *Park, et al. v. The Dannon Company, Inc.*, No. 08-81147-CIV (S.D. Fla. Oct. 8, 2008); and *Wegrzyniak v. The Dannon Company, Inc.*, No. 08-cv-05992 (D.N.J. Dec. 8, 2008).

12.     On April 18, 2008, Defendant filed its Motion to Dismiss for *Forum Non Conveniens*, Or, in the Alternative, Motion to Transfer Venue Pursuant to 28 U.S.C. §1404, or in the Alternative, Motion to Stay in *Gemelas* (the "Motion to Transfer *Gemelas*").  In the Motion to Transfer *Gemelas*, Defendant moved this Court to transfer this Litigation to the Central District of California where *Wiener* was being litigated, or, in the alternative, to stay this Litigation pending resolution of *Wiener*. On June 13, 2008, this Court granted the Motion to Transfer *Gemelas*, transferring this Litigation to the Central District of California.  On September 25, 2008, the Honorable S. James Otero granted Plaintiff's motion transferring the case back to this Court.  On March 6, 2009, the Court stayed this Litigation and on September 18, 2009, reopened it pursuant to the Parties' joint motion to lift stay and consent to file an amended complaint.

### 2.     Discovery Propounded on Defendant

13.     Both parties engaged in extensive discovery.  On May 23, 2008, just four days after the Federal Rules of Civil Procedure Rule 16 Conference in *Wiener*, my office served Defendant with Plaintiff's First Request for Production of Documents, Plaintiff's First Set of Requests for

- 4 -

Admissions, and Plaintiff's First Set of Special Interrogatories (collectively "Plaintiff's First Set of Discovery Requests").   On December 5, 2008, we served Plaintiff's Second Set of Special Interrogatories.

14.     Beginning on June 4, 2008, and in advance of Defendant's deadline to formally respond to Plaintiff's First Set of Discovery Requests, the Parties conducted the first of many meet and confers regarding the same.  During the meet and confers, the Parties prioritized the subject matters for production, and negotiated appropriate keywords, search terms, and custodians for the production of ESI.

15.     As explained in detail below, as the result of near daily meet and confers between the Parties, repeated motion to compel briefing, and numerous in-person and telephonic hearings with Magistrate Judge Alicia G. Rosenberg, Defendant produced nearly 1 million pages of documents. Numerous third-parties produced nearly 30,000 pages of documents in response to subpoenas *duces tecum* and Freedom of Information Act ("FOIA") requests.

### a.      Document Coding Team

16.     In order to properly review and analyze Defendant's enormous document production under the deadlines of the pretrial schedule, Plaintiffs' Counsel organized a huge team of attorneys to work around the clock, seven days a week.  Over a period of a month, along with Mr. O'Reardon, I hired and directed a team of over 40 attorneys to work full time reviewing Defendant's documents. In addition to periodic presentations to the attorney review team, we created and circulated issue outlines, casts of characters, timelines, and case summaries to help ensure that the attorney reviewers could spot all relevant issues in Defendant's documents.

17.     A thorough and exacting process was used to carefully examine and organize all of these documents.  Upon receipt, summary memoranda were generated based on an initial review of the documents (as they were produced) to identify important and useful information.  The documents

- 5 -

were then carefully analyzed and categorized (or "coded") by key topics pertaining to plaintiffs' allegations and the legal elements comprising plaintiffs' claims.  This analytical information, along with objective data (*e.g.*, title, date, recipients, etc.), was uploaded into a database for each individual document.  Additionally, the analytical data was accompanied by both a stored image of the document and a copy of the document that was suitable for electronic word searches.  As a result of this time consuming and laborious process, Plaintiffs' Counsel created a database comprised of every document produced, accompanied by counsel's legal analysis, that permitted counsel to search for and retrieve documents as necessary (*e.g.*, for use at deposition) for the prosecution of the litigation.

18.     The necessary infrastructure to support such a large influx of attorneys at my office was substantial.  We purchased more than 30 new computer workstations, devoted numerous large conference rooms to the Dannon Lawsuits, and enlisted the services of a team of information technology employees to set up the necessary document review technology.  This large team of attorneys was responsible just for the first level of review of Defendant's production.  Following approximately one month of the initial round of review, we embarked on a second level of review with approximately 10 full-time attorneys for purposes of preparing for 15 depositions scheduled to begin January 20, 2009, and continuing until February 15, 2009 in New York, for culling documents and scientific data relating to expert reports and discovery, and preparing exhibits for trial set to begin May 19, 2009.

**b.       The First Discovery Motion**

19.     On August 25, 2008, the Parties submitted a Joint Stipulation Regarding Plaintiff's Motion to Compel Further Responses to Plaintiff's First Set of Requests for Production of

Documents and First Set of Interrogatories.[2]  In this 106-page discovery motion, Class Counsel detailed 39 requests for production of documents and 9 interrogatories, and provided law and argument for compelling further responses to each request.

20.     On September 2, 2008, Thomas O'Reardon from my firm submitted supplemental memorandum in support of the first discovery motion.  In the supplemental memorandum, we addressed the reasons why documents residing with Defendant's French parent corporation, Groupe Danone, were within the Federal Rules of Civil Procedure, Rule 34 "control" of Defendant and must be searched and produced.  In so arguing, we took the position that Defendant's reliance on the Hague Evidence Convention and French Data Protection Law of 1978 lacked merit.  We also provided supplemental briefing and authority regarding the relevant time period for the discovery in the action, and addressed various individual discovery disputes, including draft advertisements and product sales and expense information.  On September 2, 2008, Defendant filed a supplemental memorandum in opposition to the first discovery motion.

21.     On September 12, 2008, my office submitted a supplemental notice and evidence in support of the first discovery motion.  In this second supplemental notice we further discussed the interrelationship between Defendant and Groupe Danone and the issue of "control" under Rule 34.

22.     On September 16, 2008, the Parties appeared before Magistrate Rosenberg.  Along with Mr. O'Reardon, I appeared on behalf of the plaintiff.  During the hearing, which lasted more than four hours (resulting in a 157-page transcript), the Parties argued the merits of the first discovery motion.  At the outset of the hearing, Magistrate Rosenberg praised the strength of the

---

[2]     In the Central District of California, motions to compel discovery are done by joint stipulation whereby each party is given limited space in a joint memorandum to make their initial arguments.  The sections are exchanged simultaneously between the parties, combined and filed with the court.  Short responsive briefings pleadings are thereafter permitted.

- 7 -

Parties' briefing: "First, I want to say that counsel have done a tremendous job in terms of identifying the legal issues and briefing the legal standards.  Really some of the best papers I've seen on that level."

23.     On September 16, 2008, Magistrate Rosenberg issued a minute order regarding the first discovery motion.  As reflected by the minute order, Magistrate Rosenberg made orders with respect to numerous discovery requests and ordered the Parties to continue meeting and conferring with respect to others.

24.     On October 7, 2008, Magistrate Rosenberg held an in person hearing regarding the portion of the first discovery motion concerning documents residing at Groupe Danone.  On behalf of plaintiff, I attended this nearly two hour hearing (resulting in an 86-page transcript) with Mr. O'Reardon.  As reflected in the minute order dated October 7, 2008, Magistrate Rosenberg rejected Defendant's argument that plaintiff must use Hague Convention procedures, stating that "Dannon Company has neither custody or control or the legal ability to obtain [Groupe Danone]'s documents."

25.     During the October 7, 2008, hearing Magistrate Rosenberg acknowledged the strength of the Parties' briefing: "The parties have done a fabulous job of identifying the legal issues and briefing the legal standards . . . ."

26.     On October 14, 2008, Magistrate Rosenberg held another telephonic hearing regarding documents residing with Groupe Danone.  Along with Mr. O'Reardon, I appeared on behalf of plaintiff.

### c.     The Second Discovery Motion

27.     On September 26, 2008, the Parties submitted a Joint Stipulation Re: Custodian Files to Be Searched in Response to Plaintiff's Discovery Requests.  Following the discovery hearing on September 16, 2008 and pursuant to the court's instructions, the Parties exhaustively met and

- 8 -

conferred over search terms and document custodians to reduce the volume of ESI to be searched and produced in response to Plaintiff's First Set of Discovery Requests.  Although the meet and confer process led to agreement on 39 search terms and phrases, the Parties could not reach agreement on the appropriate documents custodians.  In this second discovery motion, plaintiff successfully argued for the inclusion of a fifteenth document custodian – Dannon's CEO, Juan Carlos Dalto.

28.     Defendant vigorously opposed the second discovery motion, attaching a declaration from an electronic discovery professional attesting to the burden and expense of complying with plaintiff's discovery requests.

29.     On October 7, 2008, Magistrate Rosenberg held a nearly two hour hearing regarding the second discovery motion.  In the minute order from the same date, Magistrate Rosenberg acknowledged that "the parties have diligently met and conferred, [and] resolved many outstanding disputes" and, during the hearing stated that "counsel have been working very hard."

### d.     The Third Discovery Motion

30.     Pursuant to Magistrate Rosenberg's instruction, on October 22, 2008, the Parties submitted a joint status report regarding Defendant's ESI, including the pace of the document production.  On October 23, 2008, my office filed a supplement to the joint status report, which summarized plaintiff's efforts at streamlining the production of ESI.

31.     On October 27, 2008, Magistrate Rosenberg held a telephonic status conference attended by Mr. O'Reardon on behalf of plaintiff.  During the hearing, Magistrate Rosenberg again recognized the Parties' discovery efforts.  During the hearing Defendant represented to the court, "We have an enormous team of people that's just working as hard as they can . . . everybody is working as fast and furious as they can."  Defendant was ordered to search the ESI files of each custodian requested by plaintiff.

- 9 -

### e.  The Fourth Discovery Motion

32.  On November 5, 2008, Defendant filed a request to redact portions of the transcripts from discovery hearings held on September 16, 2008 and October 7, 2008.  On November 12, 2008, my office filed an opposition to Defendant's request to redact.  In the opposition we argued that Defendant had waived its right to request redaction and that it failed to demonstrate particularized harm resulting from public discourse of the information.  On November 14, 2008, Defendant filed a brief in response to plaintiff's opposition to the request to redact.

33.  On January 8, 2009, Magistrate Rosenberg issued an order granting in part and denying in part Defendant's request to redact.

### f.  The Fifth Discovery Motion

34.  On November 26, 2008, the Parties submitted separate requests for status conference to the Honorable S. James Otero.  At that time, the Parties were engaged in full-time efforts to conduct and complete discovery, and needed additional time.  We requested a status conference to discuss the status of Defendant's document production and to extend the schedule for taking depositions and completing expert discovery.  On December 2, 2008, Judge Otero issued an order extending pretrial deadlines by just two months.  While the additional time was welcome, we needed to, and did, redouble our efforts to complete production, review, deposition preparation, expert and expert report preparation and trial preparation.

### g.  The Sixth Discovery Motion

35.  In response to plaintiff's First Notice of Videotaped Depositions dated November 25, 2008, Defendant filed an *ex parte* application to hear a motion for protective order on shortened time.  As discussed, plaintiff's deposition notice sought testimony from 15 of Defendant's current and former employees regarding the marketing, science and sale of the Products.  The employees included Defendant's Chief Executive Officer and Chief Marketing Officer.  On December 8, 2008,

- 10 -

I filed an opposition to Defendant's application and urged the court to hold a status conference regarding numerous outstanding discovery disputes and issues.

36.     In response to the Parties' briefing described above, on December 9, 2008, Magistrate Rosenberg held a telephonic conference.  I, along with Mr. O'Reardon, appeared for plaintiff.  The court ordered the Parties to continue their meet and confer efforts and to submit additional papers on disputed discovery issues by December 19, 2008.

37.     On December 19, 2008, the Parties submitted a Joint Stipulation Regarding Supplemental Briefing on Disputed Discovery Issues and Request for Imposition Over Deposition Schedule.  In this 80-page discovery motion, Class Counsel moved to compel further responses to 8 requests for production, and 3 interrogatories.  Furthermore, plaintiff sought leave of the limitation imposed by Federal Rule of Civil Procedure, Rule 30 on ten depositions per party.  Plaintiff also sought specific permission to depose Defendant's CEO.  The discovery motion also sought the court's imposition over a deposition schedule, and deadlines for expert reports and depositions.  Additionally, plaintiff challenged Defendant's document redactions of class members and witness contact information, Defendant's refusal to provide a log identifying the network and/or custodial source of documents produced, and Defendant's refusal to comply with an agreed upon production protocol requiring the production of specific metadata fields.  The Parties also briefed the appropriate deadlines for document production, privilege and redaction logs, and a timeline for expert report exchanges and expert discovery.

38.     In support of the December 19, 2008 joint stipulation, we submitted a declaration with 73 exhibits, comprising nearly 100 documents.  These exhibits were culled from a universe of nearly 1 million pages of documents.  The declaration and the number of exhibits attached as evidence are indicative of the efforts Class Counsel took litigating every issue in the Dannon Lawsuits and their level of preparation.

- 11 -

39.     Later that day on December 19, 2008, my office submitted supplemental memoranda, along with another declaration and evidence in support of the discovery motion.

40.     Two days before Christmas, on December 23, 2008, Magistrate Rosenberg held an in-person discovery hearing concerning Dannon's document production, written discovery responses, plaintiff's motion for leave of court to take 15 depositions, and various other discovery matters.  Mr. O'Reardon and I attended the hearing on behalf of plaintiff.  As reflected in her order dated December 23, 2008, Magistrate Rosenberg mostly granted plaintiff's requests.  Over Defendant's objections, Magistrate Rosenberg permitted plaintiff to take the deposition of Defendant's Chief Executive Officer.

41.     On January 6, 2009, my office filed supplemental briefing advising the court of Defendant's possession of metadata and requesting production of the same.  On January 12, 2009, Magistrate Rosenberg held a telephonic hearing ordering Defendant to produce metadata and denying its request to postpone depositions.

42.     Meanwhile, defendant petitioned the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate the Dannon Lawsuits.  My office filed a brief in response to Defendant's petition, and Mr. Stein, Jayne Goldstein, and I attended the JPML hearing in Florida.

43.     On January 13, 2009, Defendant filed an *ex parte* application to continue pretrial dates, arguing that given its pending JPML petition, and that an order on plaintiff's motion for class certification was still outstanding, it did not make sense to proceed at that time with depositions costing the Parties hundreds of thousands of dollars.  On January 14, 2009, my office filed an opposition to Defendant's *ex parte* application for a continuance.  By then, Class Counsel's team of attorneys had reviewed the enormous document production, had set up operations in New York, was prepared to take the 15 depositions in New York, and was ready to exchange expert discovery.  We were also preparing for trial.

- 12 -

### h. The Deposition Process

44.     As discussed, on November 25, 2008, we noticed the deposition of 15 current and former employees of Defendant.  In addition, Class Counsel served a Rule 30(b)(6) deposition notice on Defendant.  After the court order approving 15 depositions and permitting the deposition of Defendant's Chief Executive Officer, and numerous meet and confer sessions, the following deposition schedule was agreed upon between the Parties:

| Deponent | Date / Time | Location |
|---|---|---|
| Jeanne Collins | January 20, 2009<br>9:30 a.m. | Wilson Elser Moskowitz Edelman & Dicker LLP<br>3 Gannett Drive<br>White Plains, New York 10604<br>Telephone: (914) 323-7000 |
| Brian Walsh | January 20, 2009<br>9:30 a.m. | Wilson Elser Moskowitz Edelman & Dicker LLP<br>3 Gannett Drive<br>White Plains, New York 10604 |
| Glenn Deutsch | January 21, 2009<br>9:30 a.m. | Wilson Elser Moskowitz Edelman & Dicker LLP<br>3 Gannett Drive<br>White Plains, New York 10604 |
| Marc Jove | January 21, 2009<br>9:30 a.m. | Coughlin Stoia Geller Rudman & Robbins LLP<br>52 Duane Street, 7th Floor<br>New York, New York 10007<br>Telephone:  212/693-1058 |
| James Cordero | January 22, 2009<br>9:30 a.m. | Coughlin Stoia Geller Rudman & Robbins LLP<br>52 Duane Street, 7th Floor<br>New York, New York 10007 |
| Sergio Fuster | January 23, 2009<br>9:30 a.m. | Coughlin Stoia Geller Rudman & Robbins LLP<br>52 Duane Street, 7th Floor<br>New York, New York 10007 |
| Phillipe Caradec | January 27, 2009<br>9:30 a.m. | Coughlin Stoia Geller Rudman & Robbins LLP<br>52 Duane Street, 7th Floor<br>New York, New York 10007 |
| Juan Carlos Dalto | January 27, 2009<br>10:00 a.m. | Coughlin Stoia Geller Rudman & Robbins LLP<br>52 Duane Street, 7th Floor<br>New York, New York 10007 |

| Deponent | Date / Time | Location |
|---|---|---|
| Carlos Oropeza | January 28, 2009 9:30 a.m. | Coughlin Stoia Geller Rudman & Robbins LLP 52 Duane Street, 7th Floor New York, New York 10007 |
| Miguel Freitas | February 3, 2009 9:30 a.m. | Coughlin Stoia Geller Rudman & Robbins LLP 52 Duane Street, 7th Floor New York, New York 10007 |
| Jeff Rothman | February 3, 2009 9:30 a.m. | Coughlin Stoia Geller Rudman & Robbins LLP 52 Duane Street, 7th Floor New York, New York 10007 |

45.     In preparation for the aggressive deposition schedule, I formed a team of about 15 attorneys to help cull the huge database of documents for particular deponents.  To do so, my office prepared several conference rooms as designated Dannon work rooms.  For each deponent, a multi-layer review process was undertaken and deponent specific memoranda were drafted.  In addition, marketing and science consultants reviewed the document database, both onsite and remotely, for purposes of deposition preparation.  From our office in San Diego, we coordinated daily during December and much of January with Plaintiffs' Counsel nationwide in order to prepare them for the depositions.

46.     Beginning on January 18, 2009, I and several members of the Dannon team arrived in the New York City area to begin onsite deposition preparation.

47.     On January 20, 2009, Jayne Goldstein took a full-day deposition of Jeanne Collins.  As discussed below, because the Parties were simultaneously negotiating a possible settlement, the remaining depositions were stayed following the Collins deposition.

- 15 -

### 3.    Third Party Discovery: Subpoenas

48.    Class Counsel conducted significant third party discovery.  Seven subpoenas *duces tecum* for documents were served on behalf of plaintiffs.  These subpoenas were directed to *inter alia*, marketing agencies used by Defendant to promote the Products, consumer research firms used by Defendant to shape the Products' marketing and labeling, scientists involved in testing the Products, and an independent standards association which analyzed some of the marketing and advertising at issue in the Dannon Lawsuits.

49.    Beginning on June 2, 2008, my office served subpoenas on relevant third-parties. The June 2nd subpoenas were served on Tribal DDB Worldwide ("Tribal") and Young and Rubicam, Inc. ("Y&R").  Defendant contracted with Tribal to create the online and interactive marketing for the Products.  Defendant contracted with Y&R for the Products' print advertising and television marketing.

50.    On July 10 and 11, 2008, attorneys from Davis & Gilbert LLP responded to the subpoena served on Tribal and Y&R, respectively.  Davis & Gilbert is a 110 lawyer, New York City-based firm that describes itself as "the preeminent law firm for the advertising, marketing communications and media industry." On instructions from Dannon, Tribal and Y&R dug in and fought production.

51.    Representatives of Class Counsel, chiefly Mr. O'Reardon, Jonathan M. Stein and Cullin O'Brien from Robbins Geller, met early and frequently with counsel for Tribal and Y&R. Over the course of tens of meet and confers, search terms, ESI custodians, and document requests were negotiated.  Detailed information concerning Y&R's network file structure, the gigabyte size of responsive information, and employee organization (*e.g.*, employee titles, roles and timeframes) were exchanged.  Counsel for Y&R, Tribal, and Class Counsel also negotiated an ESI production format protocol.

52.     On September 26, 2008, Class Counsel filed a motion to compel the production of documents from Tribal and Y&R in the United States District Court for the Southern District of New York.  On October 14, 2008, Mr. Stein and Mario Alba from Robbins Geller attended the motion to compel hearing on behalf of plaintiff.

53.     As a result of the motion to compel and the extensive meet and confer process, Tribal produced and Y&R produced approximately 10,000 pages of documents.  Plaintiffs' Counsel analyzed and coded all Tribal and Y&R documents, which provided additional information on Defendant's marketing and advertising strategies for the Products.

54.     Class Counsel also served subpoenas for documents on HealthFocus International (consumer research firm), Milward Brown, Inc. (marketing agency), the National Advertising Division of the Council of Better Business Bureaus, Inc. (the "NAD") (industry advertising standards association), and Gabriel Gelb (Defendant's marketing expert).  Class Counsel met and conferred with each of these third-parties on numerous occasions.  For instance, Class Counsel negotiated electronic discovery protocol and cost shifting plans with Milward Brown (represented by Davis & Gilbert attorneys), and successfully fought off the NAD when it contended in support of the industry that all of its non-public documents were somehow protected from production. As a result of Class Counsel's efforts and negotiations, each of the aforementioned third-parties produced documents, which were then coded and analyzed by Plaintiffs' Counsel.

### 4.     Third Party Discovery: FOIA Requests

55.     On July 9, 2008, my office sent Freedom of Information Act ("FOIA") requests to the U.S. Food and Drug Administration (the "FDA") and the U.S. Federal Trade Commission (the "FTC").

56.     On July 15, 2008 and September 30, 2008, the FTC responded in writing to the FOIA request.  Mr. O'Reardon followed up with the FTC via telephone and in writing on several occasions.  Initially, the FTC withheld all responsive records based on statutory exemptions.

57.     After repeated calls and several letter exchanges with the FDA, on August 18, 2009, the FDA produced all records responsive to the FOIA request.

### 5.     Discovery Propounded by Defendant

58.     Defendant propounded discovery on plaintiff as well.  On July 2, 2008, Defendant's Counsel propounded 49 requests for production, and 21 special interrogatories.  Defendant's requests included numerous contention interrogatories, including many asking for all facts supporting plaintiff's allegations that Defendant's representations are false and misleading.  On August 7, 2008, my office served verified responses to Defendant's discovery requests, which included numerous responsive documents and lengthy and substantive responses to Defendant's contention requests.

59.     On August 12, 2008, plaintiff Wiener sat for a full day deposition.  Prior to her deposition, Class Counsel (and in particular me, Jayne Goldstein, and Mr. O'Reardon) held several preparation sessions with plaintiff Wiener, both in-person and telephonically.

60.     Throughout the pendency of the Dannon Lawsuits, plaintiff Wiener, as well as the other named plaintiffs, was kept informed, stayed involved and reviewed documents at Plaintiffs' Counsel's instructions.  For instance, plaintiff Wiener reviewed and approved numerous drafts of the *Wiener* complaint before it was filed.  In addition, plaintiff Wiener has had approximately 15 face-to-face meetings with Plaintiffs' Counsel and has communicated with Plaintiffs' Counsel on a routine basis.  Plaintiffs were each notified of Defendant's settlement offers and each accepted the Settlement subject to final approval.  Plaintiff Gemelas also remained particularly active in the

Litigation as well. In addition to periodic calls with members of Class Counsel and reviewing select pleadings, Mr. Gemelas attended mediation sessions in this Court.

### 6. Plaintiff's Motion for Class Certification

61.     On July 28, 2008, my office filed opening memorandum in support of class certification in *Wiener*. Based upon common law breach of express warranty, California's Unfair Competition Law and Consumers Legal Remedies Act, we sought certification of a California class. Certification of a California class was part of a strategy to obtain a multi-state resolution, either by settlement or multiple judgments after trial. Such multistate approaches have become increasingly necessary, partly as a result of Congress' failure to address multistate certification when it passed the Class Action Fairness Act in 2005. The class certification motion was heavily contested, and included boxes of evidentiary support and numerous expert declarations from both Parties.

62.     Filed along with plaintiff's opening memorandum were the declarations of plaintiff Patricia Wiener, Carol Scott, Ph.D., and Srinadh Komanduri, M.D., M.S.

63.     Plaintiff Wiener testified regarding her willingness to be appointed a class representative. Dr. Scott, Professor of Marketing at the Anderson Graduate School of Management of the University of California, Los Angeles, provided a declaration regarding the marketing and promotion of the Products. Dr. Komanduri, assistant professor at Northwestern University's Feinberg School of Medicine, Division of Gastroenterology, provided a declaration regarding class-wide methods of analyzing the purported scientific substantiation for the Products.

64.     Numerous attorneys from Class Counsel spent a substantial amount of time culling through Defendant's large document production to provide Drs. Scott and Komanduri with documents for their expert review. For example, in addition to conducting his own research, Dr. Komanduri was provided and reviewed over 200 scientific studies, many of which were generated by or on behalf of Dannon, which Defendant claimed as substantiation for the Products' health

- 19 -

claims.  Class Counsel provided Dr. Scott with large amounts of market research and testing and vast amounts of Defendant's other marketing, to permit Dr. Scott to form opinions on "main messaging," the effectiveness of the advertising campaign, the target audience for the Products, the history and breadth of Defendant's marketing efforts, and the intended message(s) for the Products.

65.     In its opposition, filed August 25, 2008, Defendant contested nearly all aspects of the motion for class certification:

(a)     Defendant first argued that plaintiff Wiener did not satisfy Rule 23(a)(3) or (a)(4)'s typicality and adequacy requirements.  In so arguing, Defendant asserted that typicality is lacking where a single plaintiff seeks to represent a class of individuals who purchased multiple products.  That is, Defendant argued typicality was lacking because plaintiff and class members purchased different products under different circumstances involving disparate sets of facts. Defendant forcefully objected to Weiner's request that she could represent both purchasers of Activia and DanActive products when she herself only purchased Activia.[3]  According to Defendant, the advertising claims and scientific substantiation for Activia and DanActive were different and therefore Wiener was not typical of purchasers of DanActive.  Regarding the adequacy requirement, Defendant argued that plaintiff Wiener did not suffer injury in fact as a result of a DanActive purchase and therefore lacked standing.  Citing her August 12, 2008, deposition transcript, Defendant also argued (albeit incorrectly) that Wiener was a disinterested and uninvolved plaintiff not suitable as a class representative.

(b)     Second, Defendant argued that Class Counsel failed to establish the Rule 23(b)(3) predominance and superiority requirements.  At the time of the class certification briefing, all published California Federal Court decisions (but a single one) held that under California's

---

[3]     Plaintiff Gemelas purchased both Products at issue.

- 20 -

Unfair Competition Law, a demonstration of reliance was required for the plaintiff and class members.  On that basis, Defendant argued that not all consumers were led to purchase Activia and DanActive through the challenged advertising.  Citing to the attached declarations of Brian Walsh, Director of Market Research, and an independent marketing expert Gabriel Gelb, Defendant contend for example, that word-of-mouth or friend or doctor recommendations led class members to purchase the Products.  Most importantly, Defendant argued, the evidence showed that consumers purchased the Products for varying reasons – and not because they relied upon the health benefit messages challenged by the Dannon Lawsuits – and therefore a presumption of class-wide reliance based on materiality of the challenged misrepresentation did not apply.  Dannon further stated that separate damage inquiries – *e.g.*, consumers purchased the Products at varying prices and did not always pay a premium over other yogurts – destroyed predominance.  Finally, Defendant argued that a class action was not superior because of manageability issues.  For example, determining class membership where individual consumers do not keep purchase records would swamp judicial resources.

        (c)     In support of its opposition, Defendant submitted four non-attorney declarations – those from Brian Walsh and Gabriel Gelb, as well as Miguel Freitas, Ph.D. (Defendant's Scientific Affairs Director) and Marc Jove (Defendant's Vice President of Marketing).  Dr. Freitas testified that the benefit claims for the Products were substantiated by peer-reviewed published scientific studies.  Marc Jove testified concerning the Products' benefit messages, consumer sales channels and methodologies, and the purported distinct and separate advertising as between the Products.  In support of its opposition, Defendant also conducted a consumer survey.  Gabriel Gelb, the consumer survey expert retained by Defendant for purposes of the Dannon Lawsuits, conducted a survey of California consumers to purportedly help determine the purchase factors involved.

- 21 -

66.     On September 15, 2008, my office filed plaintiff's reply papers in support of the motion for class certification.

(a)     In our reply memorandum we argued that Wiener was typical and adequate to represent consumer who purchased both Products.  In so arguing, we detailed plaintiff Wiener's significant involvement in the lawsuit by citing exhaustively to her deposition transcript.[4]  In addition, we detailed why reliance, to the extent required, could be established on a class-wide basis using, e.g, Defendant's own marketing analysis.  In support of our position regarding the materiality of the Products' health benefits claim we attached additional internal documents culled from the nearly 1 million page document productions, revealing the importance of the claims at issue in class members' decision to purchase the Products.  We also prepared and submitted summary analysis of the individual studies that Defendant claimed constituted scientific substantiation for the Products' health benefits claims.

(b)     Concurrently filed with the reply memorandum were the declaration of Jennifer Keough, and the supplemental declaration of Dr. Carol Scott.  Jennifer Keough, a claims administration expert, testified regarding the ability to notify class members via publication notice of the pendency of the lawsuit, establish class membership, and administer the claims process using reliable and manageable methodologies.  In her supplemental declaration, Dr. Scott provided analysis of the methodology and results of Defendant's Gelb survey.[5]  In addition, Dr. Scott

---

[4]     In addition to the 5-page reply memorandum, my office concurrently filed a 10-page reply memorandum attached as Exhibit A to our second request to exceed the court's 5-page limit for reply memorandum, which the Court granted.

[5]     Immediately following receipt of Defendant's class certification opposition and the Gelb declaration, my office served a subpoena on Gabriel Gelb for all documents used and relied upon in creating his survey, including all of the data underlying his survey results.  We then provided this information and data to Dr. Scott for her review and inclusion in her supplemental declaration.

compared and contrasted the Gelb survey with Defendant's own extensive market research data.  Dr. Scott concluded that the Gelb survey suffered from a variety of methodological and technical defects, and its results were unreliable and conflicted with the fact that perceived health benefits is the main consumer purchase reason as indicated by Defendant's internal documents.

67.     **The *Wiener* Certification Opinion**:  In a published opinion dated January 30, 2009, Judge Otero determined that plaintiff satisfied Rule 23(b)(3)'s predominance and superiority requirements.  *See Wiener v. The Dannon Company, Inc.*, 255 F.R.D. 658 (C.D. Cal. 2009).  Judge Otero's detailed opinion reflects the detailed analysis of the claims at issue and class members' purchase intent.  Holding that "Plaintiff's CLRA, UCL, and breach of express warranty claims satisfy the requirements for an inference of reliance," the Court held that "the record clearly establishes that Dannon's alleged misrepresentations regarding the clinically proven health benefits of the Products are prominently displayed on all of the Products' packaging." *Id.* at 669.  Citing Class Counsel's briefing, the court concluded that the health benefits claims were material and an inference of class-wide reliance was appropriate: "The record clearly establishes that the characteristic that distinguishes the Products from others on the market is their respective alleged health benefit." *Id.*  Pursuant to Rule 23(g), the court pointed to our work investigating the claims against Defendant, the amount of resources we could commit to the litigation, and Plaintiffs' Counsel's experience litigating consumer class actions, and found that certain members of Plaintiffs' Counsel would fairly and adequately represent the class. *Id.* at 672.  The *Wiener* opinion states that although plaintiff was an adequate and interested class representative, she failed to satisfy the typicality requirement because she had not purchased DanActive, and permitted plaintiff or another purchaser to seek certification of DanActive purchasers. *Id.* at 666.

### 7.      Settlement Negotiations

68.      After exchanging a list of potential mediators, the Parties agreed on formal mediation before the Honorable Dickran M. Tevrizian (Retired) of JAMS in Los Angeles, California, which included a full day of expert witness presentation and discussion.  Beginning on July 14 and 15, 2008, the Parties held the first two full-day mediation sessions before Judge Tevrizian.  In advance of the mediation, the Parties submitted settlement memoranda to Judge Tevrizian, setting forth their respective positions.  The settlement memoranda described in detail the procedural history and settlement negotiations to date, including the major barriers to a final and comprehensive settlement. In advance, the Parties also exchanged documents which they believed constituted the substantiation, or lack of substantiation, for the health benefit claims at issue.

69.      As part of mediation, on the first day the Parties were accompanied by some of their scientific experts who made presentations and answered questions regarding the Products' health claims and the purported scientific substantiation.  Along with Dr. Miguel Freitas, Defendant brought one of its expert consultants, Mary Ellen Sanders, Ph.D.  Dr. Sanders is a widely recognized figure in the area of probiotic microbiology, frequently paid for by corporations to conduct research to support their claims.  Dr. Sanders is the founding President of the International Scientific Association for Probiotics and Prebiotics and she has participated in a joint working group convened by the Food and Agriculture Organization of the United Nations and the World Health Organization developing guidelines for the evaluation of probiotics in food products.  Dr. Komanduri was brought to Los Angeles from Chicago to accompany Class Counsel and make a presentation before Defendant and Judge Tevrizian.

70.      In preparation for the first mediation sessions, several members of Class Counsel traveled to Chicago, Illinois to meet with Dr. Komanduri.  Over a two day period, we discussed the Products' claims, the science necessary to properly substantiate the health claims, and the purported

- 24 -

substantiation possessed by Defendant. With the assistance of a Robbins Geller attorney specializing in trial exhibits and preparation, my office reviewed and catalogued Defendant's 200 "studies" and created exhibits highlighting various flaws of each study.

71.     On July 15, 2008, the second day of mediation before Judge Tevrizian, the Parties exchanged their respective positions concerning general terms of any proposed resolution. However, the Parties were unsuccessful at settling the litigation and remained far apart on any agreement.

72.     From the outset of the negotiating process, the Parties agreed to refrain from discussing the issue of attorneys' fees and expenses until all material terms of a settlement were finalized.

73.     In advance of the January 2009 depositions, Class Counsel from Robbins Geller held an in-person meeting with the General Counsel for Defendant. Before and after the in-person meeting substantive conference calls were held on numerous occasions up until late into the night of January 19, 2009.[3]

74.     On the morning of the first of Defendant's depositions, January 20, 2009, Jonathan M. Stein and I held another in-person meeting with Defendant's General Counsel in White Plains, New York. As a result of the January 20th meeting and the Parties' prior negotiation and mediation sessions, the Parties felt comfortable that a settlement agreement would be reached and agreed to stay the remaining depositions to memorialize a written settlement agreement.

75.     After exchanging several versions on January 21 and 22, 2009, on January 23, 2009, the Parties executed a Memorandum of Understanding ("MOU") memorializing the agreement to resolve this Litigation on behalf of Settlement Class Members.

76.     Following the execution of the MOU, and over the course of the next number of months, the Parties continued substantive and lengthy conference negotiating the Stipulation and its exhibits. During this period, the Parties exchanged and negotiated at least ten significant versions of

- 25 -

the Stipulation.  The Parties continually exchanged versions of the various exhibits, as well.  With the assistance of the Class Action Settlement Administrator, the Parties drafted and agreed upon the Class Notice.  As discussed below, during this period the Court substantially assisted the continuing negotiation process with the result that an amended stipulation of settlement was filed on January 20, 2010.

77.     Furthermore, during this year-long period I, along with Plaintiffs' Counsel Pamela Gilbert (a Washington, D.C. attorney and former Director of the Consumer Products Safety Commission), and Jonathan Stein had another in-person meetings and several telephone conferences with counsel from the FTC in Washington, D.C.  These discussions followed an in-person meeting attended by me, a microbiologist, and my co-counsel, former Executive Director of the Consumer Products Safety Commission, Pamela Gilbert with FTC attorneys in 2008.

78.     During the FTC meetings and telephone conferences Ms. Gilbert and I worked to engage the FTC in this matter and to educate them about the facts and science involved.  In fact, at one meeting we brought one of our scientific experts, Patrick M. Gillevet, Ph.D, to assist in educating the FTC.  Later, we discussed the settlement with the FTC.  To assist the FTC in its review, we also culled the document production and provided it with a manageable set of "hot" documents for the FTC's review.  We also offered to make available the entire document database we had created, including assisting the FTC in conducting targeted searches of the database.

79.     On September 18, 2009, the Parties submitted the original stipulation of settlement, the accompanying exhibits, and a motion for preliminary approval.

80.     Beginning on September 21, 2009, this Court held the first of several lengthy telephonic and in-person conferences with the Parties to discuss the settlement, with a particular emphasis on the injunctive relief component.

81.     On January 20, 2010, the Parties submitted the first Amended Stipulation of Settlement.  As the Stipulation reflects, the Court's assistance with these settlement negotiations resulted in still more injunctive relief, and other changes benefitting the Class.  The amended stipulation also required additional labeling changes and expressly includes a provision that the equitable relief, if any, obtained by the FTC shall govern Defendant's conduct.

82.     On January 27, 2010, this Court granted the Parties' motion for preliminary approval.  In so ordering, the Court preliminarily found that the Rule 23(a) and (b)(3) requirements were established and conditionally certified the Class, appointed Plaintiff Gemelas as class representative of the Class, and appointed Class Counsel to represent the Class.  The Court also ordered *inter alia*, the distribution of Class Notice and designated Garden City Group ("Garden City") to serve as Class Action Settlement Administrator.

83.     Pursuant to the Class Action Fairness Act ("CAFA") and 28 U.S.C. §1715, notice of this proposed Settlement was provided to the Attorney General of the United States as well as state Attorneys General.  Following submission of the first amended stipulation of settlement and circulation of the CAFA Notice, I have had telephone conferences with assistant attorneys general from the states of Oregon and Tennessee, who are leading a National Association of Attorneys General working group formed as a result of this litigation.  I have explained to them the significance of the action, the allegations of the Dannon Lawsuits, the science behind "probiotic" bacterial and the settlement, as well as providing additional information and background.

84.     On May 5, 2010, Plaintiff filed the Second Amended Class Action Complaint in this Litigation.

85.     On May 20, 2010, the Parties submitted the Stipulation of Amended to Settlement and [Proposed] Order.  The amended stipulation was submitted to ensure that state agencies, such as state attorneys general, had a paragraph of the Settlement such that in addition to an order by the

- 27 -

FTC, if a provision of the stipulation concerning Defendant's advertising or promotion of the Products conflicted with equitable relief obtained by any state Attorneys General or other state protection agency (collectively "Government Entity"), Defendant is to comply with the Government Entity's requirements.

## III.    CLASS OUTREACH AND THE NOTICE PROGRAM

86.    The Dannon Lawsuits have generated a large amount of publicity.  Dozens of publications have carried stories about the lawsuits and their underlying facts.  Both ABC's *World News Tonight* and *Good Morning America* have carried nationally broadcast feature stories about the lawsuits and probiotics, as well as several local television stations.  There are also numerous websites discussing the lawsuit and containing information about the settlement.  A Google search for "Dannon Lawsuit" yields about 163,000 results, with most referring to this action.

87.    In addition, pursuant to the Court's Preliminary Approval Order, Garden City, implemented the approved Class Notice program.  As fully explained in the concurrently submitted Declaration of Jeanne C. Finegan, APR ("Finegan Decl."), Garden City publicized the Settlement and sent out Class Notice through a combination of publication, Internet notice, audio news release, press release, official web site, and a toll-free telephone number.

88.    Beginning on February 19, 2010 and continuing through April 20, 2010, Garden City had the Publication Notice published once in *Parade Magazine*, *USA Weekend*, *American Profile*, *Better Homes & Gardens*, *Newsweek*, *People en Espanol*, *Health*, *Ebony*, *Latina* and *TV y Novelas* and twice in *People Magazine*.  Finegan Decl., ¶14.  In addition, Garden City used Internet banner advertising on various websites over a 30-day advertising schedule from February 15, 2010 to March 15, 2010.  *Id.*  The Publication Notice was published in over 1,200 newspapers throughout the United States by way of *Parade Magazine* and *USA Weekend*.  Combined, these publications have a circulation of over 54 million.  *Id.*, ¶20.  All told, the publications selected for the Publication Notice

- 28 -

have a combined circulation of over 81 million.  *Id.*  Garden City estimates that over 123 million consumer impressions were made via the Class Notice's Internet banner ads.  *Id.*

89.    Garden City used a scientific methodology embraced by the court to design and target the paid media portions of the Class Notice program.  *Id.*, ¶¶15-18.  And to provide the most broad-reaching Class Notice, Garden City selected publications using Defendant's target audience for the Products.  *Id.*, ¶19.

90.    Garden City maintained, and continues to maintain, the Settlement Website www.DannonSettlement.com, and a toll-free telephone line with an Interactive Voice Recording ("IVR").  Garden City designed the content of the Settlement Website and IVR in consultation with the Parties.  As of June 3, 2010, the Settlement Website has received 265,389 hits and the toll-free number has received 6,564 calls.  *Id.*, ¶24.

## IV.    CLASS MEMBERS OVERWHELMINGLY SUPPORT THE SETTLEMENT

91.    As of the May 24, 2010, Objection and Opt-Out Deadline, the Parties had received just 3 opt-outs and only 6 objections to the Settlement.

92.    The number of opt-outs is a *de minimus* number compared to the size of the Class, and the objections are primarily originate from known professional objectors that seek to hold up class action settlements in return for a payment of attorneys' fees.

93.    Attorney Edward Cochran and the other lawyers in his group routinely file in other cases the near verbatim objection filed in this Litigation regardless of the settlement.  This fact is well known in the class action bar.  In fact, counsel in other cases have compiled a sampling of the nearly verbatim, boilerplate objections filed throughout the country.  Attached as Exhibit 1 is an example of one of these compilations.  *See* Declaration of John R. S. McFarlane in Support of Lead Plaintiffs' Memorandum of Law in Response to Objections and in Further Support of Final Approval

of Settlement, filed October 9, 2007 in *Spahn v. Edward D. Jones & Co., L.P.*, No. 4:04-cv-00086-HEA (E.D. Mo., Jan. 23, 2004).  The court in *Edward Jones* overruled the objections.

## V.    ATTORNEYS' FEES

94.    As set forth above and for the reasons detailed in Plaintiff's Motion for Final Approval of Settlement, the requested Attorneys' Fees and Expenses are fair and reasonable under Sixth Circuit legal standards and, in light of the result achieved on behalf of the Class, should be fully awarded by this Court pursuant to the Parties' agreed-upon Stipulation.  Plaintiffs' Counsel seek an award of fees and expenses separate and apart from the relief provided to the Class.

### A.    Class Counsel at Blood Hurst & O'Reardon, LLP's Lodestar

95.    As stated above, my firm opened on January 1, 2010, after my partners and I left the Robbins Geller firm.  Since January 1, 2010, to June 7, 2010, the total number of hours spent on this Litigation by my firm is 205.25.  The total lodestar amount for attorney time based on my firm's rate is $128,503.75.  The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases.  These rates are charged in both our contingent fee work, as well as our hourly work.  A breakdown of the lodestar is as follows:

| NAME | HOURS | RATE | LODESTAR |
|---|---|---|---|
| Timothy G. Blood (Managing Partner) | 162.75 | $655.00 | $106,601.25 |
| Leslie E. Hurst (Partner) | 7.00 | $542.50 | 3797.50 |
| Thomas J. O'Reardon II (Partner) | 35.50 | 510.00 | 18,105.00 |
| **TOTAL** | **205.25** | | **$128,503.75** |

### B.    Class Counsel at Blood Hurst & O'Reardon, LLP Have Incurred Reasonable Expenses

96.    My firm incurred a total of $3,539.69 in expenses in connection with the prosecution of this Litigation.  They are broken down as follows:

526720_1

| EXPENSE CATEGORY | TOTAL |
|---|---|
| Meals, Hotels & Transportation | $2,979.02 |
| Photocopies | 130.20 |
| Postage | 3.90 |
| Telephone, Facsimile | 89.57 |
| Lexis, Westlaw, Online Library Research | 337.00 |
| **TOTAL** | **$3,539.69** |

97.     The expenses pertaining to this case are reflected in the books and records of this Firm.  These books and records are prepared from expense vouchers, check records and other documents and are an accurate record of the expenses.

### C.     Shepherd Finkelman Miller & Shah, LLP's Attorneys' Fees and Expenses

98.     My co-counsel, Jayne Goldstein, ask that I submit to the court the time and expense information for the firms she has worked for during the pendency of this action.  Ms. Goldstein is out of the country, and has been since the court requested briefing be submitted by June 9, 2010.  Ms. Goldstein informed me that she intends to submit her own declaration upon her return.  I am informed that the total number of hours spent on the Dannon Lawsuits by Shepherd Finkelman is 1,855.80 hours.  The total lodestar amount for attorney/professional time based on shepherd Finkelman's rate is $836,552.00.  These hours and rates include time from the firm formerly known as Mager & Goldstein LLP.  A breakdown of the lodestar is as follows:

| NAME | HOURS | RATE | LODESTAR |
|---|---|---|---|
| James E. Miller | 17.0 | $600.00 | $10,200.00 |
| James C. Shah | 34.70 | $575.00 | $19,952.50 |
| Jayne A. Goldstein | 845.05 | $569.33 (blended) | $481,114.75 |
| Carol A. Mager | 6.75 | $550.00 | $3,712.50 |
| Lee Albert | 73.75 | $550.00 | $40,562.50 |
| Natalie F. Bennett | 2.10 | $550.00 | $1,155.00 |

- 31 -

526720_1

| NAME | HOURS | RATE | LODESTAR |
|---|---|---|---|
| Patrick A. Klingman | 7.80 | $500.00 | $3,900.00 |
| Karen M. Leser Grenon | 88.10 | $425.00 | $37,442.50 |
| Nathan Zipperian | 1.70 | $425.00 | $722.50 |
| Bruce Parke | 8.25 | $345.00 | $2,2846.25 |
| Jay Mager Donohue | 2.00 | $320.00 | $640.00 |
| Shelley Nieman | 280.80 | $310.00 | $87,048.00 |
| Melanie Porter | 122.75 | $310.00 | $38,052.50 |
| Joanna Jacob | 224.05 | $310.00 | $69,455.50 |
| Taline Snell | 113.25 | $310.00 | $35,107.50 |
| Drew Albert | 9.0 | $170.00 | $1,530.00 |
| Mark Goldstein | 11.0 | $170.00 | $1,870.00 |
| Chiharu Sekino | 2.40 | $160.00 | $384.00 |
| Sue Moss | 3.60 | $160.00 | $576.00 |
| Terry Turner | 0.80 | $160.00 | $128.00 |
| **TOTAL** | **1,855.80** | | **$836,552.00** |

99.     I am informed that Shepherd Finkelman incurred a total of $46,180.63 in expenses in connection with the prosecution of Dannon Lawsuits.  These figures include expenses from the firm formerly known as Mager & Goldtsein LLP.  They are broken down as follows:

| EXPENSE CATEGORY | TOTAL |
|---|---|
| Meals, Hotels & Transportation | $12,698.79 |
| Photocopies | $1,402.58 |
| Postage | $531.67 |
| Filing, Witness & Other Fees | $720.00 |
| Lexis, Westlaw, Online Library Research | $1,837.65 |
| Pacer Fees | $30.00 |
| Litigation Fund | $30,000.00 |
| **TOTAL** | **$46,180.63** |

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed this June 9, 2010, at San Diego, California.

s/ Timothy G. Blood
TIMOTHY G. BLOOD

EXHIBIT 1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| JOHN M. SPAHN, IRA, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>EDWARD D. JONES & CO., L.P., THE JONES FINANCIAL COMPANIES, L.L.L.P., EDJ HOLDING COMPANY, INC., JOHN W. BACHMANN, DOUGLAS E. HILL, MICHAEL R. HOLMES, RICHIE L. MALONE, STEVEN NOVIK, DARRYL L. POPE and ROBERT VIRGIL JR.,<br><br>Defendants. | Case No. 4 04CV00086HEA<br><br>Consolidated Case Nos.<br><br>4:04-CV-00118 CAS<br>4:04-CV-00255 DJS<br>4:04-CV-00282 DJS<br>4:04-CV-00466 HEA<br>4:04-CV-00467 HEA<br><br>**CLASS ACTION** |

## MISSOURI CIRCUIT COURT
### TWENTY-SECOND JUDICIAL CIRCUIT
### (City of St. Louis)

| | |
|---|---|
| RACHEL M. ENRIQUEZ, Custodian for Diego Enriquez under IL/UTMA, On Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>EDWARD D. JONES & CO., L.P., et al.,<br><br>Defendants. | Cause No. 22042-00126-02 |

# DECLARATION OF JOHN R. S. MCFARLANE IN SUPPORT OF LEAD PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO OBJECTIONS AND IN FURTHER SUPPORT OF FINAL APPROVAL OF SETTLEMENT

I, John R. S. McFarlane, declare as follows:

1.    I am an attorney-at-law and associate of the law firm of Milberg Weiss & Bershad LLP, One Pennsylvania Plaza, New York, New York 10119.  I am submitting this Declaration in support of Plaintiffs' Memorandum Of Law In Response To Objections And In Further Support Of Final Approval of Settlement.

2.    I am an attorney in good standing and duly licensed and admitted to the New York State bar.

3.    Attached hereto as Exhibit A is a true and correct copy, without attachments, of the Objections of Marion Washburn to Class Action Settlement Agreement, and Notice of Intent to Appear as filed in *In re AT&T Sec. Litig.*, 00-cv-5364-GEB-JJH (D.N.J. filed Jan. 31, 2005) (Docket No. 320).

4.    Attached hereto as Exhibit B is a true and correct copy, without attachments, of the Objections to Proposed Settlement of Shareholder Litigation as filed in *In re AT&T Sec. Litig.*, 00-cv-5364-GEB-JJH (D.N.J. filed Jan. 31, 2005) (Docket No. 322).

5.    Attached hereto as Exhibit C is a true and correct copy, without attachments, of the Memorandum Opinion as filed in *In re AT&T Sec. Litig.*, 00-cv-5364-GEB-JJH (D.N.J. filed Jan. 31, 2005) (Docket No. 340).

6.    Attached hereto as Exhibit D is a true and correct copy, without attachments, of the Joint Application By Objectors' Counsel For Attorney Fees as filed in *In re AT&T Sec. Litig.*, 00-cv-5364-GEB-JJH (D.N.J. filed Jan. 31, 2005) (Docket No. 352).

7.    Attached hereto as Exhibit E is a true and correct copy, without attachments, of the Objections to Proposed Settlement of Class Action as filed in *Perez v. Asurion Corporation*, No. 06-20734-CIV-Seitz/McAliley (S.D. Fla filed March 23, 2006) (Docket No. 108).

8.      Attached hereto as Exhibit F is a true and correct copy, without attachments, of the Objections to Settlement and Notice of Intent to Appear in *Perez v. Asurion Corporation*, No. 06-20734-CIV-Seitz/McAliley (S.D. Fla filed March 23, 2006) (Docket No. 110).

9.      Attached hereto as Exhibit G is a true and correct copy, without attachments, of the Order Granting Class Counsel's Motion in Support of Request for Final Approval of Settlement and Closing Case in *Perez v. Asurion Corporation*, No. 06-20734-CIV-Seitz/McAliley (S.D. Fla filed March 23, 2006) (Docket No. 167).

10.      Attached hereto as Exhibit H is a true and correct copy, without attachments, of the Joint Notice of Appeal for *Perez v. Asurion Corporation*, No. 06-20734-CIV-Seitz/McAliley (S.D. Fla filed March 23, 2006) (Docket No. 177).

11.      Attached hereto as Exhibit I is a true and correct copy, without attachments, of the Class Plaintiffs' Motion for an Order to Show Cause Regarding Objectors' Notices of Appeal for *Perez v. Asurion Corporation*, No. 06-20734-CIV-Seitz/McAliley (S.D. Fla filed March 23, 2006) (Docket No. 182).

12.      Attached hereto as Exhibit J is a true and correct copy, without attachments, of the Order to Show Cause for *Perez v. Asurion Corporation*, No. 06-20734-CIV-Seitz/McAliley (S.D. Fla filed March 23, 2006) (Docket No. 184).

13.      Attached hereto as Exhibit K is a true and correct copy, without attachments, of the Civil Minutes - Sept. 6, 2007 for *Perez v. Asurion Corporation*, No. 06-20734-CIV-Seitz/McAliley (S.D. Fla filed March 23, 2006) (Docket No. 192).

14.      Attached hereto as Exhibit L is a true and correct copy, without attachments, of the Joint Notice to the Court and a Request to Be Excused From Hearing for *Perez v. Asurion*

3

*Corporation,* No. 06-20734-CIV-Seitz/McAliley (S.D. Fla filed March 23, 2006) (Docket No. 191).

15. Attached hereto as Exhibit M is a true and correct copy, without attachments, of the Class Counsels' Notice of Recent Events for *Perez v. Asurion Corporation,* No. 06-20734-CIV-Seitz/McAliley (S.D. Fla filed March 23, 2006) (Docket No. 193).

16. Attached hereto as Exhibit N is a true and correct copy, without attachments, of the Amended Objections to Proposed Settlement of Class Action in *In re Charter Comm., Inc.,* 02-cv-01186 (ct), (E.D. Mo. filed Aug. 5, 2002) (Docket No. 314).

17. Attached hereto as Exhibit O is a true and correct copy, without attachments, of the Objections to Proposed Settlement of Class Action for *In re Bristol Myers Squibb Securities Litigation,* No. 00-cv-1990 (SRC), (D.N.J. filed Apr. 26, 2000) (Docket No. 361).

18. Attached hereto as Exhibit P is a true and correct copy, without attachments, of the Order Approving Attorneys Fees and Expenses and Lead Plaintiff's Costs Directly Related to its Representation of the Class for *In re Bristol-Myers Squibb Securities Litigation,* No. 00-cv-1990 (SRC) (D.N.J. filed Apr. 26, 2000) (Docket No. 367).

19. Attached hereto as Exhibit Q is a true and correct copy, without attachments, of the Judgment for *In re Bristol-Myers Squibb Securities Litigation,* No. 00-cv-1990 (SRC), (D.N.J. filed Apr. 26, 2000) (Docket No. 368).

20. Attached hereto as Exhibit R is a true and correct copy, without attachments, of Objection to Class Action Settlement and Request for Attorney's Fees and Notice of Intent to Appear of James J. Hardy and Beverly Hardy submitted in *In re American Express Financial Advisers Securities Litigation,* 04-cv-1773 (S.D.N.Y. filed Mar. 4, 2004).

21.     Attached hereto as Exhibit S is a true and correct copy, without attachments, of the Order and Final Judgment in *In re American Express Financial Advisers Securities Litigation*, 04-cv-1773 (S.D.N.Y. filed Mar. 4, 2004) (Docket No. 170).

22.     Attached hereto as Exhibit T is a true and correct copy, without attachments, of the Order Denying Objector Barbara Hernandez's Motion to Intervene for *Fielder v. Credit Acceptance Corp., Cir Ct.*, No. Cv96-24285 (W.D. Mo. Amended Complaint filed March 14, 1997).

23.     Attached hereto as Exhibit U is a true and correct copy of an excerpt of the Docket Sheet for *Pozniak v. Imperial Chemical Industries PLC*, No. 03-cv-2457 (NRB) (S.D.N.Y. filed Apr. 9, 2003) (Docket Nos. 43, 47, 50).

24.     Attached hereto as Exhibit V is a true and correct copy of an excerpt of the Docket Sheet for *Simons v. Dynacq Healthcare Inc.*, 03-cv-05825 (KPE) (S.D. Tex. filed Dec. 24, 2003) (Docket Nos. 179, 180, 190).

25.     Attached hereto as Exhibit W is a true and correct copy of an excerpt of the Docket Sheet for *In re McLeod USA Incorporated Securities Litigation*, 02-cv-0001 (MWB) (N.D. Iowa filed Jan. 11, 2002) (Docket No. 331, 337, 341).

26.     Attached hereto as Exhibit X is a true and correct copy of an excerpt of the Docket Sheet for *In re Vista Care, Inc. Securities Litigation*, 04-cv-01661 (FJM) (D. Ariz. filed Aug 11, 2004) (Docket No. 138, 141, 145).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of October, 2007, at New York, New York.

John R. S. McFarlane

Stephen Tsai (ST0270)
941 East Main Street
Bridgewater, New Jersey 08807
Telephone: (732) 356-3000
Facsimile: (732) 356-4070

**RECEIVED**

JAN 3 1 2005

AT 8:30 _____ M̌
WILLIAM T. WALSH
CLERK

Kenneth E. Nelson (Missouri Bar 31993)
Nelson Law Firm, P.C.
2900 City Center Square
1100 Main Street
Kansas City, Missouri 64105
Telephone:       (816) 421-7225
Facsimile:       (816) 421-3339

Co-Counsel for Objector Marion Washburn

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re AT&T CORPORATION<br>SECURITIES LITIGATION | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL Docket No. 1399<br>Master File No. 3:00cv05364<br><br>OBJECTIONS OF<br>MARION WASHBURN TO<br>CLASS ACTION SETTLEMENT<br>AGREEMENT, and<br>NOTICE OF INTENT TO APPEAR |

Objector Marion Washburn, trustee of the Marion S. Washburn
Trust, by and through her undersigned counsel, hereby submits her
objections to the proposed settlement agreement, and states her
intent that her counsel appear at the Fairness Hearing on February
28, 2005:

**EXHIBIT**

tabbies®

A

Case 3:00-cv-05364-GEB-JJH   Document 320   Filed 01/31/2005   Page 2 of 16

## I.   SUMMARY OF OBJECTIONS

### A.   The Settlement has Significant Problems

The Settlement[1] is unfair, unreasonable, and inadequate, so it cannot be approved, because it (1) pays Class Counsel too soon, long before Class Members would receive relief, (2) omits the oversight incentive necessary to assure delivery of relief, (3) provides no requirement for showing that the settlement has performed as promised, and (4) prevents Class Members from making an informed choice about whether to exclude themselves

### B.   Simple Solutions Can Correct the Problems

Before the Settlement can be found to be fair, reasonable, and adequate, it must incorporate certain changes:

1.   Class Counsel must be paid some, but not all, of the fee soon after Final Approval. Part of the fee, such as 25%, must be withheld pending a report on delivery of relief. Class Counsel should get the full benefit of the Settlement only when Class Members receive their benefit.

2.   Class Counsel's remaining fee must be held in escrow, drawing interest, as an incentive to assure prompt and orderly delivery of relief.

3.   As a condition of releasing the final payment to Class Counsel, periodic and final reports must be submitted to show

---

[1]For convenience and consistency, this Objection adopts the terms and definitions of the Settlement.

Case 3:00-cv-05364-GEB-JJH Document 320 Filed 01/31/2005 Page 3 of 16

this Court, the Class Members and the public that the Settlement is performing as promised.

### C.    Changes are Necessary for Settlement to be Fair

The impact of these changes will be minimal upon the Settlement's substantive terms, such as the amount of relief and the type of relief, and the fees for Class Counsel. However, these changes are critical for assuring the Settlement will work as promised. If the Defendants and Class Counsel are unwilling to implement these procedural changes, their refusal is strong evidence that they believe the Settlement won't work. If the Defendants and Class Counsel do not believe the Settlement will work, then it cannot be approved. After all, a Settlement is not fair, reasonable and adequate if Defendants obtain a complete release, and if Class Counsel are fully paid, but Class Members do not receive all of the promised relief.

As described in detail below, these kinds of changes have been incorporated into other class action settlements upon the recommendations of objectors. The changes resulted in substantial benefit to class members without delaying or interfering with basic settlement terms.

These changes can benefit the parties and the Court, as well as the Class, because they need not delay or interfere with the Settlement. These changes are compatible and consistent with the substantive terms of the Settlement, and are designed to make the

Settlement workable. These changes would not change the amount or type of relief. Rather, these changes simply would assure that the relief is delivered as promised in the class notice. Thus, there is no need for new notice to Class Members. The Settlement could be implemented within the same time and cost parameters which presently are contemplated, i.e., the changes cost no substantial time or money -- even though they are absolutely essential to making the Settlement fair, reasonable and adequate.

II.   INTRODUCTION

This class action arises from allegations that Defendants and Former Defendants violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission during the period beginning October 25, 1999, and continuing through May 1, 2000. Defendants deny the allegations.

The settlement agreement provides for AT&T to pay $100,000,000 by May 1, 2005 into an escrow fund, in return for complete release of Defendants. Immediately upon deposit into escrow, attorneys' fees of $25,000,000, and expenses of $6,000,000, would be paid to class counsel -- regardless of whether any objections or appeals are pending, and long before any Class Members receive any relief whatsoever.

The Plan of Allocation requires Class Members to submit claim

forms by March 9, 2005, whereupon relief would be calculated and
paid.  Neither the Stipulation and Agreement of Settlement, nor the
Notice of Settlement of Class Action, identifies any schedule.
Consequently, no Class Member can ascertain when relief should have
been delivered.  Of course, having been fully paid, Class Counsel
has no incentive to oversee the process or assure relief is
delivered completely, as promised, or on time to Class Members.

III. <u>SETTLEMENT FAILS TO ASSURE TIMELY DELIVERY OF ALL BENEFITS</u>

        The Settlement fails to require anyone to report to the Court,
or anyone else, about how much, if any, relief was delivered to
Class Members.  It does not require any report to the Court of when
the relief was delivered.  It does not explain to individual Class
Members any means for challenging the amount, if any, awarded to
them.  It does not provide any time frame in which the entire
delivery process will be complete.  It does not provide any
incentive for Class Counsel or Defendants to ensure that the
Settlement performs as promised.

        The parties may argue that these procedural elements are to be
developed and applied by the Settlement Administrator.  However, if
these issues are not addressed in the Settlement Agreement, they
are not binding.  They cannot be enforced by Class Members because
the litigation already will be concluded.  Class Counsel will have
no incentive to insure full relief because they already are fully

paid.  A minimal amount of Court oversight at the end of relief distribution, and withholding of fees, are absolutely essential to assuring the Settlement delivers what is promised.

IV.  SPECIFIC OBJECTIONS, ARGUMENTS AND SOLUTIONS

    A.   Fees Must Be Paid in Installments

    Class Counsel must be paid upon Final Judgment for the considerable amount of hard work already done.  However Class Counsel should not be paid immediately for doing the work that remains to be done.  Further, Class Counsel should not be paid for any work that is not done.  To assure full and timely delivery of relief, fee payments must be staggered.  The concept has worked well in many class actions.

    Judge Fernando Gaitan recently reacted to a similar suggestion by objectors in In re Wireless Telephone Federal Cost Recovery Fees Litigation, MDL 1559 (W.D. Mo. April 20, 2004) ("the Nextel case") when he directed the parties to respond to the argument that fees must be staged, rather than paid in a lump sum.  The settling parties responded by amending the proposed agreement to provide 75% upon final approval of the settlement, and 25% upon completion of all post-settlement obligations.

    This common-sense concept has applied successfully in many other class actions.  In Richard Duhaime v. John Hancock Mutual Life Insurance Company, et al., 177 F.R.D. 54 (D.Mass 1997), the

Case 3:00-cv-05364-GEB-JJH   Document 320   Filed 06/09/10   Page 1 of 99   PageID #: 6877

federal court withheld 40% of the contemplated fee for a year so the court could review the quality of representation provided by Lead Counsel and the results achieved for the class. Likewise, in Ace Seat Cover Co., Inc., et al. v. The Pacific Life Insurance Company, Case No. 97-CI-00648 (Kenton Cir. Ct. Ky., Nov. 19, 1998), the court ordered 20% of the fees withheld until completion of the settlement agreement. In In re: Prudential Ins. Co. of Am. Sales Practices Litig., 962 F.Supp. 450 (D.N.J. 1997) (aff'd re class certification and settlement but vacated and remanded re attorneys fees), 148 F.3d 283 (3d Cir. 1998), the court ultimately ordered that 50% of the attorney's fees be withheld.

By staggering the fees, Class Counsel can be paid for work that has been done. But Class Counsel cannot get the full benefit of the Settlement until their clients -- the Class Members -- get the full benefit of the Settlement. Basic, prudent business practices dictate that people should not be paid fully until the job is done completely.

B.   Oversight Necessary to Assure Relief is Delivered

The Court must maintain jurisdiction, and at least a small degree of oversight, to assure that the Settlement is implemented as promised. When the final report is delivered, the Court can order payment of the last attorney fee payment.

C.   Class Members Need Access and Appeal Rights

Individual Class Members have no opportunity under the

Case 3:00-cv-05364-GEB-JJH Document 320 Filed 01/31/2005 Page 8 of 16

proposed Settlement Agreement for tracking their claims, or for challenging the amount of relief awarded to them.  The Plan of Allocation, as described in the Notice of Settlement of Class Action, vaguely suggests that the Court can "disallow and adjust the claim of any Class Member on equitable grounds."

This "appeal" procedure fails for many reasons.  First, it gives no direction to a Class Member about how to challenge an award (or rejection.)  Second, it is impractical and inappropriate to presume that Court has the resources to decide individual claims of class members.  An independent reviewer must be engaged to provide this essential component of the Settlement if it is to be fair.

As a practical matter, if the Settlement Administrator acts too slowly, or fails to act at all, or makes mistakes about award amounts, the prejudiced Class Member has no real recourse.  The Settlement must provide Class Members a way to know when their relief will arrive, who to contact if it doesn't, how to measure if it's fair, and what to do if a mistake or unfair result has occurred.

If the Settlement will have any credibility, it must provide some genuine appellate process -- even a truncated or cursory process -- to promote fairness and to avoid errors.  Independent appeals are available in numerous class action settlements, including In re: Prudential Ins. Co. of Am. Sales Practices Litig.,

962 F.Supp. 450 (D.N.J. 1997), (aff'd re class certification and settlement but vacated and remanded re attorneys fees), 148 F.3d 283 (3d Cir. 1998), and <u>Michels v. Phoenix Home Life Mutual Ins. Co.</u>, No. 5318-95, 1997 N.Y. Misc. Lexis 171 (Sup. Ct. Albany Co. Jan. 3, 1997).

    D.   <u>Monitoring and Reporting Required</u>

To have any credibility, the Settlement also must require reports to establish that it is performing as promised. The reports must be delivered to the Court so they are available to the public, including Class Members. Progress and results must be a condition of awarding benefits to the Defendants (the Release) and Class Counsel (attorney fees), because a Settlement that benefits only Defendants and Class Counsel, but not Class members, is not fair, reasonable or adequate. The reports need not be elaborate, but must show what efforts and results have occurred in obtaining and processing Claim Forms and in distributing relief.

In the Nextel case, Judge Gaitan directed the parties to address the objectors' concerns about administrative oversight and reporting. The parties submitted a joint response to the court's order, agreeing to modify their settlement agreement to accommodate the objectors' concerns. For instance, their settlement agreement was changed to provide:

> Further, Class Counsel shall file a report
> with the Court setting forth the results of
> the discovery regarding Defendants' provision
> of benefits to class members, together with

Page 9 of 16

> supporting information showing its compliance with the Settlement Agreement, within fifteen (15) days following the completion of discovery. Once the Court is satisfied with Defendants' and Class Counsel's performance under the Settlement Agreement, the Court shall authorize and direct Defendants to pay the final twenty-five percent (25%) of the attorneys' fees due Class Counsel as set forth in Paragraph 13.

Upon approving the modified settlement, Judge Gaitan awarded attorneys fees to Class Counsel.[2]

## V.    OBJECTORS PROVIDE SUBSTANTIAL VALUE TO THE PROCESS

The foregoing demonstrates the great value which Objectors provide to the class action process. Without the changes described above, the Settlement could become a complete sham and no one would be the wiser. The judicial system would have failed class members by requiring no mechanism for assuring that the agreed relief ever is received by the persons who should benefit. The foregoing changes are submitted to improve the Settlement by guaranteeing it will work, and by showing when and how well it is completed. These improvements are developed only because objectors offer the last opportunity to preserve the adversary process which is necessary to test the fairness of a proposed settlement.

---

[2]In the Nextel case, Judge Gaitan awarded to class counsel $2,500,000 (which was 1.2% of the class recovery) in response to a request for $3,500,000 (1.7% of the class recovery). The remaining $1,000,000 was awarded to objectors who made contributions to improving the settlement.

It is desirable to have as broad a range of participants in the fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally.  It is impossible for a class to select, retain or monitor its lawyers as an individual client would.  <u>Great Neck Capital Appreciation Inv. P=ship, L.P. v. PricewaterhouseCoopers, L.L.P.</u>, 212 F.R.D. 400, 412 (E.D. Wis. 2002).  Class counsel and defendants' counsel may reach a point where they are cooperating in an effort to consummate the settlement.  <u>Id.</u>  Courts, too, are often inclined toward favoring the settlement, and the general atmosphere may become largely cooperative.  <u>Id.</u>

Thus, objectors serve as a highly useful vehicle for class members, for the court and for the public generally.  <u>Great Neck</u>, <u>supra</u>, 212 F.R.D. at 412.  From conflicting points of view come clearer thinking.  <u>Id.</u> at 412-13.  Therefore, a lawyer for an objector who raises pertinent questions about the terms or effects, intended or unintended, of a proposed settlement renders an important service.  <u>Id.</u> at 413.

The value of objectors is even acknowledged by attorney Melvyn Weiss, one of the nation's most well-known class action attorneys, of firm now known as Milberg Weiss Bershad & Schulman LLP: "Objectors are part of the class action system and, though they may be irritating from time to time, the system's been working effectively.  If objectors can come in and negotiate a benefit,

that's great.  I'm not going to criticize one of the safeguards [of
the class action process].   The objectors act as a check and
balance to the whole procedure."  See, "Objectors to Class Action
Settlements:   Watchdogs or Scum of the Earth?" by Joe Frey,
Insure.com website, March 23, 2000.

The law generally does not allow good Samaritans to claim a
legally enforceable reward for their deeds.  Reynolds v. Beneficial
Nat. Bank, 288 F.3d 277, 288 (7th Cir. 2002) (Posner, C.J.).  But
when professionals render valuable albeit not bargained-for
services in circumstances in which high transaction costs prevent
negotiation and voluntary agreement, the law does allow them to
claim a reasonable professional fee from the recipient of their
services.   Id.   That is the situation of objectors to a class
action settlement.   Id.

In other cases, objectors' counsel have been recognized where
their efforts have augmented the common fund or otherwise improved
a class action settlement.  See, e.g., Bowling v. Pfizer, Inc., 922
F.Supp. 1261, 1285 (S.D. Ohio), aff'd, 102 F.3d 777 (6th Cir.
1996); In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 257,
359-60 (N.D.Ga. 1993).  Indeed, even in cases where objectors
appeared but the settlement terms were not altered, courts have
recognized their value in that their presence improved the process
and assisted the court in its scrutiny of the settlement.  See
County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1325-

27 (2d Cir. 1990); <u>Howes v. Atkins</u>, 668 F.Supp. 1021, 1027 (E.D.Ky. 1987); <u>Frankenstein v. McCrory Corp.</u>, 425 F.Supp. 762, 767 (S.D.N.Y. 1977); <u>see also</u> <u>Domestic Air</u>, 148 F.R.D. at 359.

Accordingly, this Objector wishes to reserve the right to apply for reasonable and appropriate compensation for the valuable and crucially important services which have been provided in assisting the Court with this complex matter, preserving the adversary process needed to test the Proposed Settlement, identifying problems with the Proposed Settlement, and presenting substantial and workable solutions.


VI.   CONCLUSION

The purpose of these Objections is not necessarily to destroy or derail the pending Settlement.  Rather, it is to promote the essential improvements which are necessary before the Settlement can be fair, reasonable and adequate.  Brief postponement, perhaps a few weeks, of a ruling could enable the Settlement Agreement to be adjusted (as was done in the Nextel case recently) to assure that the substantive terms can be fulfilled in a legally acceptable manner.   To instill public confidence in the integrity of the Settlement, and assurance that relief will be received as promised, these changes are essential.

With little or no expense of time, effort, and money, and minimal Court oversight, the parties can make the adjustments and

improvements which are critical to making the Settlement fair, reasonable and adequate.   In just a few weeks they can (1) establish a procedure for tracking and appealing relief awards, (2) create a schedule of one or more reports to the Court, (3) develop a procedure for paying Class Counsel's fees, and (4) incorporate those critical changes into a workable, enforceable Settlement. Only upon making such improvements can the Settlement gain approval.

If the settling parties are unwilling to incorporate those provisions into the Settlement, then that speaks volumes for whether the agreement was reached at arm's length, whether it will work, and whether it is fair.

WHEREFORE, Objector respectfully requests that this Court:

1.    Sustain the instant objections, and

2.    Withdraw its preliminary conditional approval of the proposed Settlement, pending submission of proposed Settlement that addresses the issues raised in these Objections, and

3.    Direct the parties to address the points raised in these Objections in subsequent briefing, and

4.    Postpone a ruling on fairness, reasonableness and adequacy of the Settlement until the parties respond to the points, and

5.    Direct submission of applications for attorneys fees, and

6.    Award such other and further relief, and make such other

Case 3:04-cv-00268-JHR Document 67-4 Filed 06/09/10 5091079 Page 1 of 1885

Orders, as the Court deems fair, just and appropriate.

Respectfully submitted,

Stephen Tsai (ST0270)
941 East Main Street
Bridgewater, New Jersey 08807
Telephone: (732) 356-3000
Facsimile: (732) 356-4070

Kenneth E. Nelson (MBE 31093)
Nelson Law Firm, P.C.
2900 City Center Square
1100 Main Street
Kansas City, Missouri 64105
Telephone: (816) 421-7225
Facsimile: (816) 421-3339

Co-Counsel for Objector
 Marion Washburn

CERTIFICATE OF SERVICE

     This is to certify that on January 28, 2005, 2005 I sent the foregoing to:

Keith F. Park, Esq.
Arthur C. Leahy, Esq.
Michael J. Dowd, Esq.
Bruce D. Greenberg, Esq.
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1700
San Diego, California 92101

Lead Counsel for Plaintiffs

by

|     |                    |
| --- | ------------------ |
|     | regular mail       |
|  x  | overnight delivery |
|     | hand-delivery      |
|     | electronic means   |

and to:

Charles W. Douglas, Esq.
David F. Graham, Esq.
Sidley Austin Brown & Wood LLP
10 South Dearborn Street
Chicago, Illinois 60603

Counsel for Defendants

by

|     |                    |
| --- | ------------------ |
|     | regular mail       |
|  x  | overnight delivery |
|     | hand-delivery      |
|     | electronic means   |

Stephen Tsai

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: AT&T CORPORATION SECURITIES LITIGATION | : : : : | MDL Docket No. 1399 Master File No. 3:00cv05364 JUDGE GARRETT E. BROWN, JR. |
| This Document Relates To: | : : : | Magistrate Judge John J. Hughes |
| | : : | CLASS ACTION |
| CIVIL ACTION NO. 3:00CV05364 | : : | |

## OBJECTIONS TO PROPOSED SETTLEMENT OF SHAREHOLDER LITIGATION

NOW COMES Objector William A. Hoffman III by and through the undersigned counsel, and files these Objections to the proposed Settlement of the above Class Action.

## PROOF OF MEMBERSHIP IN CLASS

As set out in the Proof of Claim attached hereto as Exhibit A, Objector William A. Hoffman III resides at 17 Hunting Hollow Drive, Cleveland Ohio 44124, his telephone number is (216) 831-5442 and he purchased 100 shares of AT&T common stock between December 6, 1999 and May 1, 2000.

## NOTICE OF INTENT TO NOT APPEAR

Objector William A. Hoffman III hereby gives notice that he does not intend to appear in person or through counsel at the fairness hearing presently scheduled for February 28,2005 at 9:00 a.m. before the Honorable Garrett E. Brown, Jr. at the Clarkson S. Fisher Building and United States Courthouse, 402 East State Street, Trenton New Jersey, but that he intends to rely on these written objections.

**EXHIBIT**

tabbies®

B

## **OBJECTIONS**

The proposed Class Action Settlement Agreement is inadequate, unfair and unreasonable for the following reasons:

1.    The settlement fund consists of cash in the amount of $100 million plus interest. The Notice indicates that, of this amount, class counsel intend to seek a fee of 21.25% ($21.25 million) plus reimbursement of litigation expenses in the amount of $5,465,996.79 for a total of $26,715,996.79.

2.    If one combines the funds being provided for counsel fees and the litigation expenses, the total awarded to plaintiff's counsel amounts to **26.7%** of the settlement amount.

3.    According to the study by the consulting firm of Logan, Moshman and Moore, the average award for fees and costs in class action cases whose settlements were valued over $100 million was **15.1** percent.    Stuart J. Logan, Jack Moshman and Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 169 (2003). This study also found that the average for all of the 1120 cases that were analyzed for the study was 18.4 percent for fees and costs. (A copy of the first three (3) pages of such report which includes the chart and executive summary is attached hereto as Exhibit B for the Court's convenience.)

4. The fees and expenses requested in the amount of over $26 Million are legally excessive, unfair and unreasonable, and should not be awarded by this Court. There is nothing in the record, or in the Petition for Fees, which directs the Court's attention to any facts or circumstances to justify such a significant differential from the average

percentage awarded in settlements of this size, as reported in the Logan, Moshman, Moore study. Accordingly, the Court should award for all attorneys fees and expenses no more than Fifteen (15%) percent of the $100 Million settlement fund.

     5.     The notice of settlement of the class action does not disclose the amount of damages demanded or those to which the class would be entitled if it prevailed, nor does it disclose the percentage of that amount which is being proposed for settlement. Without knowing how many cents on the dollar the claims are being settled for, the class members are unable to make a truly informed judgment as to the merits of the settlement amount.

     6.     Objector incorporates by reference all other well taken, timely objections that are filed with this Court that are not inconsistent with these Objections.

     7.     Class member William A. Hoffman III has a legally protectable interest in this litigation. That interest will be impacted by the proposed settlement agreement, particularly the legal fees and expense reimbursements that are proposed to be paid.

     8.     These Objections, presented to the Court as a matter of right, are properly and timely filed by said Objector. All of the legally required prerequisites material to these Objections have been met.

     WHEREFORE, Objector respectfully requests that this Court:

     A.     Upon proper hearing, sustain these Objections;

     B.     Continue the issue of attorneys' fees for a subsequent hearing;

     C.     Upon proper hearing, enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and

unreasonableness of the Notice and the requested attorneys' fees.

Respectfully submitted,

 /s/ Stephen Tsai
Stephen Tsai (ST0270)
941 East Main St.
Bridgewater N.J. 08807
(732) 356-3000
(732)356-4070 (fax)
stsai@stephentsai.com

Edward F. Siegel
(Ohio Bar 0012912)
efsiegel@apk.net
Counsel for William A. Hoffman III

## CERTIFICATE OF SERVICE

I certify that these Objections were served by ordinary U.S. mail on

January 29, 2005, to the following:

William S. Lerach, Esq.
Keith F. Park, Esq.
Arthur C. Leahy
Michael J. Dowd
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins
401 B Street, Suite 1700
San Diego, California  92101
        Lead  Counsel for  Plaintiffs

SIDLEY AUSTIN BROWN & WOOD LLP
CHARLES W. DOUGLAS
DAVID F. GRAHAM
10 South Dearborn Street
Chicago Il 60603
Counsel for Defendants

/s/ Stephen Tsai
Counsel for William A. Hoffman III

4

**NOT FOR PUBLICATION**

RECEIVED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

APR 2 5 2005

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

.
.
IN RE AT&T CORPORATION      :
SECURITIES LITIGATION       :
.
.
____ ___ ___ ____ ___:
.
This Document Relates To:    :
.
**ALL ACTIONS**              :
____ ____ ___ ____ ___:

MDL Docket No. 1399

Civ. No. 00-5364 (GEB)

**MEMORANDUM OPINION**

**BROWN, District Judge**

This matter comes before the Court upon Lead Plaintiffs' Motion for Final Approval of Class

Action Settlement and Plan of Allocation of Settlement Proceeds, and the Application of Plaintiffs'

Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses. A fairness hearing was

held on February 28, 2005. The Court, having reviewed the parties' written submissions and oral

argument, and for the reasons discussed herein, grants both the Motion and Application.


**I.    BACKGROUND**

This action involves a securities class action lawsuit that was vigorously litigated for more

that four years. The Court is now called to consider the fairness of the proposed cash settlement in

the amount of $100,000,000 that was reached two weeks after trial began in October 2004. The

settlement was reached with the considerable assistance of Magistrate Judge John J. Hughes, whose

major contribution to the management of this complex litigation from its inception was of great

benefit.

**EXHIBIT**

tabbies®

C

Having discussed at length the factual and procedural history of this action in the
Memorandum Opinion that was issued by this Court on June 4, 2004, the Court does not need to
repeat such details here. At summary judgment, Plaintiffs' claims under §§ 10(b) and 20(a) of the
Securities and Exchange Act of 1934 ("1934 Act") survived because this Court found that a triable
issue of fact existed. The issue concerned a single statement made by Defendants at an analyst
conference on December 6, 1999, regarding a 9-11% projected revenue growth for the Business
Service Unit of AT&T ("the December 6 Statement"). Whether Defendants made this statement
with "actual knowledge" of its falsity was an issue of fact that could only be resolved at trial.

Following the Court's ruling on the summary judgment motion, the parties proceeded with
trial preparation, which included the filing of numerous motions *in limine*. Oral argument on these
motions was heard on September 23, 2004. The Court ruled from the bench on a number of these
motions, and reserved on others. The trial began before this Court on October 5, 2004. On the first
day of trial, the jury was selected and impaneled. During the next seven days of trial, after opening
statements, Plaintiffs called eleven witnesses to the stand and submitted numerous documents into
evidence.

After completing eight days of trial, this Court referred the parties to Judge Hughes for a
settlement conference on October 18 and 20, 2004. The negotiations proved to be successful, and
the parties entered into a tentative settlement agreement. Under the agreement, AT&T would pay
$100,000,000 to the Class, which consisted of purchasers of AT&T common stock between
December 6, 1999 through May 1, 2000. (Decl. of Arthur C. Leahy ("Leahy Decl.") at ¶ 154). On
October 26, 2004, this Court granted preliminary approval of the settlement, approved the form and
manner of Notice of Settlement of Class Action ("Notice"), and scheduled a fairness hearing for

2

February 28, 2005.

Pursuant to this Court's Order of October 26, 2004, notice was mailed to over one million potential Class Members by the Court-appointed Settlement Administrator, Gilardi & Co. LLC ("Gilardi"). (Pls.' Settlement and Plan Approval Mem. at 11). Gilardi also published a notice of the settlement hearing in *Investor's Business Daily* and posted pertinent documents on its website.

The Notice described the Plan of Allocation which dictates how the Net Settlement Fund will be allocated. Generally, the Plan of Allocation provides that proceeds from the Fund will be distributed to Class Members who suffered a "net loss on all transactions in AT&T common stock during the Class Period" and who timely submit valid Proofs of Claim and Release forms. (Decl. of Carole K. Sylvester ("Sylvester Decl."), Ex. A at 4). The Notice also informed Class Members of their right to be heard at the fairness hearing. The deadline for filing objections was January 31, 2005.

## II.    DISCUSSION

### A.    Fairness of Class Action Settlement and Plan of Allocation

#### 1.    Standard for Judicial Approval of Settlement in Class Action

Under Federal Rule of Civil Procedure 23(e), the district court must approve any settlement in a class action, and direct reasonable notice to all class members who may be bound by such settlement. FED. R. CIV. P. 23(e). Approval is warranted only if the settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(C). Acting as a fiduciary responsible for protecting the rights of absent class members, the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of

those whose claims will be extinguished." *In re Cendent Corp. Litig.*, 264 F.3d 201, 231 (quoting

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995)).

This determination rests within the sound discretion of the court. *Girsh v. Jepson*, 521 F.2d 153, 156

(3d Cir. 1975).

In *Girsh v. Jepson*, the Third Circuit identified nine factors that a district court should

consider when determining whether a proposed class action settlement warrants approval. 521 F.2d

at 157. These factors include: (1) "the complexity, expense and likely duration of the litigation"; (2)

"the reaction of the class to the settlement"; (3) "the stage of the proceedings and the amount of

discovery completed"; (4) "the risks of establishing liability"; (5) "the risks of establishing

damages"; (6) "the risks of maintaining the class action through the trial"; (7) "the ability of the

defendants to withstand a greater judgment"; (8) "the range of reasonableness of the settlement fund

in light of the best possible recovery"; (9) "the range of reasonableness of the settlement fund to a

possible recovery in light of all the attendant risks of litigation." *Id.* at 157. The burden of proving

that these factors weigh in favor of approval rests on the proponents of a settlement.

### 2.    Application of *Girsh* Factors

Based on the facts and circumstances of this case, the Court concludes that factors one

through five overwhelmingly weigh in favor of approval of settlement, and factors six through nine

weigh slightly or moderately in favor of approval. Significantly, the Court finds that none of the

*Girsch* factors suggest that the proposed settlement should not be approved. The Court will now

discuss its reasons for arriving at this conclusion.

4

### a.    Complexity, Expense and Likely Duration of the Litigation

The first factor concerning the complexity, expense and duration of litigation, is considered to evaluate "the probable costs, in both time and money, of continued litigation." *Cendant*, 264 F.3d at 233 (quoting *GM Trucks*, 55 F.3d at 812). As the Court noted in earlier proceedings, securities class actions are by their nature convoluted and complex. (Tr. of Fairness Hearing, Feb. 28. 2005). This action was no exception. The lawsuit involved alleged violations of §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("1934 Act") and Rule 10b-5, and was subject to the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Thus, from its inception, the case involved complex legal and factual issues. With the resolution of summary judgment, however, the relevant issues of this case were narrowed substantially. The crux of the Plaintiffs' case rested on one specific statement made by Defendants. Though the initial complexity of this action had been significantly refined, the remaining factual issue left to be resolved was not straightforward or simple. Plaintiffs were left with the formidable task of proving that the December 6 Statement was made with "actual knowledge" that it was false or misleading.

Further, in addition to establishing liability at trial, Plaintiffs were required to establish loss causation and damages. Indeed, the issue of damages in a § 10(b) action adds to the complexity factor. As this Court previously ruled, the Plaintiffs would need to prove that the share price decreased because of the alleged misrepresentation. This task would likely involve conceptually difficult economic theories and complex calculations. Reliance on damage experts in proving their theories was expected, and as this case indicated, the parties' damage experts had diametrically opposed opinions. Furthermore, Defendants filed a motion *in limine* to exclude the report and testimony of Plaintiffs' damage expert. Dr. Nye. During oral argument, this Court expressed doubt

as to the admissibility of Dr. Nye's opinion, and reserved ruling on this issue until the damages phase of the trial. Thus, it is evident that the issue of damages would have been litigated vigorously by both parties – but was nonetheless obviated by the settlement agreement.

Without question, significant expense in both time and money would have continued to incur had the litigation gone forward – particularly in light of the remainder of trial, and any potential filings of post-trial motions or appeal. Accordingly, the Court finds that the first *Girsch* factor weighs strongly in favor of approval.

### b.    Reaction of the Class to the Settlement

This factor weighs heavily in favor of approval. Notices of the settlement were mailed to over one million potential class members on November 9, 2004. (Sylvester Decl. ¶ 3). Notice was also published in *Investor's Business Daily*, and relevant documents were posted on Gilardi's website. However, only eight class members filed objections.[1] Notably, none of these objections opposed the settlement amount, and only four objections concerned the attorneys fees which will be discussed in Part B of this Opinion.[2] As the Third Circuit articulated in *Rite Aid*, "such a low level

---

[1] Two objections were filed by Richard R. Furstenau and State Street Bank and Trust Company, on behalf of the AT&T Savings Plan Master Trust concerning ERISA claims. The parties resolved the dispute prior to the fairness hearing, and these objections were withdrawn. (Tr. of Fairness Hearing, Feb. 28. 2005).

[2] An objection, dated November 19, 2004, was filed by John N. Pavlis ("Pavlis"), Custodian for Anastasia F. Pavlis and Nicholas J. Pavlis. Pavlis objected to the form and format of the Notice of Settlement, and stated that it was "improper, vague and unduly cumbersome and constitutes a violation of the United States Constitution as it applies to the undersigned through the Fourteenth Amendment." (John N. Pavlis Objection at 1). This constituted the entirety of his objection. Pavlis fails to provide the Court with any evidence, argument or reasons supporting his assertion. Thus, the Court concludes that his contention lacks merit and is therefore rejected.

Objector William A. Hoffman III ("Hoffman") also objected to the Notice by stating that

Case 1:00-cv-05364GEB-JJH Document 340 Filed 04/25/2005 Page 10 of 1897

of objection is a 'rare phenomenon.'" *Rite Aid*, 396 F.3d at 305. Furthermore, no objections were filed by any institutional investors who had great financial incentive to object. (Lead Counsel's Resp. at 1). Consequently, the Court concludes that the absence of a single objection by a Class Member to the settlement award strongly weighs in favor of approval.

### c.    The Stage of the Proceedings and the Amount of Discovery Completed

The Court should consider this factor to evaluate "the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Cendant*, 264 F.3d at 235 (quoting *GM Trucks*, 55 F.3d at 813). The Court notes at the outset that this action has been vigorously litigated for over four years. During this time, a considerable amount of time, money and effort was expended by all parties in litigating the action.

The numerous events that transpired during the course of litigation until the reaching of settlement are a testament to the hard work, dedication, and diligent efforts invested by Lead Counsel on behalf of the Class. These events include: 1) litigating motions to dismiss, motion for leave to amend the Complaint, complex discovery motions, motion for class certification, and motion for summary judgment; 2) engaging in extensive motion practice with regard to the protective order; and 3) trial preparation and trying the case for two weeks. (Lead Counsel's Resp. at 2). Additionally,

---

it did not disclose the amount of damages demanded. (Hoffman Objection, ¶ 5). However, such a statement is not required under the PLSRA when the parties disagree on the amount of damages that would have been recoverable, which is clearly the case here. *See* 15 U.S.C. § 78u-4(a)(7)(B)(ii). Therefore, the Court likewise rejects this objection and finds the Notice of Settlement to be adequate.

the parties engaged in extensive discovery. Plaintiffs reviewed and analyzed over 4.5 million pages from Defendants' document production, and over 380,000 additional pages from forty-eight non-party witnesses. Plaintiffs conducted numerous informal interviews, deposed more than eighty fact witnesses, and produced over 3,000 pages of documents in response to Defendants' requests.

Based on the labor-intensive nature of the proceedings that had taken place, and the fact that the case actually went to trial, the Court finds that Counsel had a thorough and exhaustive appreciation for the merits of the case prior to settlement. Accordingly, the Court concludes that this factor cuts strongly in favor of settlement.

### d.    Risks of Establishing Liability

This factor should be considered to "examine what potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *Cendant*, 264 F.3d at 237 (quoting *GM Trucks*, 55 F.3d at 814). As aforementioned, in resolving the summary judgment motion, this Court identified the key factual issue upon which Plaintiffs' case rested. Specifically, to succeed at trial, Plaintiffs would have to prove that Defendants made the December 6 Statement with actual knowledge that it was false or misleading. Throughout the litigation, Defendants vehemently denied any wrongdoing. Defendants asserted that a reasonable basis existed for making the statement. At trial, Defendants intended to call key witnesses, namely AT&T Executives, who would support this assertion.

Given this backdrop, the Court finds that liability would have not been easily established if the trial continued rather than settled. It involved difficult factual issues which would have translated into protracted litigation and accumulating expenses, in both time and money. Thus,

8

whether the jury would have returned a favorable verdict for the Class remains uncertain. What is

certain, however, is that Plaintiffs faced formidable obstacles in establishing liability. Accordingly,

the Court finds that this *Girsch* factor weighs strongly in favor of approval.

### e.    **Risk of Establishing Damages**

This factor also "attempts to measure the expected value of litigating the action rather than

settling it at the current time." *Cendant*, 264 F.3d at 238 (quoting *GM Trucks*, 55 F.3d at 816).

Plaintiffs submit that they faced significant risks in establishing damages in this case. Plaintiffs

contend that establishing damages at trial would have lead to a battle of the experts. The experts on

both sides had completely contradictory opinions as to damages. Plaintiffs would have been required

to discredit Defendants' damage expert opinion that the decease in value of shares was caused by

factors unrelated to the December 6 Statement. This would have been difficult because of the other

obstacle Plaintiffs faced – the possibility of not having their damage expert, Dr. Nye, testify at trial.

Thus, the Court agrees that there was a significant risk in establishing damages, and concludes this

factor also weighs in favor of approval.

### f.    **Additional Girsch Factors**

The sixth factor concerning the risks of maintaining the class action through the trial slightly

weighs in favor of approval. Plaintiffs argue that pursuant to Federal Rule of Civil Procedure

23(c)(1)(C), which allows the Court to alter or amend class certification before final judgment, there

was a risk that the Class would be altered to exclude purchasers of stock on or after December 21,

1999. Plaintiffs assert that this would depend on the Court's ruling on the admissibility of Dr. Nye,

which the Court chose to reserve until the damages phase of trial. Because such a possibility existed, the Court finds Plaintiffs' argument somewhat persuasive and concludes that this factor slightly tips the balance in favor of approval.

The seventh factor concerning the ability of Defendants to withstand a greater judgment also slightly favors approval. In *Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001), the Third Circuit interpreted this factor as concerning "whether the defendants could withstand a judgment for an amount sufficiently greater than the Settlement." *Id.* at 240. Plaintiffs submit that there is no guarantee that AT&T would be able to withstand a multi-million or billion dollar judgment, as evidenced by the downfall of major corporations such as Enron, Tyco and WorldCom. As the Third Circuit noted in *Cendant*, "the possibility of bankruptcy is quite real when the settlement or judgment numbers sufficiently increase." *Id.* at 241. In light of these considerations, the Court finds that this factor weighs in favor, albeit only slightly, of approval.

Lastly, the eighth and ninth factors concerning the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation weigh in favor of settlement. "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under *Girsh*." *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citation and quotations omitted). In the present case, although the best possible recovery had yet to be determined, a recovery of $100,000,000 represents a material percentage considering the significant risks Plaintiffs faced in establishing liability. Plaintiffs note that AT&T Executives Nicholas Cyprus and Richard Roscitt testified at trial they

10

completely believed the December 6 Statement regarding 9-11% projected growth was attainable. Thus, if the trial continued, it was wholly possible that the jury would have found these witnesses, in addition to the other AT&T executives, completely credible – and render a verdict in favor of Defendants. As with the other factors, the Court finds that this favors settlement.

**3.     Summary of *Girsch* Factors**

In conclusion, the Court finds that factors one through five all weigh heavily in favor of approval of the settlement. Factors six through nine weigh slightly or moderately in favor of approval. Significantly, the Court finds that none of the *Girsch* factors weigh against settlement. As the above analysis demonstrates, the Court concludes that the settlement of $100,000,000 represents an excellent result for the Class considering the substantial risks Plaintiffs faced, and the absence of any guarantee of a favorable verdict. Accordingly, the Court grants Lead Plaintiffs' motion for final approval of the class action settlement.

**4.     Plan of Allocation**

In approving the Plan of Allocation of the Settlement ("Plan"), the Court must likewise determine whether the Plan is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e). The Court notes that no Class Members have objected to the Plan of Allocation.[3] This, along with the reasons

---

[3] By letter dated December 19, 2004, Class Member Charles Wm. Dobra ("Dobra") expressed concern regarding the necessary documentation for submitting a Proof of Claim (but did not object to the settlement award or attorneys' fees themselves). Dobra suggests that Class Members may have difficulty accessing the proper documentation relating to their ownership of stock. The Court finds it reasonable, however, to require Class Members to substantiate their claims through documentation. Though it may difficult for some Members to access the proper documentation, failure to meet the evidentiary requirement does not automatically lead to a

stated above that support approval of the settlement, lead this Court to conclude that the Plan

satisfies the standard set forth in Federal Rule 23(e). Accordingly, the Court grants Lead Plaintiffs'

motion for final approval of the Plan of Allocation.


## B.    Attorneys' Fees and Reimbursement of Expenses

### 1.    Standard for Judicial Approval of Fees

Lead Counsel seek approval of its application for attorneys' fees in the amount of 21.25%

of the settlement, and reimbursement of expenses in the amount of $5,465,996.79. The awarding

of fees is within the discretion of the court, so long as the court employs the proper legal standards,

follows the proper procedures, and makes findings of facts that are not clearly erroneous. *In re*

*Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 727 (3d Cir. 2001). In *Rite Aid Corp. Securities*

*Litigation*, the Third Circuit recently discussed the proper legal standard that a district court must

employ when determining whether to approve a request for attorneys' fees – particularly, in a

common fund case where the attorneys' fees and the clients' award are drawn from the same source.

396 F.3d 294 (3d Cir. 2005). When a district court calculates the attorneys' fees based on a

percentage-of-recovery method, which is the case here, the court should also use the lodestar method

as a cross-check on the reasonableness of the award. *Id.* at 300.

District courts are given great deference in determining whether a request for attorneys' fees

---

rejection of a claim as Dobra suggests. Instead, the processing of Class Member's claim may be
delayed, or lead to a possible rejection. Class Members may seek assistance from the Settlement
Administrator or Plaintiffs' Counsel by calling the toll-free number provided in the Notice of
Settlement.

    The Court requested Counsel to respond to Dobra's concerns. Counsel timely complied
with the request and the responses were forwarded to Dobra. The Court notes that Dobra did not
file any additional objections after Counsels' responses were forwarded to him.

should be granted. Notwithstanding this deferential standard, a district court is required to clearly

articulate the reasons which support its conclusion. *Rite Aid*, 396 F.3d at 301. The Third Circuit

identified several factors that a district court should consider. These factors include:

> (1) the size of the fund created and the number of persons benefitted;
> (2) the presence or absence of substantial objections by members of
> the class to the settlement terms and/or fees requested by counsel; (3)
> the skill and efficiency of the attorneys involved; (4) the complexity
> and duration of the litigation; (5) the risk of nonpayment; (6) the
> amount of time devoted to the case by plaintiff's counsel; and (7) the
> awards in similar cases.

*Rite Aid*, 396 F.3d at 301 (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir.

2000)). The district court need not apply these fee award factors in a formulaic way. Certain factors

may be afforded more weight than others. *Rite Aid*, 396 F.3d at 301. The Third Circuit emphasized

in *Rite Aid*, however, that the district court must engage in a robust assessment of these factors. *Rite*

*Aid*, 396 F.3d at 302; *see also Gunter*, 223 F.3d at 196 (vacating district court's ruling because the

fee-award issue was resolved in a "cursory and conclusory" fashion).

In *Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001), the Third Circuit discussed the proper

standard that should be applied in class action lawsuits that are brought under the PSLRA.

> Although in general the court should use the same seven-factor test
> that our cases have developed for reviewing fee requests in other class
> action contexts, review in PSLRA cases must be modified to take into
> account the changes wrought by the Reform Act. The biggest change,
> we believe, is that courts should afford a presumption of
> reasonableness to fee requests submitted pursuant to an agreement
> between a properly-selected lead plaintiff and properly-selected lead
> counsel. This is not to say, however, that this presumption cannot be
> overcome. There is an arguable tension between the general schema of
> the PSLRA on the one hand and its overarching provision that requires
> the court to insure that counsel fees not exceed a reasonable amount,
> on the other. We hold that the presumption will be rebutted when a
> district court finds the fee to be (prima facie) clearly excessive.

13

*Cendant*, 264 F.3d at 220 (citation omitted). Thus, the relevant inquiry for the district court is whether this presumption has been rebutted. At the outset, the Court notes that the percentage fee of 21.25% was negotiated by Lead Counsel and Lead Plaintiff New Hampshire Retirement System ("NHRS") at the beginning of the case. (Pls.' Attorneys' Fees Mem. at 12). Additionally, each Court-Appointed Lead Plaintiff subsequently approved the fee. (*Id.*). Thus, the requested fee of 21.25% is presumptively reasonable.

### 2.    Relevant Factors

The Court finds that the totality of these factors weighs strongly in favor of approval of the fee award for the same reasons provided in this Court's analysis of the *Girsch* factors. Given the similarity and overlap of the *Girsch* factors with the factors the Court must consider here, the Court incorporates by reference the reasons given for approval of the settlement. The Court will now discuss additional reasons that support approval of attorneys' fees in this matter.

First, the absence of substantial objections by class members to the fees requested by counsel strongly supports approval. Only four objections by Class Members concerned attorneys' fees. These objections fall into two main categories: 1) that the fee award is excessive and 2) that a staggered fee system should be implemented.[4] With respect to the first issue, Objectors Hoffman, Carlon M.

---

[4] The Frames also suggest that a "*De Minimus* Settlement Administrator" be appointed who will be responsible for the administration of claims totaling less than $5000. The Frames argue that this is necessary because many Class Members with small claims will likely not expend the effort to fill out their Proof of Claims. The Court rejects this proposal. In addition to the absence of binding precedent that would require this Court to adopt such a proposal, the Court finds no reason why the settlement, which was the product of considerable effort on the part of all Counsel, needs to be modified in order to accommodate those Class Members who cannot expend (what may be *de minimis*) effort to file a Proof of Claim.

Colker, Marion Washburn, and Jacquelynn D. Frame and Doland J. Frame ("the Frames") challenge the amount of attorneys' fees and expenses. The Objectors generally suggest that the fees are excessive, and that documentation should be provided to substantiate the award. For example, Hoffman cites a study where it was determined that 15.1% is the average percentage for fee awards in class action lawsuits resulting in settlements over $100 million. Notably, however, none of the Objectors cite controlling authority that would require this Court to make a downward adjustment.

As aforementioned, the requested fee of 21.25% of the settlement was negotiated by Lead Plaintiff NHRS and Lead Counsel at the start of trial, and was subsequently approved by all Lead Plaintiffs. (Pls.' Attorneys' Fees Mem. at 12). Therefore, this fee arrangement is entitled to a presumption of reasonableness. The Objectors fail to present evidence to rebut this presumption.[5] As the Court expressed at the fairness hearing, this lawsuit may be characterized as anything but average. Lead Counsel invested the time (over 48,000 hours) and advanced its own money (over $5,000,000), to develop this case from the ground up, try the case for two weeks, and achieve an excellent result for the Class. The Court witnessed first hand the dedication and tenacity with which this case was prosecuted, and concludes that a fee award of $21,250,000 is well-deserved. Consequently, the Court rejects Objectors' request for a reduction in the fee award.

Secondly, Objector Washburn proposes a staggered fee award.[6]    Specifically, Washburn

---

[5] The Frames note that according to the fee agreement, Lead Counsel was entitled to 15% for any recovery up to $25,000,000, 20% for any recovery between $25,000,000 and $50,000,000, and 25% for any recovery over $50,000,000. (Frames Reply Mem. to Objection to Proposed Settlement at 2). Citing *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294 (3d Cir. 2005), the Frames contend that Lead Counsel should be held to the 15% recovery only since "it is no easier to try a case for $10 million than one for $100,000,000." *Id.* The Court finds this argument insufficient to rebut the presumption of reasonableness, and is therefore rejected.

[6] Objector Hoffman joined in this objection on February 24, 2005.

15

asserts that the Court should withhold a percentage of the attorneys' fees until the Class Members are paid. Additionally, Washburn argues that Lead Counsel should file reports periodically so that the settlement administration could be monitored closely. Washburn's proposal appears to focus on the possibility of Lead Counsel abandoning Class Members once their fees are paid. In response, Lead Counsel argues that their record of vigorous advocacy, their extensive experience in the securities class action settlements, and the involvement of Gilardi, an experienced independent Settlement Administrator, render this proposal unnecessary. (Lead Counsel's Resp. at 10).

This Court agrees with Lead Counsel. By her objection, Washburn implicitly suggests that Lead Counsel cannot be trusted with properly effectuating the terms of the settlement. The Court finds no basis, however, to suddenly distrust Lead Counsel after having witnessed them vigorously prosecute this action for four years without any guarantee of success. Throughout the entire litigation, Plaintiffs' Counsel represented the Class with zealous advocacy and utmost diligence. They have given no indication to this Court that they will suddenly abandon Class Members during the administration of the settlement. Class Members will have at their disposal the Settlement Administrator to assist them in processing their claims. Further, this Court retains jurisdiction over this matter and will be available to Class Members for final resolution of any dispute that may arise. For these reasons, in addition to the absence of any controlling authority that would require this Court to enforce Washburn's proposal, the Court declines to implement a staggered fee award.

With regard to the size and nature of the common fund and the number of persons benefitted by the settlement, as discussed previously, Lead Counsel were able to obtain an excellent, sizeable result on behalf of the Class despite the substantial risks they faced in establishing liability. Further, the number of persons benefitting from this award is expected to be large considering the Notices of

16

Settlement that were sent to over a million potential Class Members. Many thousands of Class Members will likely participate in the settlement. This factors weighs in favor of approval.

The factor concerning the skill and efficiency of the attorneys prosecuting the action also favors approval of the fee award. Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action, and their professionalism and diligence displayed during litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

The remaining factors likewise weigh in favor of settlement for the same reasons discussed in the first part of this Opinion. This class action began over fours years ago as a complex security class action. Over the course of litigation, with extensive discovery and motion practice, the Court was ultimately able to narrow the issues to very specific factual issues that had to be resolved at trial. Indeed, Lead Counsel invested a substantial amount of time and effort to reach this point and obtain the favorable settlement that it did. Having accepted the responsibility of prosecuting this class action on a contingent fee basis and without any guarantee of success or award, Lead Counsel nonetheless maintained vigor and dedication throughout. In sum, for all the reasons stated above, the Court concludes that the requested fee by Lead Counsel is fair and reasonable. Consequently, the Court grants approval of the requested attorneys' fees on this basis.

17

### 3.    Lodestar Cross-check

The Third Circuit has articulated that when an award is based on percentage of recovery, it is sensible to confirm the reasonableness of the award using the lodestar method. *Rite Aid*, 396 F.3d at 305-06. The lodestar analysis is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* at 305. When performing this analysis, the court "should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *Id.* at 306. Thus, the lodestar multiplier is equal to the proposed fee award divided by the product of the total hours and the blended billing rate. If the lodestar multiplier is large, the award calculated under the percentage-of-recovery method may be deemed unreasonable, and a trial judge may consider a reducing the award appropriately. *Id.* at 306.

The multiplier, however, "need not fall within any pre-defined range, provided that the [d]istrict [c]ourt's analysis justifies the award." *Id.* at 307. Further, the court is not required to engage in this analysis with mathematical precision or "bean-counting." *Id.* at 306. Instead, the court may rely on summaries submitted by the attorneys, and is not required to scrutinize every billing record. *Id.* at 306-07.

In the present case, the proposed fee award presented by Lead Counsel is 21.25% of the proposed settlement, or $21,250,000. Counsel have submitted declarations indicating that the total number of hours expended by the attorneys and paraprofessionals in this case is 48,727.70 hours. (*See* Decl. of Keith F. Park Filed on Behalf of Lerach Coughlin Stoia Geller Rudman & Robbins LLP In Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses ("Park

18

Decl.") at 1-3; Decl. of Peter S. Pearlman Filed on Behalf of Cohn Lifland Pearlman Herrmann &

Knopf LLP In Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses

("Pearlman Decl.") at 2-3; Decl. of Alan P. Cleveland Filed on Behalf of Sheehan Phinney Bass +

Green, P.A. In Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses

("Cleveland Decl.") at 2; Decl. of Wendy W. Huang, Esq. Filed on Behalf of Secured Holdings, Inc.

In Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses at 1). Lead

Counsel submit that the cumulative lodestar equals $16,626,896.49. (Pls.' Attorneys' Fees Mem. at

38). This amount is adequately supported by the detailed declarations submitted by the parties. The

Court further notes that this lodestar value is based on the blended billing rates of all attorneys and

paraprofessionals who were involved with this case. Accordingly, the Court accepts these

calculations as the basis for performing the lodestar cross-check.

These values render a lodestar multiplier of 1.28. The Court finds this result to be indicative

of a truly reasonable fee award, particularly in light of the massive time and effort expended by Lead

Counsel in litigating this action. The Court again notes that the attorneys in this matter, on both sides,

exhibited a high level of proficiency and professionalism during the course of this litigation and finds

the fee award to be well-deserved. In sum, for the reasons stated above, the Court grants approval

of Lead Counsel's request for attorneys' fees.

### 4.    Reimbursement of Expenditures

Lead Counsel also request reimbursement for expenses incurred during this litigation in the

amount of $5,465,996.79. (Pls.' Attorneys' Fees Mem. at 1). "Counsel for a class action is entitled

to reimbursement of expenses that were adequately documented and reasonably and appropriately

incurred in the prosecution of the class action." *In re Safety Components, Inc. Sec. Litig.*, 166 F.

Supp. 2d 72, 108 (D.N.J. 2001) (citing *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir.1995)).

The declarations submitted to the Court by Lead Counsel describe typical litigation expenditures

including, *inter alia*, photocopies, postage, telephone, online legal research, court reporters, meals,

hotel and transportation. The Court finds that these expenses were reasonably and appropriately

incurred during the prosecution of this case, and sufficiently documented in the declarations. (*See*

Park Decl. at 3-29; Pearlman Decl. at 3-5; Cleveland Decl. at 3-4). Consequently, the Court approves

Lead Counsel's request for reimbursement.

Additionally, Lead Plaintiffs Mohammed Karkanawi, Mauline Coon, Secured Holdings, Inc.,

Robert Baker and the International Brotherhood of Electrical Workers Local 98 ("IBEW") request

reimbursement for expenses incurred during the litigation, including lost wages, as Lead Plaintiffs

in this action.[7]  Under the PSLRA, lead plaintiffs are entitled to recover reasonable expenses incurred

during litigation, including lost wages, that directly relate to their representation. *See* 15 U.S.C. §

78u-4(a)(4).  The Court finds Lead Plaintiffs' request for reimbursement reasonable, and likewise

properly substantiated in the declarations submitted to the Court. (*See* Decl. of Mohammed

Karkanawi at 2; Decl. of Mauline Coon at 2; Decl. of Andrei Olenicoff at 3; Decl. of Robert Baker

at 2; Decl. of Harry Foy at 4).  Accordingly, the Court grants Lead Plaintiffs' request for

reimbursement of expenses.

---

[7] The following amounts are requested by Lead Plaintiffs: 1) $2,320 by Mohammed
Karkanawi; 2) $113.40 by Mauline Coon; 3) $9,420 by Secured Holdings, Inc.; 4) $16,045 by
Robert Baker; and 5) $2,550 by IBEW.  (Pls.' Attorneys' Fees Mem. at 1).

20

## III.  CONCLUSION

For the foregoing reasons, the Court grants Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, grants the Application of Plaintiffs' Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses, and dismisses this action in its entirety with prejudice.    The appropriate forms of Order accompany this Memorandum Opinion.

Dated: April 22, 2005

_s/ Garrett E. Brown, Jr._

GARRETT E. BROWN, JR., U.S.D.J.

Stephen Tsai (ST0270)
941 East Main Street
Bridgewater, New Jersey 08807
Telephone:      (732) 356-3000
Facsimile:      (732) 356-4070
Counsel for Objectors Marion Washburn,
    William A. Hoffman III, and Jacquelynn D.
    Frame and Donald Frame

Kenneth E. Nelson (Missouri Bar 31993)
Nelson Law Firm, P.C.
2900 City Center Square
1100 Main Street
Kansas City, Missouri 64105
Telephone:      (816) 421-7225
Facsimile:      (816) 421-3339
Co-counsel for Objector Marion Washburn

Edward F. Siegel
5910 Landerbrook Drive, #200
Cleveland OH 44124
Telephone:      (440) 544-1107
Facsimile:      (440) 446-1240
Co-counsel for Objector William A. Hoffman III

Roy B. Thompson
Thompson - Bogran, P.C.
15938 SW Quarry Rd., Suite B-6
Lake Oswego OR 97035
Telephone:      (503) 245-6600
Facsimile:      (503) 244-8399
Co-counsel for Objectors Jacquelynn D. Frame
    and Donald Frame

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re AT&T CORPORATION SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) | MDL Docket No. 1399 Master File No. 3:00cv05364 JOINT APPLICATION BY OBJECTORS' COUNSEL FOR ATTORNEY FEES |

**EXHIBIT**

D

COME NOW the undersigned counsel for Objectors Marion Washburn, William A. Hoffman III, and Jacquelynn D. Frame and Donald Frame and hereby submit the following application for attorney fees.

I.    SUMMARY OF REQUEST

For their efforts, expertise and expense, spent since December 2004, counsel for Objectors request this Court's Order directing payment by of $260,000 for fees and $10,000 for expenses. Their work included preparation of Objections, appearing at the Fairness Hearing, preparation of appellate briefs, appearing at oral argument, and all of the necessary related activity.

II.    PROCEDURAL BACKGROUND

This securities-fraud class action resulted in a settlement calling for $100,000,000 to be paid into a fund for class members, $21,250,000[1] to be paid as attorney's fees to class counsel, and nearly $6,000,000 to be paid as expense reimbursement to class counsel.  Objectors filed objections and appeared at a Fairness Hearing on February 28, 2005 to show why the settlement could not be approved as submitted.

The Court entered an Order and Judgment on April 22, 2005, approving the settlement and the request for attorney's fees.  Objectors appealed, filed consolidated briefs, and appeared at oral argument on April 24, 2006.  An Opinion was filed on July 20, 2006, affirming the District Court's findings and judgment.

The Objectors were among only a few who filed objections, and they were the only persons to appeal.  They provided the only opportunity to preserve the adversary process throughout the

---

[1] A multiplier of 1.28 was applied to the lodestar.

Case 1:08-cv-02026-DAP Doc #: 67-1 Filed: 06/09/10 86 of 199. PageID #: 914

proceedings, thereby permitting the class, the District Court, and the Court of Appeals to benefit

from an independent review which otherwise was unavailable after the settlement agreement was

signed. Their presence, efforts and arguments enabled the District Court and the Court of Appeals to

make independent examinations of the settlement, informed decisions, and clarifications of law on

the points raised by Objectors. For these benefits provided by Objectors' counsel to the class, the

process, and the Courts, and the public generally, counsel for Objectors must be compensated fairly.

III.    Objectors Provide Substantial Value to the Process.

The foregoing demonstrates the great value which Objectors provide to the class action

process, a value which is well recognized.

A.    Judge Chesler Welcomes Objectors.

Consider the comments by the Hon. Stanley R. Chesler at a Fairness Hearing on May 11,

2006, in Trenton, New Jersey, in In re Bristol-Myers Securities Litigation, Civil Action 00-1990

(SRC), directed at counsel for an objector:

> [W]hether or not plaintiffs' counsel or even these defendant's counsel
> welcomes you, the Court does. . . . Indeed, the role of objectors is an
> important and significant one. You're absolutely right. At this stage
> of the proceedings, it is only a party such as you who in fact bring[s]
> an adversarial approach to an important decision which the Court has
> to make and your reviewing this material and bringing your
> observations is a useful and, indeed, an important function which is
> served. . . . You are right. The Court does function in a fiduciary
> capacity but the Court needs independent observations to help it
> fulfill that role and, indeed, it's important that the Court make sure,
> both in approving settlements and in approving attorneys' fees, that
> the Court never lose sight of the fiduciary role which it indeed is
> obligated to perform.[2]

---

[2]Hearing transcript at pp. 33-34.

B.    <u>Well-Established Law Recognizes Need for Objectors</u>

For many years courts have recognized the importance of filing objections, and paying objectors' counsel to join the class-action process.

"It is desirable to have as broad a range of participants in the fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally . . . . It is impossible for a class to select, retain or monitor its lawyers as an individual client would." <u>Great Neck Capital Appreciation Inv. P=ship, L.P. v. PricewaterhouseCoopers, L.L.P.</u>, 212 F.R.D. 400, 412 (E.D. Wis. 2002). "Class counsel and defendants= counsel may reach a point where they are cooperating in an effort to consummate the settlement." <u>Id.</u> "Courts, too, are often inclined toward favoring the settlement, and the general atmosphere may become largely cooperative." <u>Id.</u>

"Thus, objectors serve as a highly useful vehicle for class members, for the court and for the public generally." <u>Great Neck</u>, 212 F.R.D. at 412. "From conflicting points of view come clearer thinking." <u>Id.</u> at 412-13. "Therefore, a lawyer for an objector who raises pertinent questions about the terms or effects, intended or unintended, of a proposed settlement renders an important service." <u>Id.</u> at 413.

The value of objectors is even acknowledged by attorney Melvyn Weiss, one of the nation's most well-known class action attorneys, of the firm now known as Milberg Weiss Bershad & Schulman LLP: "Objectors are part of the class action system and, though they may be irritating from time to time, the system's been working effectively.  If objectors can come in and negotiate a benefit, that's great.  I'm not going to criticize one of the safeguards [of the class action process]. The objectors act as a check and balance to the whole procedure." See, "Objectors to class action settlements:  Watchdogs or scum of the earth?" by Joe Frey, <u>Insure.com</u> website, March 23, 2000.

"The law generally does not allow good Samaritans to claim a legally enforceable reward for their deeds." Reynolds v. Beneficial Nat. Bank, 288 F.3d 277, 288 (7th Cir. 2002) (Posner, C.J.). "But when professionals render valuable albeit not bargained-for services in circumstances in which high transaction costs prevent negotiation and voluntary agreement, the law does allow them to claim a reasonable professional fee from the recipient of their services." Id. "That is the situation of objectors to a class action settlement." Id.

Objectors' counsel have been recognized where their efforts have augmented the common fund or otherwise improved a class action settlement. See, e.g., Bowling v. Pfizer, Inc., 922 F.Supp. 1261, 1285 (S.D. Ohio), aff'd, 102 F.3d 777 (6th Cir. 1996); In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 257, 359-60 (N.D.Ga. 1993). Indeed, even in cases where objectors appeared but the settlement terms were not altered, courts have recognized their value in that their presence improved the process and assisted the court in its scrutiny of the settlement. See County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1325-27 (2d Cir. 1990); Howes v. Atkins, 668 F.Supp. 1021, 1027 (E.D.Ky. 1987); Frankenstein v. McCrory Corp., 425 F.Supp. 762, 767 (S.D.N.Y. 1977); see also Domestic Air, 148 F.R.D. at 359.

IV.    Lodestar, Multiplier and Percentage Affect Request.

Objectors' counsel have invested more than 607 hours at various hourly rates, for a total value of $238,381. They suggest a multiplier of 1.09% (less than the 1.28 multiplier enjoyed by class counsel,) which would bring the total fee to $260,000. An additional $10,000 must be reimbursed for expenses, bringing the requested amount to $270,000 -- which is only one (1%) percent the amount awarded to class counsel.

V.    Request is Reasonable Under the Circumstances.

Objectors' lesser, albeit critically important, role should be recognized in a fee which is far smaller than the fee approved for Class Counsel. About $27,000,000 was approved for Class Counsel's fees and expenses. If Objectors' fee were only 10% of that figure, they would recover $2,700,000 -- far more than is requested. Rather, Objections request only one per cent, about $270,000, which would include about $10,000 in actual out-of-pocket expenses. That figure is only about one-quarter of one percent (0.27%) of the $100,000,000 class settlement fund.

The figure is appropriate because it is such a tiny percentage, and it can withstand a cross-check against a lodestar, according to the recently prevailing practice. The lodestar can compare the actual amount of work performed to assure that the percentage is not too great. The process involves examining a summary of hours so the Court can avoid the tedious review of detailed time records. Then, if appropriate, the court can enhance it with a multiplier to recognize the risk of engaging in uncertain litigation, rather than merely determining a percentage of the fund.

The percentage of recovery in class litigation usually is in the range of 10% to 33% of the fund, so the 21.25% awarded in the instant case is within that range. In Vizcaino v. Microsoft, 290 F.3d 1043 (9th Cir. 2002) the court did a cross-check on the percentage of the recovery by looking at the lodestar and enhancing with a multiplier. The court appended to its opinion a survey of 34 cases involving common funds valued between $50 million and $200 million. The multiplier range is 1.0 to 19.0.

In In re Prudential Sales Practice Litigation, 148 F.3d 283 (3rd Cir. 1998), the court applied multiples ranging from 1 to 4, finding them reasonable and noting those multiples were awarded frequently in other cases.

Accordingly, a multiplier of three (3) is reasonable under all of the circumstances. A lodestar of $238,381, with a multiple of three (3) would yield $715,143. Yet Objectors are requesting less

about a third of that amount, only $260,000.

VI.    <u>Conclusion</u>

  Accordingly, Objectors' counsel hereby seek compensation for the valuable and crucially important services which have been provided in assisting this Court (and the Court of Appeals) with this complex matter, preserving the adversary process needed to test the settlement, identifying potential problems with the settlement, presenting substantial and workable solutions, and clarifying the law on the points raised by Objectors. Regardless of whether the Court ultimately agreed with the Objectors, or adopted the Objectors' recommendations, or to reject Objectors' arguments, the settlement was tested independently, and the Court was able to make a fully informed decision about whether to approve the settlement and award fees. The benefit to the class, the Court and the public is in knowing that the settlement was not considered in a vacuum, absent an aggressive challenge to assure that the settlement should be approved.

  In fairness, Objectors' counsel should be compensated for their considerable effort, expertise and expense. So, to refuse compensation would be unfair. But, even more importantly, refusal to compensate would discourage, perhaps prevent, the critical independent review of class actions which courts and the public need to maintain confidence in the integrity of the class-action process.

  WHEREFORE, Counsel for Objectors respectfully request that this Court:

1.  Approve this Joint Application for Fees and Expenses, and

2.  Direct the parties to pay forthwith to counsel for Objectors the sums of $260,000 for fees and $10,000 for expenses, and

3.  Award such other and further relief, and make such other Orders, as the Court deems fair, just and appropriate.

Respectfully submitted,


_____/s/_____
Stephen Tsai (ST0270)
941 East Main Street
Bridgewater, New Jersey 08807
Telephone:      (732) 356-3000
Facsimile:      (732) 356-4070
Counsel for Objectors
Marion Washburn, William A.
Hoffman III, and Jacquelynn
D. Frame and Donald Frame

Kenneth E. Nelson (Mo. Bar 31993)
Nelson Law Firm, P.C.
2900 City Center Square
1100 Main Street
Kansas City, Missouri 64105
Telephone:      (816) 421-7225
Facsimile:      (816) 421-3339
Co-counsel for Objector Marion Washburn

Edward F. Siegel
5910 Landerbrook Drive, #200
Cleveland OH 44124
Telephone:      (440) 544-1107
Facsimile:      (440) 446-1240
Co-counsel for Objector William A. Hoffman III

Roy B. Thompson
Thompson - Bogran, P.C.
15938 SW Quarry Rd., Suite B-6
Lake Oswego OR 97035
Telephone:      (503) 245-6600
Facsimile:      (503) 244-8399
Co-counsel for Objector Jacquelynn D. Frame and
   Donald Frame


## CERTIFICATE OF SERVICE

This is to certify that on _____, 2006 I sent the foregoing to:

Keith F. Park
Arthur C. Leahy

Michael J. Dowd
Bruce D. Greenberg
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1700
San Diego, CA   92101

Lead Counsel for Plaintiffs

by
____    regular mail
____    overnight delivery
____    hand-delivery
____    electronic means

and to:

Charles W. Douglas
David F. Graham
Sidley Austin Brown & Wood LLP
10 South Dearborn Street
Chicago, IL   60603

Counsel for Defendants

by
____    regular mail
____    overnight delivery
____    hand-delivery
____    electronic means

_____/s/_____
Stephen Tsai

Summary of Time and Expenses

| Timekeeper | Hours | Rate | Total | Sub-Total |
|---|---|---|---|---|
| Roy Thompson | 97.8 | $450.00 | $44,010 | |
| Amy Bogran | 19.9 | $390.00 | $ 7,761 | |
| Erik Peterson | 119.5 | $119.50 | $26,290 | |
| Rhyen Coombs | 2.4 | $100.00 | $   240 | |
| Total Thompson-Bogran | | | | $   78,301 |
| | | | | |
| Kenneth E. Nelson | 149.7 | $450.00 | $67,365 | |
| Lisa B. Reinier | 14.0 | $ 75.00 | $ 1,050 | |
| Total Nelson Law Firm, P.C. | | | | $   68,415 |
| | | | | |
| Edward Siegel | 173.5 | $450.00 | $78,075 | |
| Total Edward Siegel | | | | $   78,075 |
| | | | | |
| Stephen Tsai | 30.2 | $450.00 | $13,590 | |
| Total Stephen Tsai | | | | $   13,590 |
| | | | | |
| Total fees | | | | $  238,381 |

Expenses

| | |
|---|---|
| Thompson-Bogran | $ 3,143.96 |
| Nelson Law Firm, P.C. | $ 3,052.04 |
| Edward Siegel | $ 2,850.00 |
| Stephen Tsai | $   499.20 |
| Total Expenses | $ 9,545.20 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CARLOS PEREZ

    Plaintiff,

vs.

ASURION CORPORATION et al.

    Defendant,

_____/

Case No.: 06CV-20734 (PAS)-



## OBJECTIONS TO PROPOSED SETTLEMENT OF CLASS ACTION

NOW COME Rita Carfagna (originally represented by Edward W.Cochran), Barbara Rose, and Chad Simmerson, by and through counsel, and hereby file these Objections to the Proposed Settlement of this Class Action and, in support thereof, state as follows:

### PROOF OF MEMBERSHIP IN CLASS

Each of the Objectors received a card in the mail informing him or her that each is a member of the Class. The last 4 digits of the PIN numbers from the front of the cards are: Carfagna xxxxx3018; Rose xxxxx8497; and Simmerson xxxxx9886.

### NOTICE OF INTENT TO APPEAR

Objectors hereby give notice that they intend to appear, through counsel, at the Fairness Hearing presently scheduled for June 22, 2007 at 9:00 a.m. in the U.S. District Court for the Southern District of Florida, Miami Division, 301 North Miami Avenue, 5th Floor, Miami, FL 33128, Courtroom 5 before the Honorable Patricia A. Seitz.



EXHIBIT

E

## OBJECTIONS

The proposed Class Action Settlement is inadequate, unfair and unreasonable for several reasons. The most glaring are that (1) This is a "coupon" settlement in which coupons (phone cards) of minimal value and vouchers which cover only a portion of expected future costs are being awarded to Class Members; (2) Claim Forms must be filed in order to participate in the Settlement Fund even though the Defendants know the identity of each of the Class Members; (3) The Class Members each had to pay a "deductible" when they made a claim for a replacement cell phone which is far in excess of the Five Dollar ($5) phone card that they will receive; (4) Phone cards are of little value to cell phone users who seldom use land-lines or pay phones for long distance calls; and (5) the attorneys are requesting a fee ($1.6M) which exceeds the guaranteed amount of the compensation to the class ($1.5M).

## 1. INADEQUATE INFORMATION IN NOTICE

A Five Dollar ($5) phone card is of little value to cell phone users. This is exacerbated by the fact that there is no information either in the Notice or the Amended Stipulation of Settlement and Release (Docket no. 83-4) ("Settlement Agreement") of exactly how this card can be used, other than the statement that if the card is used at a pay phone, "a surcharge not expected to exceed twelve minutes per pay phone call will apply." (Settlement Agreement § 3.1.3 (a)). This makes **NO SENSE** on its face. How can something denominated in dollars be assessed a surcharge denominated in minutes? And where and how, exactly, can such a card be used? Class Members know that if used at a pay phone, it is actually worth less than $5.00, although they don't know how much less. Where can it be used?  Many cell phone users pay a set monthly fee for a set

2

number of minutes. Can this card be sent to the Cell Phone provider as partial payment? Can a card be sent to a land-line company as partial payment? What assurances does the Class Member have that this card will be honored by one of those companies? What assurances does a Class Member have that the card will be of any value at all? The short answer to each of these questions, is "none!"

There is also no indication in any of the filings of the estimated amount of damages that has been suffered by the Class or the estimated amount of the value of the Phone Cards and Vouchers. Without this information, a Class member cannot reasonably determine whether to remain in the class, to opt-out, or to object.

Finally, the date before which Claim Forms must be filed is not clearly set forth. The Settlement Agreement states that the Proof of Claim form must be submitted within ninety (90) days after the mailing of the Postcard Notice. (Settlement Agreement § 4.6), but there was no mention in the Postcard Notice of the date upon which it was sent or the date upon which the Proof of Claim must be filed. The lack of detail in the Notice and in the Settlement Agreement render both of those documents inadequate.

## 2.    DE MINIMIS VALUE/ ILLUSORY VALUE

Even if all the questions about how and when a card could be utilized were clearly set forth in the Notice or the Settlement Agreement, Class Members are receiving only $5.00. For most persons, it does not pay to fill out the Claim form for this paltry sum of money. In fact, the Class Member is required to provide "verification" that they paid one or more monthly premiums in order to even get their $5 phone card. (Settlement Agreement §4.5.2.). Most Class Members were unaware of the existence of the Defendants and paid no premiums directly to them. Premiums were probably paid as part

of a cell phone bill. It is unlikely that a consumer would keep a cell phone bill from 2004 or 2005, so complying with this "verification" requirement will be difficult at best.

Class Members are also being sent vouchers for new cell phones. However, these vouchers are only valid for 90 days from date of issuance, and are also of somewhat illusory value. The vouchers are worth between $75 and $150. However, the reality is that many cell phones retail for more than $200 each prior to any promotional discount provided by the carrier. Also, there is always a charge, sometimes substantial, to get a phone activated. There are also charges for transferring phone books. And what if a person has recently purchased a new phone? Of what value then is a short-term voucher? To be of any meaningful value, the voucher should be valid for at least a year and Defendants should pay any activation, data transfer or other ancillary charge. Otherwise the "voucher" provides only an illusory benefit.

As a part of the consideration for the Releases, the Defendants have agreed that in the future, if someone submits a claim for a replacement phone, he will not be sent a phone for which the Defendant's Replacement Cost is less than the amount of the applicable deductible or fee, unless the consumer is so informed prior to collecting the deductible. (Settlement Agreement, § 3.1.2) How is this anything more than agreeing to honesty and fair dealing in business? Can agreeing to be honorable and ethical in the future, and agreeing not to cheat people in the future, really amount to "consideration"? These Objectors do not believe that such is the state of the law.

### 3.  COUPON SETTLEMENTS ARE DISFAVORED

The relief provided herein, a $5 Phone card and a voucher for a new phone are essentially "coupons," and coupon settlements have been criticized widely. See

"Consumer Class Actions and Coupon Settlements: Are Consumers Being
Shortchanged?," Advancing the Consumer Interest, Vol. 12, No. 2, Fall/Winter 2000,
wherein Westchester County (New York) Court Judge Thomas A. Dickerson describes
the shortcomings of such settlements. For instance, he notes that in Kahn v. Bell Atlantic
NYNEX Mobile, New York Law Journal, June 4, 1998, p. 29, Col. 4 (N.Y. Sup.) the
court rejected a proposed settlement offering class members "free airtime" because it
could not "make an independent assessment of the value of the airtime."

In the instant case, the Court cannot ascertain the value of the relief until it knows
(1) how many customers are covered, and (2) how many of the $5.00 phone cards and
vouchers will actually be used. Without this information, the Court has no basis for
determining what the relief is worth. (Of course, without knowing what the relief is
worth, the Court also will have no basis for deciding what amount of attorneys' fees is
fair.) Without knowing the value of the settlement to Class Members, the Court cannot
make an independent finding about whether the Settlement is fair. Even if every member
of the Class received a $5 phone card, it is likely that some cards will be lost, misplaced,
stolen, or incompletely utilized. It is also likely that many of the vouchers will not be
redeemed. Therefore, not all of the putative value to the Class will be realized.

One of the most instructive cases in this area is a pre- CAFA case, In re: Excess
Value Insurance Coverage Litig., No. M-21-84, MDL-1339 (S.D.N.Y. Nov.2, 2005).
The Court therein pointed out that under CAFA, 28 U.S.C. § 1712 (a), the attorneys' fee
award is to be based upon the value to members of the Class of coupons actually
redeemed. It therefore waited until the end of the redemption period to award fees.
Counsel had estimated the value of the coupon voucher program at $205 to $265 Million

and requested a fee of approximately 10% of this amount. The actual value of vouchers redeemed was only $4.8 million, or only 2.4% of the original estimate. Based upon the actual redemption, the fees requested by class counsel was **280% greater** than the actually value of the redeemed coupons. The court awarded counsel $2.4 Million in fees. The Court should wait until it receives a report on actual coupon redemption before awarding fees. If no changes are made in the voucher redemption period, this will be only 90 days from the date that the Postcard notices were sent out, which is certainly a very short, and reasonable, period of time.

There are many other examples of the courts rejecting coupon settlements and/or the attorneys' fees requested in those cases. For example, in In re: General Motors Corp. Pickup Truck Fuel Tank Products Liability Litigation, 55 F.3d 768 (3d Cir. 1995), cert. denied, 516 U.S. 824 (1996), the court rejected a settlement (seeking $4 million in attorneys fees) which offered $1,000 coupons for the purchase of a new truck. In Maffei v. Alert Cable TV of North Carolina, 342 S.E.2d 867, 872 (N.C. Sup. 1986), class certification was denied where the 29-cent relief was worth less than the cost of postage and stationery for submitting a claim.

Part of the difficulty in identifying the value (and proper attorneys' fees) of a coupon settlement is the uncertain and low redemption rate -- sometimes called the "take rate." Judge Dickerson's article notes that redemption rates for food and beverage coupons consistently average between 2% and 6%. In Bloyed v. General Motors Corp., 881 S.W.2d 422, 431 (Tex.App. -Texarkana 1994), the court rejected a settlement because the anticipated take rate -- between 10% and 46% -- was too low. Judge Dickerson cites several cases which have solved this problem by requiring that coupons

continue to be issued until an agreed value has been redeemed: <u>Feldman v. Quick Quality Restaurants, Inc.</u>, New York Law Journal, July 22, 1983, p. 12, col. 4 N.Y.Sup.); <u>In re The Coca-Cola Co. Apple Juice Consumer Litigation</u>, No. E-47054 (Ga.Sup.Ct. Fulton Co. May 4, 1998); <u>Tepper v. Tropicana Products, Inc.</u>, No. 96-000846 (Fla. Cir. Ct. Manatee Co. Nov. 13, 1998), <u>Muller v. Cadbury Schweppes PLC</u>, No. 96-0148788 (Conn. Super. Ct. Waterbury Jud. Distr. June 29, 1999).  Judge Dickerson also found cases wherein cash, coupons or goods were given to charity until the agreed settlement amount was met: <u>Ohio Public Interest Campaign v. Fisher Foods</u>, 546 F. Supp. 1 (N.D. Ohio 1982); <u>Gordon v. Boden</u>, No. 89 CH 6531 (Ill. Cir. Ct. Cook Co. July 14, 1995). While this does not directly apply to the instant case, it provides some excellent examples of how creative Courts can be in structuring settlements that truly benefit the Class.

### 4.    <u>CLAIM FORMS UNNECESSARY</u>

It is obvious from the Settlement Agreement that the Defendants know the identity of each of the potential class members.  After all, they agree in § 3.2 to send vouchers to all of the members of the class who paid deductibles to Asurion.  Therefore, they know the identity of all of the members of the sub-class. To force these persons to submit claim forms is a transparent and obvious attempt to minimize the number of persons who submit claims for the phone cards and to make sure that not more than $1.5M is paid out to the Class.  The identity of the class members are known and each one of these class members could be sent, along with the voucher for a new phone, the $5.00 phone card.  To force them to submit a claim form which requires the research noted in Section 2 above, would only serve to lessen the amount of money actually paid out by Defendants. A simple solution to this would be to require the Defendants to send

7

the $5.00 phone card to each class member to whom they send the voucher, or even to require them to send a $5 phone card to each person to whom they sent the Postcard Notice.

### 5.    INADEQUATE COMPENSATION

A Class Member who successfully files a claim form will receive one or more $5.00 phone card(s), which may be worth more or less than $5.00. Whatever amount is actually realized, however, will be far less than the deductible that each person paid when he or she received their inadequate replacement phone. These Objectors recognize that one cannot necessarily be made whole in a negotiated settlement, but feel that $5.00 is grossly inadequate when most paid Fifty Dollars ($50.00) or more in premiums and the deductible.

### 6.    ATTORNEY'S FEES

It is axiomatic that the Court stands in a fiduciary relationship with the class when the matter of fees is broached. It is clearly unfair to the class to approve attorneys' fees of $1.6 Million Dollars when the guaranteed remuneration to the class is only $1.5 Million Dollars. The amount of Class Counsel's fees must bear a reasonable relationship to the actual benefit to the class. (See, In Re: Excess Value, infra.).

One of the leading cases in the area of Class Action attorneys' fees is Goldberger v. Integrated Resources, Inc., 209 F. 3d. 43, (2nd Cir. 2000) in which the court identified six (6) factors to be considered when determining fees. Three of the most important are (1) the requested fee in relation to the settlement, (2) public policy considerations, and (3) the complexity of the case. All three of these militate in favor of denying the fee request until after the receipt of a report on the "take" rate. Here, counsel is requesting a fee of

**106%** of the guaranteed settlement fund.  Although it is not as outrageous, it is similar to

<u>In re: Excess Value</u> where the Court held that it would be anomalous and unacceptable

for counsel to fair better than the class, for example to receive 280% more than the class

actually received."

The Court should carefully scrutinize the fees being requested by Class Counsel

to assure the Court that there is a reasonable relationship between the amount requested

and the work performed.  Once a settlement in a Class Action has been agreed upon, the

Defendants no longer have an incentive to negotiate vigorously concerning the attorneys'

fees.  Especially in a case like this where the Settlement Fund is the total amount that

Defendants will pay under the Settlement "for any purpose." <u>Settlement Agreement §</u>

3.1.3(a).

The amount of fees is also objected to because there is no evidence of the basis of

the fee request. The Court assumes the position of a fiduciary for the Class when the

question of Attorneys' fees arises. At that point, Counsel and the Class have differing

goals.  Dozens of cases have confirmed and identified this fiduciary role.  For example:

> Before considering the proper methodology for awarding attorney's fees out of a
> common fund, the Court feels compelled to define its role in these proceedings.
> When an attorney makes a claim for fees from a common fund, **his interest is**
> **adverse to the interest of the class** in obtaining recovery because the fees come
> out of the common fund set up for the benefit of the class. <u>Rawlings v. Prudential-</u>
> <u>Bache Properties, Inc.,</u> 9 F. 3d  513, 516 (6th Cir. 1993).  This divergence of
> interests **requires a court to assume a fiduciary role** when reviewing a fee
> application because there is often no one to argue for the interests of the class:
> class members with small individual stakes in the outcome will often fail to file
> objections because they lack the interest or resources to do so and the defendant
> who contributed to the fund will usually have scant interest in how the fund is
> divided between the plaintiffs and class counsel." <u>In Re Copley Pharmaceutical,</u>
> <u>Inc.</u> 1 F. Supp. 2d 1407 (Wyoming, 1998).  (emphasis added.)

In <u>Wise v. Popoff,</u> et al. 835 F. Supp. 977, (E.D. Mich. 1993) the court describes the roles
as follows:

An attorney's role changes once he files a fee petition. No longer a fiduciary for his client he becomes nothing more complex than **another claimant against the fund created for the client's benefit.** The court must, in turn, become "the fiduciary for the fund's beneficiaries **and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications.**" *Skelton v. General Motors Corp., 860 F 2d 250*, 253 (7th Cir. 1988), cert denied, 493 US 810, 110 S. Ct. 53, 107 L. Ed. 2d 22 (1989). A court should not "rubber stamp" fee applications *In re Cincinnati Gas & Electric Co. Securities Litigation,* 643 F. Supp. 148, 152 (S.D. Ohio 1986). The fact that the settling defendant may agree with the fee application (or, as in this case, be persuaded to remain silent about it) is **irrelevant** to the Court's analysis because the defendant having already paid the settlement amount, has little interest in the portion of the fund that the class attorney is allowed to retain". (emphasis added.)

This Honorable Court, therefore, must act as a fiduciary for the Class and conduct an in depth investigation of the basis for the requested fee. The Court should at least determine what the Lodestar amount is (hours expended time hourly billing rate) and whether that bears a rational relationship to the fee requested. The Court should investigate not only the amount of time expended, but by whom it was expended. Was it by a partner, an associate, a paralegal or a contract attorney, and were the rates charged reasonable? Did one person take or defend a deposition, or were many associates in attendance? All of these matters should be investigated to make sure that the Class is not being overcharged.

4.    Objectors respectfully adopt and incorporate into these Objections all other well-taken, timely filed Objections that are not inconsistent with these Objections.

5.    These Class member have a legally protectable interest in this litigation. That interest will be impacted by the proposed settlement agreement, and by the legal fees that are being requested.

6.    These Objections, presented to the Court as a matter of right, are properly and timely filed by the Objectors.

WHEREFORE, Objectors respectfully request that this Court:

A.    Upon proper hearing, sustain these Objections;

B.    Continue the issue of attorneys' fees and expense reimbursement for a subsequent hearing; and

C.    Upon proper hearing, enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the Settlement and the requested attorneys' fees and expenses.

Respectfully submitted,

 /s/ John C. Rayson
John C. Rayson, Esq. (FL Bar 204153)
The Law Offices of John C. Rayson
2400 E. Oakland Park Blvd.
Fort Lauderdale, FL  33306
Voice: (954) 566-8855
Fax:    (954) 566-8902
e-mail: rayson2000@aol.com>

 /s/Edward F. Siegel
Edward F. Siegel (Ohio Bar 0012912)
27600 Chagrin Blvd. #340
Cleveland Ohio 44122
Voice: (216) 831-3424
Fax:    (216) 831-6584
e-mail: efsiegel@efs-law.com

Attorneys for Objectors

11

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was sent via regular US Mail, postage prepaid to the following on May 20, 2007:

HARKE & CLASBY LLP
155 S. Miami Ave., Ste. 600
Miami, FL 33130


KOZYAK TROPIN & THROCKMORTON PA
2525 Ponce de Leon, 9th Fl.
Coral Gables, FL 33134

David Walsh, Esq.
Paul Hastings, et al.
515 S. Flower St.
Los Angeles, CA 90071

Judith M. Korchin, Esq.
Holland & Knight LLP
701 Brickell Ave., Ste. 3000
Miami, FL 33131

Keith Kodosky. Esq.
Paul Hastings Janofsky & Walker LLP
600 Peachtree St., NE, Ste. 2400
Atlanta, GA 30308

Hillary Bass, Esq.
Holly R. Skolnick, Esq.
1221 Brickell Ave.
Miami, FL 33131

By: ___/s/ John C. Rayson___
John C. Rayson, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CARLOS PEREZ                                    Case No.: 06CV-20734 (PAS)- Civ

     Plaintiff,

vs.

ASURION CORPORATION et al.

     Defendant,

_____/

### OBJECTIONS TO SETTLEMENT
### AND NOTICE OF INTENT TO APPEAR

     COMES NOW, Dina Hill ("Objector") Class Member to this action, by and through her undersigned counsel, and hereby files these Objections to the Proposed Class Action Settlement, gives notice of her counsel's intent to appear at the June 22, 2007 fairness hearing, and requests award of an incentive fee for serving as a named class member. In support of her objections, This Objector states as follows:[1]

### I.    SUMMARY OF OBJECTIONS

     For the following reasons, inter alia, the Settlement Agreement is not fair, reasonable and adequate.

     1.    The relief[2] consists of calling cards and vouchers. Effectively it is a "coupon" settlement, which unnecessarily requires additional action by Class Members to obtain relief and thereby assures Defendants will not pay as much as the Settlement implies.

---

[1] Objector's signature authorizing these Objections is on the final page as Exhibit A.

[2] In addition to the calling cards and vouchers, which effectively are a sort of coupons which must be redeemed, "remedial" relief is offered regarding improved disclosures, presumably to benefit persons who are not Class Members now. Of course, such relief is absolutely worthless to present Class Members.

**EXHIBIT**

F

2.      The claims and redemption process is unnecessarily burdensome and restrictive, and clearly intended to inhibit and discourage Class Members from receiving a benefit in return for the Release and to minimize the cost to Defendants.  For instance, calling cards with a total face value of $1,500,000 will be worth far less because many cards will not be used fully or at all.

3.      The $1,600,000 attorney's fee contemplated in the Agreement is excessive in light of gross inadequacy of the proposed Settlement, the failure to establish the gross amount payable under the settlement, and absence of proof of the actual amount of value which Class Members would obtain, all of which are necessary for ascertaining a fair fee.

4.      Attorneys' fees are not payable with in-kind products, as is the relief payable to the Class Members.  Attorneys should be paid with the same "currency" that Class Members receive.

5.      Fees are not related to the actual value ultimately received by Class Members.  If the value of benefits actually received by Class Members falls below an established level of value -- that is, calling card minutes actually used, and vouchers actually redeemed -- attorneys' fees should decline accordingly.  Class-action contingency fees, which contemplate a multiplier with a lodestar, must be contingent upon benefits actually received by Class Members.

6.      The timing of attorney-fee payment is not linked to the timing for receiving relief.  Attorneys cannot be paid before the clients are paid.

7.      No oversight or incentive exists to establish how much, if any, relief actually is received, and whether the agreement is being administered promptly, properly and fully.

8.      No time frames are established for Class Members to receive relief, such as when claims will be processed, and cards and vouchers issued, even though the deadlines for losing relief (July 19, 2007 deadline for claims, 360- and 90-day expiration dates for vouchers) and for Class Counsel to be paid (within 10 business days after Effective Date) are clearly defined.

II.    **SUMMARY OF RELIEF**

The relief consists of (1) for National Class Members who submit claims, calling cards worth at least $5 and which expire in 360 days and, (2) for Subclass Members, i.e., persons who received a replacement telephone which was worth less than their deductible amount, vouchers for $75 to $150 each, depending upon the applicable deductible amount. The vouchers expire in 90 days.

To obtain relief, Class Members must[3]:

> (1) receive and keep a postcard with a PIN number on it, and
> (2) complete a claim form,
> (2) by July 19, 2007,
> (3) with this information:
> > (a) name,
> > (b) e-mail address,
> > (c) PIN number printed on a postcard
> > (d) whether claimant made one or more premium payments,
> > (e) whether a claim for was submitted,
> > (f) if so, the date of the claim, and
> > (g) if so, the address at the time of the claim, and
> > (h) if so, the phone number
> > (i)  signature
> (4) mail it to the claims administrator,
> (5) obtain approval for relief,
> (6) wait an known  amount of time -- weeks, months, years,
> (7) receive, keep and use the card and, if applicable, voucher.
> (8) before it expires (90 days for vouchers, 360 days for cards).

If a Class Member stumbles over any of these many requirements, relief is denied. The obvious purpose of imposing so many hurdles is to minimize the amount of relief actually received by Class Members, and actually provided by Defendants. Consider: Defendants already know who paid premiums and filed claims because they have records. Defendants also know where to find their customers. After all, postcard notices were sent, right? Furthermore, there is no election of remedies -- no decisions for individual Class Members to make about the type of relief they want. So, Defendants

---

[3] The procedure appears on pages 17-19 of the Settlement Agreement.

could send cards and vouchers directly with no need to withstand the expense of time, effort and money to process claim forms. Indeed, Defendants could send a check for an equivalent amount of cash if they truly are providing the amount of relief asserted in the Settlement. The only, and obvious, reason for not sending cash, and for requiring action by Class Members (who may well distrust Defendants too much to send personal information anyway) is to assure that the amount of value actually provided and received is minimized.

The Settlement calls for the face value of all calling cards to be $1,500,000, such that each will be worth more than $5 if fewer than 300,000 claims are filed. This apparent guarantee is an illusion because it overlooks the certainly that not all cards will be used fully, if at all. The actual value will be less, depending how many cards are lost, forgotten, under-used, and/or expired. The relief for Subclass Members has no minimum.

The claims process is structured to discourage participation, and thereby reduce the total value – and, thus, the cost to Defendants – to little or nothing. To assure that the Settlement is more than a mirage, a minimum value must be established for the amount of relief actually used, not merely available for use. If a minimum value is not received by Class Members, then cy pres relief must be available to distribute some form of benefit to a charitable organization to assure that Defendants are exchanging tangible and fair value for their release.

If the settling parties really are willing to assure that all Class Members receive some benefit in return for the release and for Class Counsel's attorney fees, a default remedy must be established. For Class Members who do not submit a claim form, a minimal benefit must be available. Such provisions are common in class actions to make sure that a claims process is not -- deliberately or inadvertently -- so onerous that the class is left empty-handed, while defendants and class counsel are counting their benefits.

Settlement notices were sent by mail, so Class Members likewise could receive mailed notices that they can automatically some benefit if they do not submit a claim

within a certain time. The money saved from claim-form administration would reduce the cost of the default relief.

## III.    SUMMARY OF ATTORNEY FEES PROVISIONS

Defendants agree not to oppose a request of $1,600,000 for attorneys' fees and expenses. The Settlement Agreement does not contemplate a guaranteed minimum amount of relief., so it does not pay attorneys according to how much relief is actually received by their clients, the Class Members. It does not require fees to be paid fully only when Class Members receive relief.

Effectively the arrangement makes the fees contingent upon settling the litigation -- and providing a complete release for Defendants – rather than upon serving clients by putting relief in Class Members' pockets. Class Counsel would get paid fully even if little or no value is received by their clients, the Class Members, including those who did not or could not use the relief within the allotted time periods.

The Settlement Agreement fails to require that some fees be withheld pending Court approval of a report by Class Counsel to the Court concerning distribution of relief.[4] Such a provision is critical because it acknowledges that Defendants have control of implementing the settlement (after the Administrator processes claims and verifies eligibility). Such a monitoring requirement provides for accountability, and recognizes the possibility that minimal amounts of relief will be redeemed.

---

[4] Reservation of fees pending a report of distribution of relief was proposed in Objections to a class action pending against Nextel, a wireless telephone company which recently merged with Sprint, concerning some similar claims and proposing similar relief. The Court directed the settling parties to consider revisiting the settlement in light of the objection, and approved the settlement after it was adjusted to accommodate this important feature. See In re WIRELESS TELEPHONE FEDERAL COST RECOVERY FEES LITIGATION, 03-md-01559-FJG (W.D. Mo. 2004), aff'd on other grounds, 922 F.3d 922 (8th Cir. 2005)

## IV.    **OBJECTIONS**

In Amchem v. Windsor, 117 S.Ct. 2231, 2248 (1997), the Supreme Court held that all of the requirements of class certification must be met, even if the certification is sought only for the purposes of settlement. Thus, those seeking certification must satisfy four prerequisites. First, the class must be so numerous that joinder of all members is impracticable; second, common questions of fact and law must predominate over any questions affecting only individual members; third, the representative parties must fairly and adequately protect the interest of the class; and forth, class action must be the appropriate method for the fair and efficient adjudication of the controversy.

The Proposed Class Action Settlement is inadequate, unfair and unreasonable for the following reasons.

### A.    **Card-and-voucher relief is inappropriate and inadequate.**

Class Members paid Defendants with cash, so they should receive cash as relief. Yet, the relief is burdened with requirements, restrictions and qualifiers which can be intended only to (1) inhibit redemption and (2) conceal the near worthlessness of the relief.

#### 1.    **Restrictions virtually eliminate value of relief.**

On its surface, the Settlement Agreement appears to provide relief for all Class Members. However, the unnecessary and cumbersome qualifications and restrictions -- claim forms and expiration dates -- clearly were designed to deter Class Members from obtaining significant relief. First, the rules are confusing. Second, the process is onerous and requires constant involvement by Class Members to avoid losing relief. Class Member must constantly take additional actions, within allotted time periods, to avoid

missing, surrendering, or otherwise being stripped of relief. All of this effort would obtain only a few dollars' (or less) worth of relief. If Class Members stumble at any point, their relief is lost. Obviously the Defendant is expecting, or at least hoping, that the frustrated Class Member will simply abandon the relief because the process is more confusing and troublesome than it's worth.

This settlement is unfair and inadequate because of the imposition of a procedure that requires class members to submit a "claims form" plus an elaborate claims process as described above, in order to obtain a benefit. As both class counsel and defense counsel are perfectly aware, a claims form process results in far less that 10% of the claims forms being returned. Steve Tilghman, a class action settlement administrator who has performed over 175 settlements, testified that the "vast majority of settlements that required filing a notice of claim" resulted in less than 10% of the class members sending in the claims form. Sylvester, et al. v. Cigna Corp., 369 F.Supp.2d 34, 44 (D.Me. 2005).

The obvious way to reduce the effect of this elaborate claims process, and thereby show there is a genuine interest in providing substantial relief, is to allow a default remedy, as described above.

## 2.    Settlement effectively offers coupons.

The relief, as proposed, requires further action by Class Members to benefit from the relief. That is, the Settlement effectively is providing coupons. Coupon settlements have been criticized widely. See "Consumer Class Actions and Coupon Settlements: Are Consumers Being Shortchanged?", Advancing the Consumer Interest, Vol. 12, No. 2, Fall/Winter 2000, wherein Westchester County (New York) Court Judge Thomas A. Dickerson describes the shortcomings of such settlements. For instance, he notes that in Kahn v. Bell Atlantic NYNEX Mobile, New York Law Journal, June 4, 1998, p. 29, Col. 4 (N.Y. Sup.) the court rejected a proposed settlement offering class members "free airtime" because it could not "make an independent assessment of the value of the airtime."

In the instant case, the Court cannot ascertain the value of the relief until it knows (1) how many customers are covered, and (2) how much of the relief actually will be used. With no minimum value, and no <u>cy pres</u> provision to cover a shortfall between the minimum and actual values, the Court has no basis for figuring what the relief is worth and, thus, no basis for deciding if the settlement is fair. Of course, without knowing what the relief is worth, the Court also will have no basis for deciding what amount of attorneys' fees is fair.[5] Without knowing the value of the settlement to Class Members, the Court cannot make an independent finding about whether the Settlement is fair.

Consider <u>In re General Motors Corp. Pickup Truck Fuel Tank Products Liability Litigation</u>, 55 F.3d 768 (3d Cir. 1995), <u>cert. denied</u>, 516 U.S. 824 (1996), wherein the court rejected a settlement (seeking $4 million in attorneys fees) which offered $1,000 coupons for purchases of a new trucks. In <u>Maffei v. Alert Cable TV of North Carolina</u>, 342 S.E.2d 867, 872 (N.C. Sup. 1986), class certification was denied where the 29-cent relief was worth less than the cost of postage and stationery for submitting a claim.

Part of the difficulty in identifying the value (and proper attorneys fee) of a coupon settlement is the uncertain and low redemption rate -- sometimes called the "take rate." Judge Dickerson's article notes that redemption rates for food and beverage coupons consistently average between 2% and 6%. In <u>Bloyed v. General Motors Corp.</u>, 881 S.W.2d 422, 431 (Tex.App. -Texarkana 1994), the court rejected a settlement because the anticipated take rate -- between 10% and 46% -- was too low. Judge Dickerson cites several cases which have solved this problem by requiring that coupons continue to be issued until an agreed value has been redeemed: <u>Feldman v. Quick Quality Restaurants, Inc.</u>, New York Law Journal, July 22, 1983, p. 12, col. 4 N.Y.Sup.); <u>In re The Coca-Cola Co. Apple Juice Consumer Litigation</u>, No. E-47054 (Ga.Sup.Ct. Fulton Co. May 4, 1998); <u>Tepper v. Tropicana Products, Inc.</u>, No. 96-000846 (Fla. Cir. Ct. Manatee Co. Nov. 13, 1998), <u>Muller v. Cadbury Schweppes PLC</u>, No. 96-0148788

---

[5] See the article attached as Exhibit B, "Federal Court Draws Roadmap to Scrutiny of Attorneys' Fees in 'Coupon Settlements,'" Legal Backgrounder Vol 21, No. 14,, Thomas M. Smith and Natalie S. Watson, (Washington Legal Foundation April 7, 2006.)

(Conn. Super. Ct. Waterbury Jud. Distr. June 29, 1999). Judge Dickerson also found cases wherein cash, coupons or goods were given to charity until the agreed settlement amount was met: <u>Ohio Public Interest Campaign v. Fisher Foods</u>, 546 F. Supp. 1 (N.D. Ohio 1982); <u>Gordon v. Boden</u>, No. 89 CH 6531 (Ill. Cir. Ct. Cook Co. July 14, 1995).

Coupon settlements also have been rejected in <u>Clement v. American Honda Fin. Corp.</u>, No. 3:95cv 660 (AHN) (U.S. D. Conn. 1997), and <u>Buchet v. ITT Consumer Fin. Corp.</u>, 845 F.Supp. 684 (D. Minn.), <u>as amended</u>, 858, F.Supp. 944 (1994), among others.

**B.**    <u>**Attorneys fees cannot be approved.**</u>

    **1.**    <u>**Value of settlement must affect amount of fees.**</u>

Contingency fees should be payable according to the value of results actually achieved. Regardless of the lodestar, or the amount of work, or the success in concluding complex litigation, or the theoretical gross amount of value, or the number of claims submitted, fees should be paid only according to the value which actually reaches Class Members' pockets. If Class Members cannot obtain significant quantifiable relief, because the relief is too confusing, or the restrictions and qualifications are too onerous, their lawyers have not provided a service to them. No matter how hard lawyers work, if they do not provide worthwhile relief to the Clients, the Class members, they should not be paid in regard to those Class Members. If the relief is delivered, but is less than promised, then the fee should decline accordingly.[6] The purpose of the settlement is to obtain value for the Class Members, as well as for the Defendant and Class Counsel.

The settlement value is unknown; the claims made could be zero, in which case there would be no class benefit. Currently there is no way to predict how many people will make claims and what the value of these claims will be. It could be One Hundred

---

[6] In one recent case, <u>In Re: Excess Value Insurance Coverage Litigation</u>, Case No. M-21-84-(MDL No. 1339)(S.D.N.Y. Nov. 2, 2005), Judge Richard M. Berman chose to wait for the coupon claim process to end so he could determine the actual benefits paid to the class before deciding the amount of attorney's fees to award.    See Exhibit B for discussion of recent trend toward linking fees to the amount of benefit actually obtained by class members.

Thousand Dollars ($100,000.00) or Fifty Million Dollars ($50,000,000.00) or anything in between. There is no way to currently estimate that. Therefore, the $1,600,000 fee to class counsel must be questioned. The Court should wait until after there is a report to the Court concerning the real value (or even the estimated value) of the settlement. Only then, after the Court knows what the value of the settlement was to the class, can the Court judge the relationship between the settlement and the fee. The Court in its capacity as a fiduciary to the class should have this information before awarding the fee.

### 2.    The Class must be protected

The Court may also wish to view this case as similar to a "common fund" case and determine the amount of the fee as a portion of the total recovery to the Class. However, since no evidence has been submitted concerning the value of the settlement, the Court should defer ruling on the Fees until such time as it receives evidence concerning the probable benefit to the Class.

The amount of fees is objected to because there is no evidence of the basis of the fee request. The Court assumes the position of a fiduciary for the Class when the question of Attorneys' fees arises. At that point, Counsel and the Class have differing goals. This is especially true, as here, when there is no evidence of what the total benefit to the Class will be.

In this case, class counsel is being paid an amount that has no apparent relationship to the amount of the settlement fund. Dozens of cases have confirmed and identified this fiduciary role. For example:

> Before considering the proper methodology for awarding attorney's fees out of a common fund, the Court feels compelled to define its role in these proceedings. When an attorney makes a claim for fees from a common fund, his interest is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class. Rawlings v. Prudential-Bache Properties, Inc., 9 F. 3d 513, 516 (6th Cir. 1993). This divergence of interests requires a court to assume a fiduciary role when reviewing a fee application because there is often no one to argue for the interests of the class: class members with

small individual stakes in the outcome will often fail to file objections
because they lack the interest or resources to do so and the defendant who
contributed to the fund will usually have scant interest in how the fund is
divided between the plaintiffs and class counsel." In Re Copley
Pharmaceutical, Inc. 1 F. Supp. 2d 1407 (Wyoming, 1998). (emphasis
added.)

In Wise v. Popoff, et al. 835 F. Supp. 977, (E.D. Mich. 1993) the court describes the roles
as follows:

An attorney's role changes once he files a fee petition. No longer a
fiduciary for his client he becomes nothing more complex than another
claimant against the fund created for the client's benefit. The court must,
in turn, become "the fiduciary for the fund's beneficiaries and must
carefully monitor disbursement to the attorneys by scrutinizing the fee
applications." Skelton v. General Motors Corp., 860 F 2d 250, 253 (7th
Cir. 1988), cert denied, 493 US 810, 110 S. Ct. 53, 107 L. Ed. 2d 22
(1989). A court should not "rubber stamp" fee applications In re
Cincinnati Gas & Electric Co. Securities Litigation, 643 F. Supp. 148, 152
(S.D. Ohio 1986). The fact that the settling defendant may agree with the
fee application (or, as in this case, be persuaded to remain silent about it)
is irrelevant to the Court's analysis because the defendant having already
paid the settlement amount, has little interest in the portion of the fund that
the class attorney is allowed to retain". (emphasis added.)

This Court, therefore, must act as a fiduciary to the Class, carefully evaluating the

basis for the fee amount. The Court should at least determine what the lodestar amount is

(hours expended time hourly billing rate) and whether that bears a rational relationship to

the fee requested. The Court must examine not only the amount of time expended, but by

whom it was expended. That is, was it by a partner, an associate or a contract attorney,

and were the rates reasonable for the locale?

### 3.    Pay attorneys with cards and vouchers.

Defendants' customers paid with cash, but would receive only cards and

vouchers. If such relief has value, Class Counsel should accept it as fees. A pro rata

share of the total relief that is paid with cards and vouchers should be paid to Class

Counsel in the same form. Then the true value of the Settlement will be identified, and the opportunity for a secondary market can develop.

**C.    There Should be a Cy Pres Award to Indirectly Benefit Class Members Who Cannot Make a Claim or Were Granted No Relief in The Settlement**

As discussed above, there are class members who will not receive any direct benefit from the settlement. When the settlement employs a reversionary fund, a cy pres distribution is appropriate to ensure that the public and the class are adequately compensated.

Abuses in the class action system have been the topic of numerous court decisions. Saylor v. Lindsley, 456 F2d. 896, 900-01 (DD Cir. 1972); Piabvino v. Bailey (Piabvino II) 757 F.2d 1112, 1143-44 (11th Cir. 1985), cert denied 476 US1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518 (1st Cir. 1991).

Courts have noted that the largest number of abuses occur in connection with "reversionary fund settlements" which include a "clear sailing clause" and "revertible clause." A "revertible clause" settlement is one in which any settlement proceeds that are not claimed by class members "revert" back to the defendant. Sylvester et al.v. Cigna Corp., 369 F.Supp.2d 34 (D.Me. 2005). Such reversionary fund settlements commonly include a feature under which each class member is required to return a "claims form" to obtain their settlement payment. Id. However, the defendant retains any unclaimed funds. A "clear sailing" clause is a provision in a class action settlement in which the defendant agrees not to oppose class counsel's attorneys' fee request as long as the requested fee does not exceed a negotiated amount. Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 520 N.1 (1st Cir. 1991).

The proposed class action settlement before this Court is a reversionary fund settlement with an apparent clear sailing provision. Courts have noted that when a

proposed settlement contains a reverter clause and/or a clear sailing clause, that the proposed settlement should be viewed with even greater suspicion than the normal class action settlement, and should not be presumed to be fair to the class members on whose behalf it was allegedly made. International Precious Metals Corp. v. Waters, 530 U.S. 1223, 147 L. Ed. 2d 265, 120 S.Ct. 2237 (2000); Sylvester, et al. v. Cigna Corp., 369 F.Supp.2d 34 (D.Me. 2005).

Once the court requires the parties to submit proof of the value of the settlement, a cy pres distribution of unclaimed funds should be required.

### D.    Fees must be paid in installments.

Class Counsel must be paid soon for the considerable amount of hard work already done. However Class Counsel should not be paid immediately when work remains to be done. To assure the Class, the Court, and the public that relief is being delivered accurately, completely and on time, fee payments must be staggered. The concept has worked well in many class actions to maintain the integrity of settlement administration.

Judge Fernando Gaitan reacted to a similar suggestion by objectors in In re Wireless Telephone Federal Cost Recovery Fees Litigation, MDL 1559 (W.D. Mo. April 20, 2004), aff'd on other grounds, 922 F.3d 922 (8th Cir. 2005) ("the Nextel case,") when he directed the parties to respond to an objector's argument that fees must be staged, rather than paid in a lump sum. The settling parties responded by amending the proposed agreement to provide 75% upon final approval of the settlement, and 25% upon completion of all post-settlement obligations.

This common-sense concept has applied successfully in many other class actions. In Richard Duhaime v. John Hancock Mutual Life Insurance Company, et al., 177 F.R.D.

54 (D.Mass 1997), the federal court withheld 40% of the contemplated fee for a year so the court could review the quality of representation provided by Lead Counsel and the results achieved for the class. Similarly, in <u>Ace Seat Cover Co., Inc., et al. v. The Pacific Life Insurance Company</u>, Case No. 97-CI-00648 (Kenton Cir. Ct. Ky., Nov. 19, 1998), the court ordered 20% of the fees withheld until completion of the settlement agreement. In <u>In re: Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 962 F.Supp. 450 (D.N.J. 1997), <u>aff'd</u> re class certification and settlement but <u>vacated and remanded</u> re attorneys fees, 148 F.3d 283 (3d Cir. 1998), the court ultimately ordered that 50% of the attorney's fees be withheld. Likewise, as recently as April 12, 2007, in <u>In Re: PNC Financial Services Group, Inc. Securities Litigation</u>, Case No. 2:02-cv-00271-DSC (U.S.D.C. W.D. Pa. W.D. filed April 17, 2007), Judge Cercone ordered part of the class counsel's fee withheld at interest pending entry of an order of distribution. As noted in the order, at page 11, the change had been suggested by an objector in that case.

At least 20 percent should be withheld pending completion of the claims-submission process, so Class Counsel can report to the Court on the take rate. Another 20 percent should be withheld pending distribution of all relief. By staggering the fees, Class Counsel can be paid for work that has been done. But Class Counsel cannot get the full benefit of the Settlement until their clients, the Class Members, get the full benefit of the Settlement. Basic, prudent business practices dictate that people should not be paid fully until the job is done completely.

### E.   Oversight will assure relief is delivered by claims administrator.

For the reasons described in the cases above, and to demonstrate the integrity of the Settlement administration, payments to the Claims Administrator must be staggered to show the Class, the Court and the public that the Agreement is being administered promptly, correctly and completely.   A classic and poignant example of the need for oversight appeared a few weeks ago on May 1, 2007 in Vaughn v. American Honda Motor Co., Inc., Case No. 0-04CV-421 (U.S.D.C. E.D. Tex. Marshall Division.)   The administrator suddenly disclosed an error in that it failed to give notice to 500,000 of the 6,000,000 class members.   On May 2, 2007, the court ordered the fairness hearing to be postponed from May 30, 2007 to August 21, 2007 to allow notice to be sent, and to renew the deadlines for opting out or filing objections.   Obviously, if the error had occurred after a settlement were approved, then the court, the class members, the public, and maybe even the class counsel, might never had known.   The result would be that the settlement would fail without a fundamental mechanism for accountability.

In the instant case, the Court must maintain jurisdiction, and at least minimal oversight, to assure that the Settlement is implemented as promised.   When the final report is delivered, the Court can order payment of the last attorney fee payment and can make the Defendants' release final.

### F.   Monitoring and reporting are essential.

To have any credibility, the Settlement must require reports to establish that it is performing as promised.   The reports must be delivered to the Court so they are available to the public, including Class Members.   Progress and results must be a condition of

awarding benefits to the Defendants (the Release) and Class Counsel (attorney fees) because a Settlement that benefits only Defendants and Class Counsel, but not Class members, is not fair, reasonable or adequate. The reports need not be elaborate, but must show what efforts and results have occurred in notifying Class Members, obtaining Option Forms, and distributing relief.

In the Nextel case, Judge Gaitan directed the parties to address the objectors' concerns about administration oversight and reporting. The parties submitted a joint response to the court's order, agreeing to modify their settlement agreement to accommodate the objectors' concerns. For instance, their settlement agreement was changed to provide:

> Further, Class Counsel shall file a report with the Court setting forth the results of the discovery regarding Defendants' provision of benefits to class members, together with supporting information showing its compliance with the Settlement Agreement, within fifteen (15) days following the completion of discovery. Once the Court is satisfied with Defendants' and Class Counsel's performance under the Settlement Agreement, the Court shall authorize and direct Defendants to pay the final twenty-five percent (25%) of the attorneys' fees due Class Counsel as set forth in Paragraph 13.

Upon approving the modified settlement, Judge Gaitan awarded attorneys fees to Class Counsel.[7]

---

[7] In the Nextel case, Judge Gaitan awarded to class counsel $2,500,000 (which is 1.2% of the class recovery) in response to a request for $3,500,000 (1.7% of the class recovery.) The remaining $1,000,000 was awarded to objectors who made contributions to improving the settlement.

### G.     Deadlines must benefit Class, not just Defendants and Counsel.

The Settlement unfairly favors Defendants and Class Counsel, at the expense of Class Members, as demonstrated by the schedule specified in the agreement. For instance, claims must be submitted by July 19, 2007, or relief is forfeited. Likewise, if cards are not used within 360 days, they expire. If vouchers are not used within 90 days, they expire, too. These deadlines all operate to benefit the Defendants, but not the Class Members. Consider, also, the time for paying attorney's fees: Within ten business days of the Effective Date, which is long before any Class Member receives any relief.

Conspicuously absent are the deadlines which would favor or benefit Class Members. For instance, there is no deadline for processing claims. The Administrator could spend weeks, months, or years. The fully paid Class Counsel will have no financial incentive to oversee how promptly the Administrator performs, or to report the progress to the Court. Likewise, there is no deadline for issuing cards, or issuing vouchers. The Administrator could wait for weeks, months or years after completing the claims processing before distributing relief. With no deadlines, and no incentives, the Class Members -- who allegedly were victimized by Defendants -- would be victimized again. No Settlement which leaves such a gaping and critical hole in the administrative process can be considered reasonable or adequate.

### H.     Adoption of all other objections

Further, this Objector adopts all bona fide objections filed by other class members in this case and incorporates them by reference as if they appeared in full herein.

### V.     OBJECTORS' VALUE TO CLASS-ACTION PROCESS.

In their zeal to win approval of an agreement, professional class counsel and professional defense counsel often overlook or deny the importance of objectors to the

class-action process. Indeed, professional class counsel and professional defense counsel may even denounce objectors' counsel as "serial objectors," or use some other pejorative epithet.[8] However, settlements, such as this one, can be so complicated that only lawyers who have participated in many class action lawsuits can provide insightful and useful analysis, thoughtful alternatives, and a context within which to identify flaws or oversights in a settlement, and thereby assist a court in fulfilling its duty to examine the settlement as an independent and impartial neutral.

Thus, objectors provide great value to the class action process. Without resolving the issues described above, the Settlement could become a complete sham and no one would be the wiser. The judicial system would have failed Class Members by requiring no mechanism for assuring that the agreed relief ever is received by the persons who should benefit. The foregoing observations are submitted to improve the Settlement, and thereafter to guarantee it will work, and to show when and how well it is completed. These improvements are developed only now because objectors offer the last opportunity to preserve the adversary process which is necessary to test the fairness of a proposed settlement.

"It is desirable to have as broad a range of participants in the fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally. . . . It is impossible for a class to select, retain or monitor its lawyers as an individual client would." Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P., 212 F.R.D. 400, 412 (E.D. Wis. 2002). "Class counsel and defendants' counsel may reach a point where they are cooperating in an effort to consummate the settlement." Id. "Courts, too, are often inclined toward favoring the settlement, and the general atmosphere may become largely cooperative." Id.

"Thus, objectors serve as a highly useful vehicle for class members, for the court and for the public generally." Great Neck, 212 F.R.D. at 412. "From conflicting points

---

[8] Such ad hominem attacks can be presumed to arise only in the absence of legitimate, persuasive and substantial responses to the merits of the objections.

of view come clearer thinking." Id. at 412-13. "Therefore, a lawyer for an objector who raises pertinent questions about the terms or effects, intended or unintended, of a proposed settlement renders an important service." Id. at 413.

The value of objectors is even acknowledged by attorney Melvyn Weiss, one of the nation's most well-known class action attorneys, of the firm now known as Milberg Weiss & Bershad LLP: "Objectors are part of the class action system and, though they may be irritating from time to time, the system's been working effectively. If objectors can come in and negotiate a benefit, that's great. I'm not going to criticize one of the safeguards [of the class action process]. The objectors act as a check and balance to the whole procedure." See, "Objectors to class action settlements: Watchdogs or scum of the earth?" by Joe Frey, Insure.com website, March 23, 2000.

"The law generally does not allow good Samaritans to claim a legally enforceable reward for their deeds." Reynolds v. Beneficial Nat. Bank, 288 F.3d 277, 288 (7th Cir. 2002) (Posner, C.J.). "But when professionals render valuable albeit not bargained-for services in circumstances in which high transaction costs prevent negotiation and voluntary agreement, the law does allow them to claim a reasonable professional fee from the recipient of their services." Id. "That is the situation of objectors to a class action settlement." Id.

In other cases, objectors' counsel have been recognized where their efforts have augmented the common fund or otherwise improved a class action settlement. See, e.g., Bowling v. Pfizer, Inc., 922 F.Supp. 1261, 1285 (S.D. Ohio), aff'd, 102 F.3d 777 (6th Cir. 1996); In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 257, 359-60 (N.D.Ga. 1993). Indeed, even in cases where objectors appeared but the settlement terms were not altered, courts have recognized their value in that their presence improved the process and assisted the court in its scrutiny of the settlement. See County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1325-27 (2d Cir. 1990); Howes v. Atkins, 668 F.Supp. 1021, 1027 (E.D.Ky. 1987); Frankenstein v. McCrory Corp., 425 F.Supp. 762, 767 (S.D.N.Y. 1977); see also Domestic Air, 148 F.R.D. at 359. In In Re: PNC Financial

Services Group, Inc. Securities Litigation, Case No. 2:02-cv-00271-DSC (U.S.D.C. W.D. Pa. W.D.), decided last month on April 12, 2007, Judge Cercone made a specific finding "in recognition of the benefit to the Class created by the objection and the time spent thereon by Objector's Counsel . . ." and thereby awarded compensation to Objector's counsel.

Accordingly, Objector wishes to reserve the right to apply for reasonable and appropriate compensation for the valuable and crucially important services which have been provided in assisting the Court with this complex matter, preserving the adversary process needed to test the Proposed Settlement, identifying problems with the Proposed Settlement, and presenting substantial and workable solutions.

Just as objectors' counsel should be encouraged to assist the class-action process, so should individual class members be encouraged to participate. Accordingly, an incentive award is appropriate for Objector herein for her   willingness to be a named party, promoting fairness, and contributing to the common welfare of the Class.

## V.    **CONCLUSION**

This Objector hereby adopts, subscribes to and incorporates into these Preliminary Objections all other well-taken, timely filed objections. This Objector also requests an incentive award as a representative of Class Members in this litigation.

WHEREFORE, This Objector respectfully requests that this Court:

A.    Upon proper hearing, sustain these Objections;

B.    Upon proper hearing, enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the proposed settlement.

C.    Award an incentive fee to this Objector for her service as a named representative of Class Members in this litigation.

Dated: _____5-21_____, 2007

Respectfully submitted,

_John C. Rayson_
John C. Rayson                    Fl bar # 204153
Law Offices of John C. Rayson
2400 E. Oakland Park Blvd.
Fort Lauderdale, FL 33306
(954) 566-8855

_Kenneth E. Nelson_
Kenneth E. Nelson (Mo. Bar 31993)
Nelson Law Firm, P.C.
2900 City Center Square
1100 Main Street
Kansas City MO 64105
(816)421-7225
(816-421-3339 fax
kennelson@mclaw.com

Attorneys for Objector, Dina Hill

Dated: _____5 - 21_____, 2007

Respectfully submitted,

_____*John C. Rayson*_____
John C. Rayson    *Fl Bar # 204153*
Law Offices of John C. Rayson
2400 E. Oakland Park Blvd.
Fort Lauderdale, FL 33306
(954) 566-8855

_____*/S/*_____
Kenneth E. Nelson (Mo. Bar 31993)
Nelson Law Firm, P.C.
2900 City Center Square
1100 Main Street
Kansas City MO 64105
(816)421-7225
(816-421-3339 fax
kennelson@mclaw.com

Attorneys for Objector, Dina Hill

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was sent to the following on this _2 1_

day of _____*May*_____, 2007, to:

HARKE & CLASBY LLP
155 S. Miami Ave., Ste. 600
Miami, FL 33130

KOZYAK TROPIN & THROCKMORTON PA
2525 Ponce de Leon, 9th Fl.
Coral Gables, FL 33134

David Walsh, Esq.
Paul Hastings, et al.
515 S. Flower St.
Los Angeles, CA 90071

Judith M. Korchin, Esq.

Holland & Knight LLP
701 Brickell Ave., Ste. 3000
Miami, FL 33131

Keith Kodosky. Esq.
Paul Hastings Janofsky & Walker LLP
600 Peachtree St., NE, Ste. 2400
Atlanta, GA 30308

Hillary Bass, Esq.
Holly R. Skolnick, Esq.
1221 Brickell Ave.
Miami, FL 33131

By: _____

Exhibit A

I have authorized my attorneys to submit the foregoing objections on my behalf.

*Dina Hill*    5·21·07

Dina Hill                          Date

Legal Backgrounder

Washington Legal Foundation
Advocate for freedom and justice®
2009 Massachusetts Avenue, NW
Washington, DC 20036
202.588.0302

Exhibit B

Vol. 21 No. 14

April 7, 2006

# FEDERAL COURT DRAWS ROADMAP FOR SCRUTINY OF ATTORNEYS' FEES IN "COUPON" SETTLEMENTS

## By

## Thomas M. Smith and Natalie S. Watson

In certain situations, coupon settlements represent the ideal resolution for class action lawsuits. Class members obtain retail products that they regularly use rather than a check for a de minimis amount representing the wholesale or manufacturer's price of the product. Defendants, often large corporations, are able to provide class members with maximum benefit at the most efficient cost. Indeed, in some situations, the defendants themselves benefit from additional purchases made by class members redeeming coupons. But while coupon settlements offer a great benefit to class members and to defendants, that benefit has been overshadowed by the specter of bloated class counsel fees.

In several high-profile class actions, including *In re Excess Value Insurance Coverage Litig.*, No. M-21-84, MDL-1339 (S.D.N.Y. Nov. 2, 2005), class counsel has attempted to justify extraordinarily large fee awards by pointing to projected coupon redemption rates. At the close of the redemption period, however, class counsel's projections often fall far short of the actual redemption rate. The gap between attorneys' fees and coupon redemption rates indicates an even larger problem:

> [I]t is not unusual for 15 or more different plaintiffs' law firms to get a nominal client and file copy-cat class action lawsuits which are later consolidated. The firms then ride each others' gravy train as they seek attorneys' fees for work that is often duplicative or unnecessary, thereby undermining one of the very purposes of allowing class actions, *i.e.*, the reduction of litigation and transaction costs...it is no secret that what drives these cases is the prospect of forcing settlements and being awarded huge attorneys' fees even where the "injury" is de minimus or liability doubtful.

Paul D. Kamenar, *The Use of "Coupon" Compensation and Other Non-Pecuniary Redress*, Address before the Federal Trade Commission's Workshop on Protecting Consumer Interests in Class Actions (Washington, D.C., 2004), *reprinted in* 18 GEO. J. LEGAL ETHICS 1161 (2005). The Washington Legal Foundation ("WLF") has long recognized that the key to reigning in runaway attorneys' fees is to align class counsels' interests with those of the class members. As such, WLF has recommended basing attorneys' fees for class counsel in coupon settlements upon a lodestar approach, rather than upon a percentage of the projected coupon redemption rate. *Id.*

Congress, also having recognized the abuses inherent in class action lawsuits, recently enacted the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1711, *et seq.* CAFA takes a first step in realigning class counsels' interests with those of class members, mandating that "the portion of any attorneys' fee award to class counsel

---

**Thomas M. Smith** is Counsel at McCarter & English, LLP, in the firm's New York office. Mr. Smith concentrates in trial and appellate practice with particular emphasis in the defense of personal injury and product liability actions. **Natalie S. Watson** is an Associate at McCarter & English, LLP, in the firm's Newark office. Ms. Watson concentrates her practice in Products Liability, focusing on civil litigation, with an emphasis on the defense of claims against manufacturers of industrial equipment, consumer products, and medical devices.

that is attributable to the award of coupons *shall be based on the value to class members of the coupons that are redeemed.*" 28 U.S.C. § 1712(a) (emphasis added). If the attorneys' fees are based upon mixed relief to the class, meaning coupons and injunctive relief, the portion of the attorneys' fees based upon the recovery of coupons must be based upon the value of redeemed coupons. *Id.* at § 1712 (a) and (c)(1). The portion of the attorneys' fees based upon injunctive relief must be based upon "the amount of time class counsel reasonably expended working on the action," and may involve the application "of a lodestar with a multiplier method. . ." *Id.* at § 1712 (b)(1) and (2) and (c)(2). Section 1712 (e) expressly requires the court to review the coupon settlement to determine whether the settlement is fair, reasonable and adequate for class members. Through such new regulations, CAFA begins to lift the shadow of over-inflated attorneys' fees for class counsel from coupon settlements in federal court.

According to recent studies, however, most state court class actions will remain in state court under CAFA, free from Section 1712's restrictions. Consequently, state courts and state legislatures remain on the frontline facing down runaway attorneys' fees for class counsel in coupon settlements. The holding of *In re Excess Value Insurance Coverage Litig.*, No. M-21-84, MDL-1339 (S.D.N.Y. Nov. 2, 2005), though a pre-CAFA federal district court case, offers a potential model for state court analysis.

***Background for the In Re Excess Ins. Coverage Litig. Holding.*** *In re Excess Value Insurance Coverage Litig.*, No. M-21-84, MDL-1339 (S.D.N.Y. Nov. 2, 2005), was a consolidated multidistrict litigation brought against United Parcel Service, Inc., ("UPS"), and related defendants by consumers who purchased "excess value" shipping insurance offered by UPS. The matter was first addressed in the Tax Court in *United Parcel Service of America Inc. v. Commissioner*, 1999 WL 592696. The Tax Court found that UPS had engaged in "ongoing sham transactions devoid of economic substance." That holding gave birth to a flurry of class action proceedings against UPS, alleging, *inter alia*, fraud, breach of contract, violations of insurance regulations, RICO violations, and violations of federal antitrust laws.

The purported "sham transactions" highlighted by the Tax Court arose from a captive insurance company set up by UPS to cover risks for losses on its excess value insurance. UPS had a policy of reimbursing customers for lost or damaged parcels up to $100 in declared value. For packages in excess of $100 in declared value, the company would assume liability and charge twenty-five cents per additional $100 in declared value. That practice was known as the "excess value charge."

In 1983, UPS, seeking certain tax advantages, formed a Bermuda subsidiary, Overseas Partners Ltd., to serve as a captive insurance company. UPS purchased an insurance policy for the "excess value" risk from National Union Fire Insurance Company. There was, in turn, a reinsurance agreement between Overseas Partners Ltd. and National Union. For tax purposes, the plan transformed a stream of income (excess value charges) into a deduction for UPS because the excess value charges became a deductible cost (insurance premiums) paid first to National Union and then to Overseas Partners Ltd. under the reinsurance contract. In short, the plan transformed a stream of income into a deduction for the parent corporation and the profit eventually resided in a foreign subsidiary (presumably taxed at lower rates).

In April, 2000, the Judicial Panel on Multidistrict Litigation consolidated before Judge Berman of the Southern District of New York several purported class actions concerning the UPS excess value insurance coverage program. *In re EVIC Class Action Litigation*, No. M-21-84, 02 CIV 2703, MDL-1339. 00 CIV 3811. This consolidated multidistrict litigation ("MDL") involved some 27 separate class actions brought against UPS and related defendants in state and federal courts throughout the United States by purchasers of "excess value" shipping insurance ("EVIC") offered by UPS .

In 2001, the Eleventh Circuit reversed and remanded the adverse Tax Court decision against UPS. *UPS of America Inc. v. Comm'r*, 254 F.3d 1014, (11th Cir. 2001). The court found that the purported "sham transactions" actually had real economic effect and a business purpose. As such, the Eleventh Circuit's decision eviscerated many of the claims asserted by the purported class. Additionally, Judge Berman dismissed a plethora of state law claims on the grounds that they were barred by the filed tariff doctrine or preempted by the FAA shipping regulations. *In re EVIC*, 2002 WL 1766554; *Stein Jewelry Co. v. UPS Inc.*, 228 F. Supp. 2d 304 (S.D.N.Y. 2002). The plaintiffs' claims were further weakened when the United States Supreme Court, in

Copyright © 2006 Washington Legal Foundation

ISBN 1056 3059

*Verizon Communications v. Law Offices of Curtis*, 124 U.S. 872 (2004), reversed the Second Circuit case upon which the class members had based their antitrust claims.

Notwithstanding these body blows to plaintiffs claims, in November 2002, Judge Berman entered an Order certifying a nationwide class alleging RICO, breach of contract and intentional interference with contract claims and certifying subclasses of plaintiffs asserting claims under the insurance statutes of Texas, Kentucky, South Carolina and Kansas. As one of the objectors to the settlement noted, plaintiffs' case seemed "in search of a theory and a harm…" *In re EVIC*, 2004 WL 1724980.

***Extraordinary Attorneys' Fees***. The parties eventually entered into a settlement, with a major portion of it consisting of coupon vouchers to the individual class members. Additionally, UPS greed to certain structural settlement requirements, including posting signs reminding customers that they were not obligated to buy "excess value" insurance. Plaintiffs moved pursuant to FED. R. CIV. P. 23(e) for final approval of the settlement. Plaintiffs also moved for an award of attorneys' fees and expenses in the amount of $19,340,000. Finally, plaintiffs moved for an award of $5,000 to each of 32 class representatives, totaling $160,000 in incentive compensation.

Class counsel predicted that the aggregate face value of the coupon voucher program would be between $205 to $265 million. Based upon this projection, the attorneys' fees requested by plaintiffs' counsel would represent less than 10% of the value of the settlement. At the close of the coupon redemption period, however, *the value of goods and services for which the vouchers were redeemed totaled only $4,863,877, only 2.4% of plaintiffs' original estimate of voucher redemptions. Based upon the actual redemption rate, the attorneys' fees requested by plaintiffs' counsel was 280% greater than the actual value of redeemed coupons.* As such, the attorneys' fees requested by plaintiffs' counsel highlight the gap between class counsel and class member interests, a gap that CAFA's section 1712 is meant to bridge. Though a pre-CAFA, federal district court case, the *In re Excess Value Ins. Coverage Litig.* court's evaluation and reduction of those proposed attorneys' fees serves as a model for the analysis that should be applied in any court's evaluation of attorneys' fees arising from coupon settlements.

***Legal Analysis Used To Reduce Attorneys' Fees***. Abandoning the lodestar approach and refusing to base attorneys' fees upon projected coupon redemption rates, the court awarded class counsel $2,407,294 in legal fees and $753,144.25 in expenses, rather than class counsel's fee application of $19,340,000.00 ($18,478,571.70 in legal fees and $861,428.30 in expenses).

The court noted a trend throughout the country towards the percentage method of determining counsel fees, which link attorneys' fees directly to actual coupon redemption rates. It found that the percentage method directly aligns the interest of the class with its counsel, while also providing a powerful incentive for efficient prosecution and early resolution of litigation. Although the court noted some value in lodestar analysis, particularly as a "cross check" to insure that attorneys' fees were in line with coupon redemption rates, the court held that lodestar analysis is inappropriate when the lodestar substantially exceeds the value to the class of the coupons redeemed.

Under the percentage method advanced by the court, attorneys' fees are determined on an evaluation of the total value of the settlement, which consists of (1) the actual value of the voucher program; (2) the value of injunctive relief, namely, the structural changes; and (3) total award of legal fees and expenses. The court found that the voucher program consisted of a total value of redeemed vouchers of $4,863,877, representing only 2.4% of plaintiffs' original estimate of the voucher redemption. Next, the court attempted to quantify the value of the structural components of settlement.[1] The court declined to assign a specific value to the structural changes, but did find that those changes had provided some benefit to the class. Consequently, based upon those structural changes, the court decided to award legal fees at the upper end (30%) of the settlement value commonly awarded

---

[1]Plaintiffs presented an expert who asserted that the value of the structural changes in the settlement was between $79.8 million to $142.4 million. The court, noting that the same expert also had valued the coupon settlement at over $200 million, held that plaintiffs' valuation was not persuasive because "among other things, [the expert had] overestimated the value of the voucher program, i.e. by over 4,000%."

Copyright © 2006 Washington Legal Foundation                3                ISBN 1056 3059

under the percentage method (280% lower than the amount sought by plaintiffs' counsel). To determine the appropriate legal fee award, the court relied on the six factors outlined in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). Under the *Goldberger* approach, attorneys' fees are determined by evaluating the complexity of the case, the risk of the case, the quality of representation, the requested fee in relation to settlement, and public policy considerations. The court relied heavily on the findings made by Magistrate Judge Fox, to whom the initial fee application was made.

The court recognized that the case was complex, involving contract, RICO, and antitrust claims filed in 27 different state and federal cases on behalf of over 2.6 million plaintiffs. Nevertheless, the court strongly agreed with Judge Fox's ruling that despite the complexity of the case, class counsel should not have had 42 sets of counsel performing identical work and traveling to court conferences or case management sessions together throughout the case. As to the third *Goldberger* factor, the court found that the risk of litigation was very low, given favorable rulings for plaintiffs by other courts. The court also focused heavily on the fifth and sixth *Goldberger* factors, namely, the requested fee in relation to settlement and public policy considerations. The court found that those factors "compelled" a fee award significantly lower than the $19,340,000 sought by class counsel. The court held that "*it would be anomalous and unacceptable for counsel to fair better than the class, for example to receive 280% more than the class actually received, as class counsel suggest.*"

As for expenses, the court again agreed with Judge Fox's recommendations that the expense award be set at $753,144.25, rather than class counsel's initial request of over $861,000. The court, citing approvingly from Judge Fox's findings, upheld strict caps on class counsels' expenses, limiting reimbursements to $500 per round trip flight, $100 per day for meals, $200 per night for lodging, and 25 cents per facsimile page. The court expressly disallowed expenses relating to duplicative staffing. Responding to class counsel's argument that Judge Fox did not have a complete record when evaluating class counsel's expenses, the court noted that class counsel bore the burden to establish entitlement to fees, and "it was not Judge Fox's burden to fill gaps in class counsel's application." Finally, the court noted that Judge Fox's reduction in expenses would have the positive effect of discouraging plaintiff's practice of sending multiple attorneys to court conferences. Based upon the foregoing considerations, the court held that the settlement value of the case was $8,024,315. As such, it awarded class counsel legal fees amounting to $2,407,294, approximately 30% of the settlement value. In addition, the court awarded class counsel $753,144.25 in expenses, upholding Judge Fox's earlier determination.

***Conclusions.*** The *In re Excess Value Ins. Coverage Litig.* holding provides guidance to all those courts that are not bound by CAFA but are seeking more appropriate methods of evaluating attorneys' fees for class counsel in coupon settlements. Tying attorneys' fees to actual coupon redemption rates positively realigns the interests of class counsel with those of the class, removing the specter of bloated attorneys' fees from otherwise beneficial coupon settlements. But a court's analysis must go farther than a simple percentage method. As the *In re Excess Value Ins. Coverage Litig.* court found, courts must engage in an intricate evaluation, balancing numerous factors including even the impact of the attorneys' fees on the public's perception of the settlement. Courts also must begin to stamp out duplicative fees and expenses, closing the loopholes that have long permitted class counsel to benefit economically from defeating the very purpose of the class action lawsuit. By using an approach similar to the one advanced by the *In re Excess Value Ins. Coverage Litig.* Court, courts will be able to ensure that a coupon settlement is fair, reasonable and adequate, that attorneys' fees reflect the true value received by the class, and that efficiency and conservation of judicial resources are promoted.

Copyright © 2006 Washington Legal Foundation

ISBN 1056 3059

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 06-20734-CIV-SEITZ/MCALILEY

CARLOS PEREZ, ERIC ZIMELMAN,
ANGELA D. RIEKE and DOROTHY
HAYS, individually and on behalf of
all others similarly situated,

Plaintiffs,

vs.

ASURION CORPORATION; ASURION
INSURANCE SERVICES, INC.; ASURION
FLORIDA WARRANTY SERVICES, INC.;
LOCK/LINE, LLC; and LOCK/LINE
WARRANTY SERVICES OF FLORIDA, LLC,

Defendants.

_____/

**ORDER GRANTING CLASS COUNSEL'S MOTION IN SUPPORT**
**OF REQUEST FOR FINAL APPROVAL OF SETTLEMENT AND CLOSING CASE**

THIS MATTER is before the Court on Class Counsel's Motion in Support of Request for Final

Approval of the Settlement [DE-132]. The matter came before the Court on June 22, 2007 for an

evidentiary hearing pursuant to Federal Rule of Civil Procedure 23(e)(1)(A) (the "Final Fairness

Hearing"), as to the fairness, reasonableness and adequacy of the parties' proposed settlement of this

class action lawsuit (the "Settlement"). The Court has carefully reviewed the parties' and objectors'

papers, the evidence submitted, the statements of all counsel at the Final Fairness Hearing, the applicable

law, and the other relevant portions of the record. Upon due consideration, the Court grants Class

Counsel's motion and approves this Settlement.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

1.    There are over 234 million cell phone accounts in the United States, and over 70

million cell phones are lost and/or damaged each year. As a result, Defendants have approximately 40

million customers, and almost one quarter of their customers make claims under their "wireless phone

1

EXHIBIT

G

protection plans" each year.

2.      This litigation arises out of Plaintiffs' dissatisfaction with the wireless phone protection plans in which they enrolled to insure their cellular phones.  Plaintiffs argue, among other things, that these protection plans are not really insurance:  the required monthly premium "do[es] nothing more than create a right ... to have the opportunity to pay additional monies in the form of the so-called 'deductible' in order to receive a refurbished phone worth less than the deductible alone."  (Original Compl. ¶ 28, filed in Prohias v. Asurion Corp., Case No. 05-22259-CIV-SEITZ/MCALILEY [the "Original Complaint"].)  The Original Complaint (further defined in paragraph 6, below) was filed on August 15, 2005, and included allegations that Defendants fail to adequately inform consumers they may receive a refurbished phone; "demand unreasonable and large deductibles" that "range from $35 to $100 for each replacement phone;" and send out replacement phones which cost much "less than even the deductibles that the customers are required to pay."  (Id. ¶¶ 1, 9.)  However, this last allegation has proven unsupportable.  Discovery has established that the vast majority of replacement phones Defendants furnished to subscribers in fulfillment of claims – including refurbished phones – cost more than the deductibles charged.

3.      This Settlement will provide relief for approximately 10.3 million Class members (the "Class" or the "National Class").  It is the result of combining into a single action before this Court three separate class actions – two that have been litigated before this Court for approximately two years and one that has been litigated in the United States District Court for the Southern District of California for a slightly longer period.

4.      The California Litigation.  On July 5, 2005, Plaintiff Angela Rieke filed a proposed class action in the United States District Court for the Southern District of California against Asurion Corporation ("Asurion Corp."), Asurion Insurance Services, Inc. ("AIS"), and Hartford Fire Insurance Company ("Hartford"), for which AIS serves as an agent.  That case is styled Rieke v. Asurion Corp.,

Case No. 05-CV-1357-IEG (JFS) (the "California Litigation"). Plaintiff Rieke alleged nine causes of action including, among other things, that she and other similarly situated subscribers received replacement phones from AIS worth less than the deductibles charged in the insurance program to which she subscribed. AIS, Asurion Corp., and Hartford filed motions to dismiss in the case, and the district court granted the motion as to certain of the claims, but allowed several other claims to proceed.

5.      The parties in the California Litigation conducted written discovery and took various depositions, including the deposition of Plaintiff Rieke and AIS's corporate representative. Asurion Corp., AIS, and Hartford answered the Second Amended Complaint, and class certification and merits discovery commenced.

6.      <u>The Florida Litigation.</u> On August 16, 2005, Plaintiff Maria Prohias[1] filed a proposed class action in this Court against three different groups of Defendants: (1) Asurion Corp., AIS, and Asurion Florida Warranty Services, Inc. ("AFWS") (collectively "Asurion"); (2) lock\line LLC and lock\line Warranty Services of Florida (collectively "lock\line"); and (3) The Signal and Signal Holdings, (collectively "The Signal"). Thereafter, the Defendants filed extensive motions to dismiss, based in part on a prior settlement involving the Defendants (the "*Greiff* Settlement") and the alleged legal inadequacy of each of the pled claims. Plaintiffs filed oppositions to these motions.

7.      All counsel met and conducted an initial conference to prepare a Joint Scheduling Report. In the Joint Scheduling Report, Plaintiff described the Defendants' practices as unfair, claiming they required "deductibles which exceed the value of the replacement used or refurbished phones." Plaintiff served discovery upon each Defendant, including requests for production, interrogatories and notices for corporate representative depositions. The parties negotiated and litigated the scope of discovery. All parties served their required Initial Disclosures.

---

[1]      This is the "Original Complaint" referenced in paragraph 2 of this Order. Ultimately, Plaintiff Jose Sanchez replaced Plaintiff Prohias as the named class representative in the case.

3

8.     On March 3, 2006, the Court conducted an initial status conference to discuss the

motions to dismiss, among other things.  At the hearing, the Court granted in part lock\line's motion to

dismiss without prejudice, specifically holding that Plaintiff Prohias did not have standing to bring any

claims against lock/line.  The Court held that

> even though Plaintiff Prohias purportedly has paid premium charges to the
> lock/line Defendants . . . , she can only speculate that lock/line would have
> sent her a lower-value and/or defective replacement phone, had she needed
> one.  Such speculation that she would not have received the benefit of her
> bargain does not constitute an injury-in-fact.

(Mar. 6, 2006 Order [DE-87].)  Accordingly, the Court required Plaintiffs to demonstrate in the amended

pleadings that each proposed class representative had standing with respect to each Defendant – by

showing that they not only paid premiums, but also that they received a replacement phone that was

either defective or of a lower value than their deductible.  The Court lifted the stay on class certification

and merits discovery as to the remaining claims.

9.     The Separation of the Cases.  Pursuant to the Court's Order, three individual putative

class action complaints were filed in March 2006 against Asurion, lock\line and The Signal, respectively.

Carlos Perez filed a complaint against Asurion (*Perez v. Asurion Corp.*, Case No. 06-20734-CIV-SEITZ/

MCALILEY); Maria Prohias filed a complaint against The Signal (this case retained the original case

number, 05-22259); and Milva Lissabet, Eduardo Perez, Eric Zimelman, Dorothy Hays, and Lisha

Gomez filed a complaint against lock\line[2] (*Lissabet v. lock\line*, Case No. 06-20733-CIV-SEITZ/

MCALILEY).  This Settlement involves only the *Perez* and *Lissabet* actions.[3]

10.     Discovery Conducted in the California and Florida Litigations.  For approximately

_____

[2]     Asurion Corp. merged with DTS lock\line Inc. on January 1, 2006.

[3]     By Order dated April 3, 2007 [DE-154], the Court denied Plaintiffs' Motion for Class Certification
in Case No. 05-22259-CIV (against The Signal defendants).  Plaintiffs filed a motion for reconsideration [DE-156],
which this Court denied on May 16, 2007 [DE-163].  On June 4, 2007, the Court issued a Final Order Dismissing
Case With Prejudice [DE-166], based on the parties' Joint Stipulation of Dismissal With Prejudice [DE-164].

eighteen months, the parties in all three lawsuits conducted discovery on the relevant issues.  Among

other things, Defendants served document requests on all Plaintiffs and took the depositions of the

individual class representatives, Angela Rieke, Carlos Perez, Eric Zimelman, Dorothy Hays, Lisha

Gomez, and Eduardo Perez.  Plaintiffs' discovery focused on both the merits of their claims and the

viability of a certifiable class.  Plaintiffs propounded document requests and interrogatories to

Defendants and took the depositions of several of Asurion's and lock/line's corporate representatives,

eliciting testimony on numerous topics, including:

     \*     The cost of the replacement equipment furnished to subscribers, including the named

Plaintiffs, in fulfillment of subscribers' claims;

     \*     The cost of fulfilling subscribers' claims;

     \*     The value of the replacement equipment furnished to subscribers, including the named

Plaintiffs, in fulfillment of subscribers' claims;

     \*     The process by which Defendants procure equipment;

     \*     The procedure for administering subscribers' claims, including the "script" used by

customer service representatives and claims adjusters when processing subscribers' claims;

     \*     The policies, guidelines, practices, procedures and/or criteria for determining and setting

deductibles for filing claims for lost, damaged and/or stolen wireless equipment;

     \*     The policies, guidelines, practices, procedures and/or criteria for evaluating and either

denying and/or approving submitted claims regarding wireless equipment;

     \*     The policies, guidelines, practices, procedures and/or criteria for providing replacement

equipment and determining whether wireless equipment is "of like kind and quality;"

     \*     Any and all goods and/or services that were provided by Asurion and lock\line and/or an

affiliated entity to Plaintiffs and any and all documents, materials and/or information that was provided

by Asurion and lock\line to them relating to issues in this litigation; and

      *     The drafting and interpretation of the underlying insurance policies.

    11.    In response to Plaintiffs' document requests, the Defendants in *Rieke*, *Perez*, and *Lissabet* produced over 100,000 pages of documents, including data and charts that reflected AIS's actual and direct costs for procuring and shipping the replacement phones during the Class Period. In the *Rieke* Action, Plaintiffs' discovery efforts also focused on the drafting, interpretation, and implementation of the applicable insurance policies, including the use of the term "deductible."

    12.    On June 20, 2006, Asurion filed an extensive motion for summary judgment [DE-21], seeking to dismiss all claims alleged against it. On June 23, 2006, lock\line filed its own motion for summary judgment as to all claims. The primary basis of these motions was that the value of each of the replacement phones provided to the entire putative class always exceeded the paid deductibles, when all costs were included. The motions also included a legal challenge to the viability of the Plaintiffs' unjust enrichment claims. Plaintiffs filed equally extensive responses to the motions. Given the pending settlement, the Court has denied these motions as moot.

    13.    On June 26, 2006, Plaintiffs Perez and Lissabet filed comprehensive motions for class certification, seeking to certify a nationwide class of all subscribers. (DE-26, in Case No. 06-20734 and DE-24, in Case No. 06-20733.) The Plaintiffs alleged that both cases could be certified on a nationwide basis. Defendants filed lengthy oppositions to each motion. The certification motions were pending when this settlement was reached.

    14.    <u>The Settlement Discussions.</u>[4]  The parties spent more than eight months discussing the terms of a possible settlement of both the California and Florida Litigations, after discovery revealed various pertinent facts (including the actual cost of the new and refurbished replacement phones) and after Plaintiffs were able to obtain evidence confirming Defendants' nationwide practices.

---

    [4]    The Court's findings regarding the settlement discussions and mediation sessions are based on the parties' representations to the Court.

15.     <u>First Mediation Session.</u>  In early May 2006, the parties contacted Brian Spector, an experienced mediator, to serve as the mediator in these cases.  In early June 2006, Mr. Spector required the parties to submit briefs regarding the pending claims and allegations.  He asked for copies of all key pleadings, as well as a confidential mediation statement that summarized each party's factual and legal positions.  Finally, he requested a recitation of any prior settlement discussions and any pending settlement demands and offers.  On July, 12, 2006, the parties conducted the first mediation session.  Counsel for each party and Asurion's corporate representative attended the day-long session, which included opening statements and individual and group meetings to discuss the merits and weaknesses of the case.  At the conclusion of the session, the parties determined that settlement was impossible without further discovery regarding certain critical issues.  The parties were able to reach agreement on a settlement discovery plan, which the Court approved.

16.     <u>Settlement-Specific Discovery Plan.</u>  First, Defendants quickly produced documents and information regarding the total number of refurbished phones that were provided during the Class Period and the manner in which Defendants purchased those phones (if obtained from a third party source).  These documents included, *inter alia*, contracts with suppliers for the phones, alternative offers provided by competing suppliers, and analysis and reports regarding these offers.  The Defendants and insurance carriers also exchanged documents regarding the values of the replacement phones.

17.     Second, Defendants produced additional witnesses to testify regarding their procurement costs for replacement phones.  Lastly, Defendants assisted in producing for deposition a representative from one of the largest phone suppliers.  Plaintiffs agreed to research and provide to Defendants, within ten days after Defendants' discovery obligations were complete, alternative sources for refurbished phones and the relevant costs based upon such sources.

18.     In late October 2006, the parties advised the Court and the mediator that they had completed all of the settlement discovery, and they were ready to conduct a second mediation session.

The parties conducted several telephonic conferences to advance the settlement process and prepare for the second mediation session.

19.   The *Greiff* Settlement.   In negotiating the terms of the settlement, Plaintiffs considered the objections made to the previously mentioned *Greiff* Settlement.   The *Greiff* case was a class action law suit in Pennsylvania state court filed in 2001 (*In re Wireless Equip. Ins. Litig.*, Case No. GD-01-14629), involving the at-issue wireless phone protection plans.[5]   The *Greiff* Settlement consisted solely of a distribution of phone cards to class members; there were no vouchers for replacement phones or other injunctive relief.   In structuring the terms of the instant Settlement, Class Counsel particularly analyzed those objections that dealt with the specific relief to the *Greiff* class.

20.   Second Mediation Session.   On November 13, 2006, the parties conducted another day-long mediation session, during which they discussed the provisions of the proposed Settlement.   The parties discussed every provision of the proposed Settlement, including the specific details of the proposed vouchers and phone cards and the prospective injunctive relief.

21.   The first issue that the parties negotiated and resolved was the injunctive relief for the entire class.   With over 70 million phones lost and/or damaged each year, Class Counsel wanted to ensure that no customer would ever again receive a replacement phone worth less than the deductible Defendants charged.   Accordingly, Defendants agreed that:  (1) each and every placard and brochure distributed after the Settlement date would inform customers that they might receive a refurbished phone and that they would be paying a non-refundable fee and/or deductible; and (2) no customer would ever receive a replacement phone valued at less than the paid deductible, unless that customer was specifically so informed and accepted such a phone.

22.   The parties also spent an entire day negotiating the details of the proposed phone cards

---

[5]   Defendants had originally raised the *Grieff* case early in the course of these proceedings, in an attempt to argue that the *Grieff* Settlement barred Plaintiffs' claims here.

and vouchers.  Initially, Defendants had only been willing to provide monetary relief to the approximately 15,000 customers who had received refurbished replacement phones with acquisition costs less than the applicable deductibles.  According to Defendants, the Court's ruling on standing made it clear that all other class members did not suffer any "injury in fact," and thus, would not be entitled to any monetary relief.  Ultimately, Defendants recognized that – to achieve a global settlement, and in light of the unknown result from a jury trial – they would have to provide some monetary relief for all customers who received a refurbished phone during the Class Period, whether or not such phone was, in fact, valued more than the applicable deductible and whether or not such Class member even knew he/she would be receiving a refurbished phone.  The parties then separated the discussions between relief for a proposed Subclass and a proposed National Class.

  23. <u>Negotiations Regarding the Proposed Subclass.</u>  By the time of the Second Mediation, Defendants had already provided Class Counsel with extensive discovery showing that the average loss for each Subclass member (namely, the difference in value between the paid deductible and the value of the replacement phone) was between $3 and $8.  Based on this information, the parties agreed that these customers would be given vouchers entitling them to an <u>additional</u> replacement phone that had a value greater than any deductible already paid to the Defendants.  These customers would not be required to return the original replacement phone they had already received after paying the deductible.  (For example, if a customer paid a deductible of $50, he or she would be entitled to an additional phone with a value of at least $75.  If a customer paid a deductible of $100, he or she would be entitled to an additional phone with a value of at least $125.)  To increase the value of these vouchers, Class Counsel demanded that the vouchers be fully transferable and not expire for 90 days.  Moreover, to ensure maximum recovery, Class Counsel demanded that each voucher be mailed directly to the last known address for each Subclass member, without the need for a claims process.  Ultimately, Defendants agreed to these provisions.

24.    Negotiations Regarding the Proposed National Class.  Defendants initially took the position that the injunctive relief discussed in paragraph 21 of this Order would be sufficient relief for the National Class.  Class Counsel insisted that Defendants provide some form of monetary relief to each National Class member.  In light of their view that they would likely ultimately prevail, Defendants would not agree to any settlement that involved a cash payment to each National Class member.  Instead, Defendants agreed to distribute phone cards to the National Class members who submitted a claim form.[6] After much debate, the parties agreed upon a minimum distribution of phone cards in the amount of $1.5 million.  The parties also agreed that each card would have a face value of $5, providing a minimum of 50 minutes of calling time for each card at 10 cents per minute.  (Based upon the recently updated information on the number of claims filed, each phone card will now have a value of between approximately $10 to $12.)  The parties further agreed that the cards would be fully transferable and valid for one year.  Finally, the parties agreed not to require that Class members sign a claim form "under oath" or provide any additional records with the claim form.

25.    Thus, at the conclusion of the Second Mediation, the parties agreed on a Memorandum of Understanding ("MOU"), which confirmed the terms of the proposed Settlement.  The terms outlined in the MOU are the same terms that are outlined in the parties' Stipulation of Settlement and Release ("Settlement Agreement" [Ex. B contained in DE-50; as amended in DE-63; amended again in DE-83]). The parties have advised the Court that they did not discuss the issue of attorneys' fees until after they had agreed on the substantive terms of the Settlement.

26.    The Fourth Amended Complaint.  On January 8, 2007, the parties filed a "Joint Motion

---

[6]    Similarly, in *Greiff, supra*, the court approved a settlement in which the distribution of phone cards with a face value of $5 to class members was the sole monetary relief to the aggrieved class.

for Leave to File Fourth Amended Complaint[7] and for Preliminary Approval of the Settlement and Incorporated Memorandum of Law" (the "Joint Motion" [DE-50]). On January 9, 2007, the Court held a hearing on the Joint Motion (the "First Hearing"), and instructed the parties to address certain specific aspects of the Joint Motion at another hearing set for January 23, 2007. On January 18, 2007, the parties filed a "Corrected Joint Motion for Leave to File Fourth Amended Complaint and for Preliminary Approval of the Settlement and Incorporated Memorandum of Law" (the "Corrected Joint Motion" [DE-56]).

27.    On January 23, 2007, the Court conducted a second hearing (the "Second Hearing"), at which it granted preliminary approval of the Corrected Joint Motion. The Court also directed the parties to do the following: (1) provide supplemental information as to why they selected *USA Weekend* as the periodical in which to publish notice of the Settlement Agreement; (2) submit evidence of their efforts to provide additional notice regarding the *Perez* case to Class members in the form of general media and consumer reports and press releases; (3) publish a history of the course of this litigation on the Settlement Website; and (4) file a depiction of the Settlement Website prior to the Final Fairness Hearing. The parties complied with these requirements.

28.    At the Second Hearing, the parties also advised the Court of a recently filed proposed class action in the United States District Court for the Central District of California, *Cole v. Asurion Corp.*, Case No. CV 06-6469 DDP (the "*Cole* case"). The *Cole* case raised allegations relating to claims made under Asurion's Program with T-Mobile, where the applicable deductible was either $40, $70, or $110. Class counsel had discussions with plaintiff's counsel in *Cole* prior to the Second Hearing. While the plaintiff in *Cole* had an applicable deductible of $110, the class sought in the *Cole* Amended

---

[7]     The Fourth Amended Class Action Complaint consolidated the *Perez*, *Lissabet*, and *Rieke* actions, and contained essentially the same factual and legal allegations found in the individual complaints for those cases. Further, the Fourth Amended Class Action Complaint redefined the putative class to encompass a nationwide class of consumers.

Complaint is not limited to only $110 deductible claims, but rather includes all individuals who purchased insurance from Asurion through T-Mobile who "were asked to pay or paid a deductible which exceeded the acquisition cost by Asurion of the replacement phone." (DE-69, in Case No. 06-20734.)

29.     The First Amended Complaint in *Cole* adopts virtually verbatim the allegations from the California and Florida Litigations, which had been filed almost 15 months earlier. As of the time of this Court's preliminary approval of this Settlement, discovery had not yet commenced in *Cole*, and Plaintiff Cole had not yet filed a motion for class certification. The papers the parties submitted for preliminary approval of the instant Settlement, including the Motion for Leave to File the Fourth Amended Complaint, all identified *Cole* and informed the Court that the proposed Settlement would overlap with some of the claims raised in *Cole*.

30.     Although the plaintiff in the *Cole* case is not a member of this Class, in that she never received a refurbished phone (or any phone) from Defendants, the Court instructed the parties that it was important to investigate all of the issues raised in *Cole* as they might relate to the proposed Settlement.

31.     At the conclusion of the Second Hearing, the Court entered a verbal Order: (1) granting preliminary approval of the parties' Settlement; (2) authorizing the sending of the proposed Notice to National Class and Subclass members as revised; (3) appointing Rust as the Claims Administrator; (4) appointing Class Counsel; and (5) setting a Final Fairness Hearing. (DE-60, in Case No. 06-20734.) The Court instructed the parties to file a more detailed, written proposed Order that would memorialize the Court's verbal Order. The Court also instructed the parties to provide any proposals to amend and enhance the approved Settlement in light of the allegations raised in *Cole* and/or any other litigation.

32.     On February 13, 2007, the parties filed the affidavit of Andrew Novak, which explained the reason for selecting the weekend edition of *USA Today* for publication of Class Notice. (DE-67, in Case No. 06-20734.) Based on this affidavit, the Court approved the weekend edition of *USA Today* for the publication of Class Notice.

33.    After the Second Hearing, Defendants determined that there was a very small group of National Class members who had deductibles other than $50 – namely $40, $85 and $110 – who made a claim, paid the premiums and the deductibles, and received refurbished phones whose equipment cost was less than the applicable deductibles.

34.    Plaintiffs asked Defendants immediately to provide confirming discovery under oath regarding this group of National Class members.  In response, Defendants provided Plaintiffs with detailed charts and materials showing each and every specific refurbished cell phone that was used to fulfill claims for T-Mobile, MetroPCS, and Cricket programs, for which the deductibles varied from $50.

35.    According to these records, Defendants provided approximately 748,748 total replacement phones to T-Mobile customers that fell within the National Class.  Of these National Class members, the Defendants discovered that 127 phones (.002% of the total shipments) were provided to customers where the applicable deductible was $40 and the equipment cost of the phone was less than $40.  They also provided 129 phones (another .002% of the total shipments) where the applicable deductible was $110 and the equipment cost of the phone was under $110.

36.    Also according to the records, Defendants provided 302,718 total replacement phones to customers of MetroPCS and 117,993 replacement phones to customers of Cricket that also fell within the National Class.  Among these National Class members, Defendants discovered that 214 phones (.07% of the total shipments) were provided to MetroPCS customers where the deductible was $85, and the equipment cost was less than $85, and 28 phones (.02% of the total shipments) to Cricket customers where the deductible was similarly $85 and the equipment cost was under $85.

37.    In sum, the Defendants identified approximately 498 additional members of the National Class who would qualify for the approved Subclass relief (currently 15,000 members) and would therefore also be entitled to receive vouchers for an additional phone.  On January 31, 2007, as part of this confirming discovery, Plaintiffs took the sworn deposition of James Flautt, Asurion's

13

corporate representative, on the specific issue of these additional 498 claims. Mr. Flautt confirmed the veracity of the information Defendants provided and stated that an exhaustive investigation had been undertaken, there were no other phones that fell within the approved Subclass criteria, and specifically, there were no replacement phones where the applicable deductible was $70 and the cost of the replacement phone was less than the $70.

38.    As a result of these additional 498 claims, the parties negotiated an enhancement to the approved Settlement (the "Enhancement"). Much discovery in this case revealed that the majority of the replacement phones that the Subclass members received were only marginally lower than the deductible rates (i.e. $44 to $49, and therefore only $5 less than the paid deductible). Although the value difference was relatively small, each Subclass member would still receive a voucher for an additional phone with a value of at least $75 but not more than $100 (more than 25 times the customer's actual loss or injury). Following this reasoning and logic, the parties agreed upon the Enhancement – namely that Subclass members with deductibles of $85 and $110 (where the replacement phone had a slightly lesser value) would receive the same voucher terms (full transferability and 90-day expiration) but with an increased value of at least $125 but not more than $150. They agreed that all of the Subclass vouchers would be mailed directly to the Subclass members with no claim process required.

39.    On January 31, 2007, the Court set a status conference for February 14, 2007, to discuss any proposed enhancements to the approved Settlement. On February 9, 2007, the parties filed their "Joint Motion to Revise the Approved Class Notice" (the "Joint Motion to Revise"), in order to propose the Enhancement to the Court. (DE-63, in Case No. 06-20734.)

40.    Prior to the status conference, Class Counsel discussed the proposed Enhancement with counsel in the *Cole* case. On February 13, 2007, the Court received a phone call from counsel for Plaintiff Cole, requesting permission to appear at the status conference. Cole's counsel, Mr. Taras Kick, Esq., was not admitted *pro hac vice* to appear in this District. As a courtesy, the Court permitted Mr.

Kick to attend the February 14, 2007 proceedings via video conference, and entered an Order requiring the parties to address whether Mr. Kick should also be permitted to actively participate in the proceedings.

41.    Both Class Counsel and Defendants filed objections to Mr. Kick's active participation. Among their objections was the fact that Ms. Cole had admitted that she is not a member of the National Class or Subclass in *Perez*, and thus, did not have standing to object to the proposed Settlement. Further, Ms. Cole's individual claims, as well as the claims of all those who similarly did not receive refurbished phones from Defendants, would still proceed in the *Cole* action if the Court were to grant final approval of this Settlement.

42.    The Court conducted the hearing on February 14, 2007 to consider the Enhancement (the "Third Hearing"). While Mr. Kick was able to observe the proceedings, the Court did not allow his active participation.

43.    At the Third Hearing, the Court considered the Joint Motion to Revise, arguments of counsel, and all of the evidence in the record. The Court granted the parties' motion, but made a few revisions to the Notice and Settlement Agreement. The Court also raised an issue with appointed Lead Class Counsel regarding the designation of Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP (the "Lerach Firm") as additional Class Counsel, in light of some recent public events regarding that firm. As a result, the Lerach Firm agreed not to serve as one of the appointed "Class Counsel" in this litigation.

44.    After the Third Hearing, Mr. Kick filed an emergency Motion/Application to Permit Winessa Cole to Intervene [DE-74, in Case No. 06-20734], pursuant to Federal Rule of Civil Procedure 24(b). The Court considered the parties' papers and the relevant portions of the record, and exercised its discretion not to allow Ms. Cole's intervention [DE-86, in Case No. 06-20734].

45.    <u>Preliminary Approval.</u> On February 28, 2007, the Court issued its Omnibus Order Regarding Class Action Settlement ("Omnibus Order" [DE-89, in Case No. 06-20734]). Among other

things, the Omnibus Order: (a) granted preliminary approval of the Settlement, as amended;

(b) appointed Class Counsel and the Claims Administrator; (c) authorized the distribution of notice to the

Class; (d) established specific requirements, procedures and deadlines for Class members to object or opt

out; (e) established a deadline for the parties to respond to objections and file an application for

fees/expenses, and (f) set the Final Fairness Hearing for June 22, 2007.[8]

46.    Further, the Court determined class certification to be appropriate under Federal Rules of

Civil Procedure 23(a) and 23(b)(3) for purposes of settlement only. Based on the evidence in the record,

the Court found that: (a) the Class members are so numerous that joinder of all Class members in the

*Perez* Action is impracticable; (b) there are questions of law and fact common to the Class that

predominate over any individual questions; (c) the claims of all of the named Plaintiffs are typical of the

claims of the Class; (d) common questions of law and fact exist and predominate over questions affecting

only individual Class members;[9] (e) the named Plaintiffs and Class Counsel can fairly and adequately

represent and protect the interests of all the Class members; and (f) a class action is superior to other

available methods for the fair and efficient adjudication of the instant controversy.[10]

---

[8]    On February 28, 2007, the Court also formally consolidated the *Lissabet* case, 06-20733-CIV-SEITZ/MCALILEY, into the instant case and closed that case. (DE-47, in Case No. 06-20733.)

[9]    These include whether Asurion "adjusted the loss" for Class member claims during the Class Period; whether Asurion's use of insurance terms such as "deductible" and "adjust the loss" is deceptive and misleading; whether Asurion was unjustly enriched or received payments and/or monies that it cannot retain, under principles of equity; and what is the amount and proper measure of damages the Class sustained because of Asurion's allegedly inequitable conduct.

[10]    Notably, as previously mentioned, after the Court issued the Omnibus Order, the Court denied the motion for class certification in the related case, *Sanchez v. The Signal*, No. 05-22259-CIV-SEITZ/MCALILEY [DE-154 and DE-163]. In denying class certification (and Plaintiff's request for reconsideration on the issue), the Court highlighted numerous defenses, also raised by the Defendants here, that presented significant hurdles to any potential recovery. The Court noted that each class member's own claim would need to be analyzed to determine whether or not they remained in the wireless phone protection plan (as most of the objectors here) and whether or not he/she was satisfied with the plan. (*See* DE-163, in Case No. 05-22259.) Moreover, each customer would need to prove that he/she received a "lower priced and/or defective phone" to have standing in the case. Accordingly, more than one million Signal customers will receive none of the relief provided to Asurion's and lock/line's 10 million customers under this Settlement.

## II.    SUMMARY OF THE PROPOSED SETTLEMENT

47.    The National Class consists of subscribers who received a refurbished replacement phone during the Class Period, and the Subclass consists of those subscribers who received a refurbished replacement phone whose acquisition cost to Asurion was less than the applicable deductible.  There are approximately 10 million National Class members and approximately 15,000 Subclass members.  None of the Subclass members have filed objections to this proposed Settlement.

48.    <u>National Class Relief.</u>  The Settlement Agreement provides the following benefits to the National Class Members:

a.    <u>Improved Disclosures.</u>  Asurion will ensure that, in the future, all placards and brochures distributed after the Class Period and describing the terms of the Programs (whether provided in stores and/or in brochures and/or advertisements) will include language substantially similar to the following:  "Claims may be fulfilled with *new and/or refurbished* equipment;" and "Each replacement phone is subject to a *non-refundable* [$ amount] deductible [or fee] per loss."

b.    <u>Improved Claims Administration Procedures.</u>  Asurion will ensure that, whenever a customer submits a claim, he or she will not receive a replacement phone for which Asurion's cost in providing the replacement phone is less than the amount of the applicable deductible or fee – unless Asurion specifically so advises the customer prior to collecting the deductible or fee during the claims process and the customer agrees to accept such phone.

c.    <u>Monetary Relief.</u>  Defendants agreed to provide each National Class Member with a Settlement Phone Card with a face value of at least $5 and to distribute a minimum of $1.5 million of those cards.  Based on Rust Consulting's most recent report, approximately 120,000 National Class members have submitted claims.  Accordingly, it appears that Settlement Participants will receive phone cards with a face value of approximately $10 to $12 – with a 10 cent per-minute charge to use the cards.  The Settlement Phone Cards are fully transferable and will expire 360 days after the date they are issued.

17

Defendants will bear the cost of the Settlement Phone Cards and the costs associated with their distribution.

        d.     <u>Additional Subclass Relief: Vouchers.</u> Each Subclass member will be entitled to all of the relief offered to National Class members. In addition, Defendants will provide each Subclass member with a voucher entitling him/her to obtain another new or refurbished phone (valued at between $75 and $150) directly from Asurion. The Subclass member does not have to return the replacement phone he/she had already received after paying the applicable deductible. Each voucher will be valid for ninety (90) days after the date it is issued and will be fully transferable. Defendants, through Rust Consulting, will mail these vouchers (via first-class United States mail) to each Subclass member's last known address, without the need for any action by the Subclass member.

        e.     <u>Cost of Claims Administration and Notice.</u> Defendants have paid, and will continue to pay, all of the costs associated with the claims process, as well as the mailing and publication of notice to the 10.3 million Class members. Defendants estimate these costs to be approximately $3.5 million. Defendants have agreed to continue paying for all costs associated with issuing the vouchers and phone cards to all Class members. The Court finds this to be a valuable benefit to the Class.

## III.    <u>EFFECTIVE AND APPROPRIATE NOTICE</u>

        49.     <u>An Overview of the Notice Program.</u> In conjunction with Rust Consulting, the parties developed a comprehensive notice program. The proposed notice program consisted of four major components: (1) a Postcard Notice mailed to the last known address of each Class member; (2) a Summary Notice published in *USA Weekend*; (3) a toll-free Settlement Hotline; and (4) a Settlement Website. Essentially, the Postcard Notice and the Summary Notice contained the vital information regarding the litigation and the Class members' rights -- including the right to opt out of and object to the Settlement and the right to submit a claim. The Settlement Hotline and the Settlement Website contained more detailed information. The Postcard Notice and the Summary Notice each directed Class members

to visit the Settlement Website and/or call the Settlement Hotline for more information.

50.     The proposed notice program enabled National Class members to complete a short, simple claim form online (available on the Settlement Website). National Class members could also complete a "hard copy" of the same claim form, which could be requested using an automated voicemail feature of the Settlement Hotline or a "link" on the Settlement Website.

51.     The Court closely scrutinized the form and the content of the proposed notice program. Before approving the notice program, the Court directed the parties to, among other things, (1) change or add language to the Postcard Notice and the Summary Notice; (2) file an affidavit justifying Rust Consulting's choice of *USA Weekend* as the periodical in which to publish the Summary Notice; and (3) simplify the claim forms.

52.     The Court's Approval and Further Requirements. In its Omnibus Order, the Court approved the notice program, as revised by the Court. The Court ordered the parties and the Claims Administrator to: (1) mail the Postcard Notice to each of the National Class Members at their last known address by or before April 27, 2007; (2) submit a declaration, by May 18, 2007, attesting that the Postcard Notices were timely mailed; and (3) publish the Summary Notice by or before April 27, 2007. The Court also instructed the parties to publicize the Settlement using all possible means, including press coverage.

53.     The Postcard Notices. Using data Defendants provided, Rust Consulting generated 10,347,446 unique records, each representing the name and address of a National Class member. Rust Consulting processed each of the 10,347,466 addresses through the Coding Accuracy Support System ("CASS") certified software to obtain the nine-digit zip codes and the all-uppercase format that the United States Postal Service preferred. Rust Consulting also utilized the Locatable Address Conversion System ("LACS") service, which provides an automated method of obtaining new addresses. After determining that it had the last known address for each of the National Class members, Rust Consulting

generated 10,347,466 Postcard Notices.  By April 27, 2007, Rust Consulting had mailed all of the

10,347,466 Postcard Notices to the National Class.[11]

54.    The Rust Declaration.  Pursuant to paragraph 66 of the Omnibus Order, on May 18,

2007, the parties filed the Declaration of Joel Botzet (the "Botzet Declaration" [DE-105]).  The Botzet

Declaration attested that Rust Consulting had mailed the Postcard Notices in accordance with the Court's

Omnibus Order.  The Botzet Declaration also explained Rust Consulting's process for determining each

National Class member's last known address.

55.    The Summary Notice.  Also, pursuant to paragraph 66 of the Omnibus Order, Rust

Consulting published the Summary Notice in the April 20-22, 2007 edition of USA Weekend.[12]

56.    The Spanish-language Hotline.  On April 23, 2007, Rust Consulting added a

Spanish-language option to the Settlement Hotline.

57.    Publicity of the Settlement.  In accordance with the Court's directive, in the days after

the January 23, 2007 hearing, Class Counsel drafted and circulated a press release and provided

information regarding the proposed settlement in numerous national and state publications, trade and

industry magazines, as well as numerous consumer-related web sites.  Class counsel filed copies of these

sources with the Court [DE-94].  Moreover, the parties posted a copy of their motions for final approval

---

[11]    Prior to mailing the Class Notice, the Claims Administrator entered the Class members' names and addresses into the United States Postal Service's National Change of Address ("NCOA") processing center for up-to-date addresses and CASS certification.  The NCOA processing center contains a consolidated file of move information that, on average, contains approximately 108 million permanent change-of-address ("COA") records filed with the United States Postal Service.  Each record contains the relocating postal customer's name, along with an old and new address.  The old address is the one compared to the NCOA customer list for matching purposes, and the new address is the one returned, if a match is made, to the customer.  Since approximately 18-20 percent of the households and businesses in the United States move each year, the NCOA service is increasingly valuable in reducing undeliverables and helping increase response rates.  The Claims Administrator is further keeping track of any returned or undeliverable Postcard Notices.

[12]    The Claims Administrator caused the Summary Notice to be published once in the national weekend edition of USA Today.  The weekend edition of USA Today has a circulation of approximately 23.4 million readers.  The Summary Notice was also published on the Settlement Website.  The Summary Notice highlights the terms of the proposed Settlement and provides instructions for obtaining the complete Settlement Agreement and/or Proof of Claim Form and how to file a Request for Exclusion from the Class or object to the Settlement.

of the Settlement on the Settlement Website so that all Class members could read and understand the reasons for the specific Settlement terms.

58.    Best Practicable Notice.  The parties provided extensive notice to the Class through a variety of media.  The Postcard Notice was mailed via first-class United States mail, postage prepaid, to the most recent address of all National Class members.  As previously discussed, the Postcard Notice summarized the litigation and directed Class members to the Settlement Website, where Class members could obtain detailed information about the Settlement and print the complete Settlement Agreement and/or Proof of Claim form.  At the Court's suggestion, the Settlement Website also provided a complete and detailed history of the litigation and a Frequently Asked Questions and Answers section.  Class members are able to submit a claim electronically by entering a personal identification number ("PIN") contained on the Postcard Notice, as more fully described below.

59.    The Postcard Notice also directed Class members to a toll-free telephone number that they could call to obtain information about the Settlement and to request a copy of the complete Settlement Agreement and/or Proof of Claim form via U.S. Mail.  The Claims Administrator operates the toll-free number, which provides an automated recording instructing each Class member to leave a message indicating his/her address and the documents being requested.

60.    The Claims Administrator also maintains the Settlement Website.  The Settlement Website contains, among other things, the Summary Notice, the Settlement Agreement, the Proof of Claim form and a Question and Answer form.  Class members can get information about the Settlement and print the complete Settlement Agreement and/or Proof of Claim form by accessing the Settlement Website.  Class members also can submit their Proof of Claim forms electronically by entering the requested information on the Settlement Website.

61.    Approval of Class Notice and Assertion of Personal Jurisdiction Over Class.  For a court to exercise jurisdiction over the claims of absent Class members, there must be minimal procedural due

process protection.  Absent class members must receive notice and an opportunity to be heard and to

participate in the litigation, whether in person or through counsel.  Fed. R. Civ. P. 23(c)(2)(B).  The

notice must be the "best practicable, 'reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their

objections.'"  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent.*

*Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  Here, among other things, the Postcard Notice

defined the settlement Class; described the allegations of the Complaint; informed Class members of

their right to opt-out and object, the procedures for doing so, and the time and place of the Final Fairness

Hearing; informed Class members of their right to enter an appearance through counsel, if they desired;

notified Class members that a Class judgment would bind them unless they opted out; and told them

where they could obtain more information, such as a full copy of the Settlement Agreement.  The

Summary Notice contained a shortened version of the same information and explained how to get more

detailed information.  Accordingly, the Court finds that the notice provided to the Class members was

sufficient to satisfy the requirements of due process, and accordingly, that this Court has personal

jurisdiction over the entire Class because the Class was provided with the "best practicable notice."

## IV.  THE CLASS MEMBERS' RESPONSE TO THE PROPOSED SETTLEMENT

62.  The Class's Use of the Notice Program's Interactive Features.  Rust Consulting has

carefully monitored the Class's response to the notice program and has maintained detailed records

reflecting the response.  The statistics cited below are current as of June 24, 2007.

63.  Postcard Notices Returned.  Of the 10,347,466 Postcard Notices mailed, 1,022,821 – or

less than 10% – were returned as undeliverable.  According to Rust Consulting, this rate of returned

mailings is typical.  (*See* June 21, 2007 Botzet Decl. [DE-146].)

64.  Claims Filed.  Of the approximately 10.3 million National Class members, 118,663

people have filed claims.  Of these, 108,134 people completed claim forms on line; the remaining 10,529

people submitted "hard copies" of the claim form. The claims period closes on July 26, 2007.

65.    Exclusions.  Of the approximately 10.3 million National Class members, 1,311 people requested exclusion from the Class.  Of these, 27 exclusion requests were submitted after the May 21, 2007 deadline.  The parties have agreed to honor the untimely exclusion requests.  The parties have also agreed to send to each of these 1,311 National Class members (to the best of their ability in identifying an address for each member) a letter indicating that they are being officially recognized as having opted out of the Settlement, that they will not be receiving a phone card and/or voucher, and that their individual rights have been preserved.

66.    The Settlement Website.  Since the Settlement Website was launched on March 26, 2007, it has had 182,489 unique visitors.  In other words, 182,489 different computers have accessed the Settlement Website.  The Settlement Website has been visited 225,644 times; in other words, some of the unique visitors returned to the website on one or more occasion.  Finally, there have been 3,209,998 "hits" or "clicks" on the Settlement Website.  This statistic indicates that visitors to the Settlement Website were accessing the various interactive features.  On average, visitors made 14 hits per visit.

67.    The Settlement Hotline.  There have been a total of 130,715 callers to the Settlement Hotline.  Of these, 1,192 utilized the Spanish language option.  Copies of the English and Spanish scripts of the automated messages were filed with the Court [DE-151].

68.    Defendants informed the Court that, as of the date of the Final Fairness Hearing, they had spent: (1) $2.3 million on mailing the 10.3 million Postcard Notices; (2) $290,451 for publication of the Summary Notice; and (3) $2,650 per month since March 2007 to maintain the Settlement Website.

69.    Objections.  Class members were advised that, in order for the Court to consider their objections to the proposed Settlement, they must file any objections with the Court by May 21, 2007. Only nine class members properly filed objections to the Settlement.  (See DE-95, DE-96, DE-97, DE-102, DE-108, DE-110, DE-112.)  In any event, the parties agreed to treat as an official objection any

letter containing any type of "objection" language and written directly to the Court, Rust Consulting, and/or any of the parties. In total, there were approximately 102 "objections" to the Settlement.

70.    Three attorneys – Paul D. Kamenar, Esq., on behalf of Objector Glenn Lammi; Kenneth E. Nelson, Esq., on behalf of Objector Dina Hill; and Edward F. Siegel, Esq., on behalf of Objectors Chad Simmerson, Barbara Rose, and Rita Carfagna (collectively, "Objectors' Counsel") – filed motions indicating that they intended to appear at the Final Fairness Hearing.

71.    By Order dated June 19, 2007, the Court established an agenda for the Final Fairness Hearing. The Court set aside time for each of the Objectors' Counsel to present his objections.

## V.    THE FINAL FAIRNESS HEARING

72.    The Final Fairness Hearing was held on June 22, 2007. Edward Siegel, Esq. appeared in person on behalf of Objectors Chad Simmerson, Barbara Rose, and Rita Carfagna. Neither Mr. Nelson nor Mr. Kamenar attended the hearing.[13] The Court allowed Mr. Siegel over one hour to discuss his client's objections to the Settlement. The hearing lasted a full day, and the Court heard from all parties regarding every facet of the proposed Settlement.

73.    The Court did not find any of the papers filed by Objectors' Counsel to be particularly helpful or to have conferred a benefit on the Class, as they were generic compilations of well-known case law and lacked specific application to this case. In short, they appeared to be standard form arguments filed in other cases. However, the Court did find that Mr. Siegel's attendance at the Final Fairness Hearing provided a safety check for the parties and the Court. Accordingly, upon submission of the appropriate, supporting documentation, Mr. Siegel may seek an award to reimburse his actual travel expenses to the hearing and a reasonable hourly rate for his actual time in attendance at the hearing. Such award will be made from the attorneys' fees fund.

---

[13]    At the hearing, Mr. Siegel advised the Court that Mr. Nelson had given him permission to represent Objector Hill's interests.

74.     At the conclusion of the Final Fairness Hearing, the Court verbally granted final

approval of the Settlement, finding that it was fair, reasonable and adequate. The Court also

preliminarily approved the the requested attorneys' fees and costs. Finally, the Court directed the

Plaintiffs to file a supplemental brief that addressed the level of involvement of each named Plaintiff, so

that the Court could consider whether to award him or her an incentive fee, and if so, how much. Class

Counsel filed the requested supplement on June 26, 2007 [DE-150].

## VI.    FAIR, REASONABLE, AND ADEQUATE SETTLEMENT

75.     The law has long been settled in this Circuit that, "[i]n determining whether to approve a

proposed [class action] settlement, the cardinal rule is that the district court must find that the settlement

is fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton v.*

*Hinton*, 559 F. 2d 1326, 1330 (5th Cir. 1977).[14] "Determining the fairness of the settlement is left to the

sound discretion of the trial court . . . ." *Bennett v. Behring Corp.*, 737 F. 2d 982, 986 (11th Cir. 1984).

The Court's exercise of discretion in this regard should be "informed by the strong judicial policy

favoring settlement as well as by the realization that compromise is the essence of settlement." *Id.* As

then Chief Judge King aptly stated in *Behrens v. Wometco Enters., Inc.*, 118 F.R.D 534, 538 (S.D Fla.

1988) (internal citations omitted):

> Litigants should be encouraged to determine their respective rights between
> themselves. This policy has special importance in class actions with their
> notable uncertainty, difficulties of proof, and length. Settlements of
> complex cases contribute greatly to the efficient utilization of scarce
> judicial resources, and achieve the speedy resolution of justice, for a just
> result is often no more than an arbitrary point between competing notions
> of reasonableness.

The Eleventh Circuit has also identified six factors that a district court should examine when

assessing whether a proposed settlement is "fair, adequate and reasonable." These factors include:

---

[14]     In *Bonner v. City of Prichard*, 661 So. 2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit
adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986. "In evaluating these considerations, the district court should not try the case on the merits." *Behrens*, 118 F.R.D. at 539 (*citing Cotton*, 559 F.2d at 1330). Rather, the court "must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" *Assoc. for Disabled Ams. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) (*quoting Cotton*, 557 F. 2d at 1330).

After carefully reviewing the pertinent factors, the Court concludes that the proposed Settlement negotiated by the parties in the instant case is fair, adequate and reasonable under all of the circumstances and was reached after both parties conducted significant investigation and voluntary discovery. Further, the Court reiterates its previous finding in its Omnibus Order that the Settlement reflects an arms-length compromise, and was not the product of fraud or collusion by the parties or their attorneys.

76.   The *Bennett* Factors.

a.   Likelihood of Success at Trial. Where a substantial question exists regarding the likelihood of success at trial, this factor weighs in favor of approving a proposed class action settlement. *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1330-31 (S.D. Fla. 2001). This case faced significant hurdles for Plaintiffs, especially in their quest to prove the merits of each claim and to show that any of the Class members suffered an actual injury. The essence of Plaintiffs' claims is that Defendants' customers paid premiums and deductibles to "insure" their cell phones, only to receive replacement phones valued much less than such payments. However, extensive discovery revealed that, for almost every Class member, this was not so. During discovery, Defendants produced documents confirming that only a very small percentage of the Class (approximately 15,000 of 10.3 million customers) received a

26

replacement phone that, under Plaintiffs' calculation, could be valued at less than the premium and

deductible payments. Based on this information, Plaintiffs would have incurred substantial costs and

risks in a most likely unsuccessful attempt to win on the merits at trial. In addition, in the unlikely event

of success at trial, there would most likely have been appellate proceedings, further delaying Class

recovery.

Moreover, as the Court reiterated in denying the plaintiffs' class certification motion in

*Sanchez v. The Signal*, Case No. 05-22259-CIV-SEITZ/MCALILEY, each individual Class member's

own facts would have had to be analyzed to determine why each customer remained in the phone

protection program after learning of the refurbished nature of the phone (as with most of the objectors).

Even though the Plaintiffs believed, based on reasoned investigation, that they had meritorious claims,

the strong defenses that Defendants could have asserted weighed in favor of settlement.

b.    Range of Possible Recovery and the Point at which a Settlement is Fair. "The

second and third considerations of the *Bennett* test are easily combined." *Behrens*, 118 F.R.D. at 541. A

district court must first determine the appropriate standard of damages (in order to calculate the range of

recovery), and then determine where in this range of recovery a fair, adequate and reasonable settlement

amount lies. *Id.* The existence of strong defenses to the claims presented makes the possibility of a low

recovery quite reasonable. *See Behrens*, 118 F.R.D. at 542 (explaining that "a settlement can be

satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential

recovery").

In this case, the range of recovery is very narrow relative to the benefits of the proposed

Settlement. Defendants have agreed to provide a minimum of $1.5 million in Settlement Phone Cards, to

send out vouchers for replacement phones with an approximate aggregate additional value of $1.5

million, and to pay all costs associated with this Settlement which will total almost $3.5 million. More

importantly, Defendants have agreed that they will not send to a customer a phone valued less than the

charged deductible without first advising that customer. They also have agreed to change all of their

placards and promotional brochures describing the specific terms of the phone protection programs.

These benefits to Defendants' approximately 40 million customers – when viewed against the backdrop

of all of the uncertainties, risks, and problems that have surfaced in this litigation (including the limited

damages suffered by only 15,000 Subclass members) and the reasonable possibility that Plaintiffs would

not have recovered <u>anything</u> if they had proceeded to trial – weigh heavily in favor of approving this

Settlement.

        c.    <u>Complexity, Expense and Duration of Litigation.</u>  "The law favors compromises

in large part because they are often a speedy and efficient resolution of long, complex, and expensive

litigation." *Id.* at 543. Moreover, what the Eleventh Circuit stated regarding settlements nearly three

decades ago applies with even more force here: "In these days of increasing congestion within the

Federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial

resources." *Cotton,* 559 F. 2d at 1331.

        If this case were tried, the Plaintiffs would incur significant trial expenses. Experts in

cell phones, insurance policies, and damages calculations might all have been necessary to address these

specific issues. As previously mentioned, the case would not conclude at trial, but would continue with

appellate proceedings. With the uncertainties inherent in pursuing trial and appeal of this case, combined

with the delays and complexities presented by the nature of the case, the benefits of a settlement are

clear. Moreover, one of the main goals in bringing all of these cases in the first place – namely better

disclosure for all customers so that they can make an informed choice in the purchase of Defendants'

wireless phone protection plan – is being specifically accomplished with this proposed Settlement.

Absent a settlement, Defendants would have defended these three lawsuits vigorously, with potential

success and no recovery of any kind for Plaintiffs.

        d.    <u>Substance and Amount of Opposition to the Settlement.</u>  This Settlement should

also be approved because the Class has overwhelmingly accepted it. "In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor. *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005). A low percentage of objections demonstrates the reasonableness of a settlement. *Id.* Conversely, a high percentage of objections indicates that a class action settlement may very well not be fair and reasonable. *Id.* In *Lipuma*, of the nearly 9,000,000 notices mailed to the class, there were 1,159 opt-outs and just 41 objections. *Id.* The *Lipuma* court found that 41 objections constituted an "infinitesimal" number (0.0005%) when compared to the number of class members. *Id.*

Here, the Court-approved notice program set out a very specific procedure for Class members to officially file an objection to the proposed Settlement. Approximately 9 people exactly complied with this procedure. Other Class members simply wrote letters to Class Counsel, Rust Consulting, or the Court, some of which included "objection"-type comments while others favored the Settlement. Class Counsel took each letter very seriously and undertook the unusual task of attempting to contact each and every one of these Class members. Class Counsel called every such Class member (over 300 people) and sent letters to each one, denoting in the letter a specific lawyer whom they could contact directly for additional information. (*See* Schwager Aff. [DE-119].) The June 5, 2007 Schwager Affidavit details each and every contact made with these Class members.

The number and corresponding percentage of objections to the proposed Settlement is approximately 100 out of 10.3 million, or 0.001% (if every letter or phone call is considered an official "objection"). This is a minuscule figure, and is certainly insignificant when compared to the millions of Class members. Accordingly, given the large number of claims filed in this case (approximately 120,000 National Class members have filed claims as of June 24, 2007), the small number of objections weighs in favor of approval. *See Lipuma*, 406 F. Supp. 2d at 1324.

The lack of substance of the objections also weighs in favor of approving the Settlement.

29

The Court has considered the arguments raised by the proportionately small number of objectors, and finds that the objections do not identify problems sufficient to justify rejecting the proposed Settlement. Upon due consideration, it appears that most of the objectors have simply misread and/or misunderstood the Settlement documents and/or desired to "have a better deal." The majority of the objectors focused only on the monetary portion of the Settlement for the National Class (namely, the phone cards). They argued that the phone cards should provide "more" value than just $5, and that they should have a "lower" charge per minute than the current per minute charge of 10 cents. No objector raised any concerns with the full transferability of the cards or with the extended expiration date of the cards (360 days). None of these objections discussed the significant injunctive relief that will benefit the over 70 million consumers that lose and/or damage their cell phones each year.

The Court will overrule the objections as to the phone cards and vouchers. The Court has already ruled that, to have standing in this case, a customer needed to have received a replacement phone valued lower than the deductible paid. The only members of the Class that received such lower-valued phones (under any calculation) are members of the 15,000-person Subclass who are receiving vouchers for replacement phones valued between $75 and $150 (which is approximately 25 times the value of each customer's loss, and thus a significant benefit). It does not appear that any of the Subclass members have objected to this relief.[15]

Also, Class Counsel was able to negotiate several important provisions with respect to the phone cards and vouchers, all of which provide significant value to the Class. For the phone cards these included: full transferability, 360-day expiration, and a $1.5 million minimum distribution. For the

---

[15]    In fact, as previously mentioned, by currently remaining in the wireless phone protection programs, many of the objectors likely would not have been entitled to any damages had the case gone to trial, but are receiving a benefit by way of this Settlement. (*See* Apr. 3, 2007 Order Denying Pl.'s Suppl. Mot. for Class Cert. at 7 [DE-154, in Case No. 05-22259]) ("[I]f customers are told in some manner other than through the printed brochures that The Signal sends out refurbished replacement phones . . . and those customers still elect to keep the insurance and make claims for replacement phones, they are not getting anything but exactly what they bargained for").

vouchers these included:  full transferability, 90-day expiration, no claims process, and no requirement to return the previously provided replacement phone.

Another problem with many of the objections is their inaccurate characterization of the phone cards as "coupons."  The phone cards are not mere coupons, but rather full-value, fully transferable, long-distance telephone cards – not unlike those available from any number of retail outlets. Because long-distance telephone carriers are honoring these phone cards, and not Asurion, there is no required future purchase from, or any other type of future dealing with, Asurion as the "issuer" of the phone cards.

Further, those objectors that object to the phone cards also ignore the negotiated $1.5 million minimum redemption floor (and lack of ceiling), and the pro-rata distribution method for the phone cards in the event of a low claims rate.  The minimum redemption requirement ensures that Defendants must disgorge $1.5 million to the Class regardless of the claims rate.  Thus, there is no need to wait for the final claims data to evaluate the success of the National Class's monetary recovery before valuing this portion of the settlement.  The pro-rata distribution method is an additional benefit, since in the event of a low response rate, those consumers who do file claims can receive phone cards valued at more than the $5 minimum value.

Lastly, some objectors have speculated that long-distance phone cards are of no value to cell phone customers, as such customers get long-distance services as part of their cell phone plans. However, the vast majority of cell phone customers also have a regular telephone (or access to one), for which long-distance phone cards have value.  Also, because the phone cards are fully transferable, the rare cell phone customer who does not have access to a regular telephone (and no intention to use a pay telephone) can transfer the card to someone else for like consideration.

e.    The Stage of the Proceedings.  The stage of the proceedings at which the parties agreed to settle this matter without further litigation likewise reflects the fairness of this Settlement.  A

court evaluates the stage of the proceedings at the time of settlement to ensure that the plaintiffs have access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of the settlement against further litigation. *See Behrens*, 118 F.R.D. at 544.

Here, as already described, the Settlement was achieved early in the litigation, but not so early that Class Counsel did not have sufficient information with which to negotiate. Defendants produced hundreds of thousands of documents to Plaintiffs and made available all of the necessary witnesses for depositions. Thus, the litigation risks and expenses facing the parties, had they not reached a settlement, were substantial, and the possibility that the Plaintiffs could have recovered nothing after a long legal battle was real.

Class Counsel advised the Court that they conducted an extensive, pre-suit investigation and evaluation of the facts and law relating to Plaintiffs' claims in order to determine how best to serve the Class's interests. This investigation included a study of publicly available information as well as review of experts' analysis, interviews of Class members, and a review of pertinent documents. It is clear to the Court that the parties were "well aware of the other side's position and the merits thereof" when settlement negotiations commenced. *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d at 1332. The parties and their counsel should be commended for their successful efforts to reduce the polarization that is all-too-familiar in the class action arena while fostering a spirit of courtesy and professionalism.

77.    The Judgment of Experienced Counsel and the Absence of Collusion.  A district court properly considers the judgment of experienced counsel when asked to approve a class action settlement. *Behrens*, 118 F.R.D. at 539. Here, Class Counsel and counsel for Defendants are all experienced lawyers highly skilled in class action work. The judgment of these attorneys that the proposed settlement is "fair, adequate and reasonable" also supports approval of the parties' proposed Settlement.

Further, the Court has already found, after carefully reviewing the background of the parties' negotiations, that this Settlement is the result of arms-length negotiation. In preliminarily approving the

Settlement, the Court noted that "settlement negotiations did not begin until after Class Counsel had substantively litigated the three cases, taken several key depositions, and reviewed thousands of documents." (Feb. 28, 2007 Omnibus Order Regarding Class Action Settlement [DE-89].) Moreover, Brian Spector, Esq., an experienced and well-respected mediator in this District, oversaw most of the settlement process. Class and Defense Counsel have ably and professionally represented their respective clients free from any conflicts of interest. The proposed Settlement is not the product of fraud or collusion.

## VII.  **CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that:

(1) Class Counsel's Motion in Support of Request for Final Approval of the Settlement [DE-132] is GRANTED. The parties' proposed Settlement is fair, adequate and reasonable, and not the product of collusion between the parties or their attorneys. Thus, the proposed Settlement is GRANTED FINAL APPROVAL;

(a) The Court anticipates that Defendants shall be able to cause to be issued all phone cards and vouchers, as appropriate, within 60 days of this Order. By **August 1, 2007**, Defendants shall submit a proposed schedule for distribution within the next 60 days, to be approved by the Court. If 60 days is insufficient, Defendants shall so advise the Court in their August 1st filing, give the reasons therefor, and propose an alternative plan for distribution, to be approved by the Court;

(b) The parties shall file with the Court, by the 25th day of each month, monthly progress reports as to the status of the Settlement "payout" and any issues therewith, until the National Class and Subclass members have received all of the benefits to which they are entitled;[16]

---

[16]    If the 25th day of the month falls on a Saturday, Sunday, or legal holiday, then the parties shall file the progress report on the next business day thereafter.

(2) All objections to the Settlement are OVERRULED;

(3) All pending motions not otherwise ruled upon in this Order, <u>with the exception</u> of DE-131 (Class Counsel's Motion in Support of Request for Attorneys' Fees and Costs) and DE-166 (Objector Dina Hill's Second Motion for Reconsideration Regarding Order on Motion for Attorneys' Fees and Incentive Costs),[17] are DENIED AS MOOT;

(4) The pretrial conference scheduled for August 16, 2007 is CANCELED; and

(5) This case is CLOSED.

DONE and ORDERED IN Miami, Florida this 26th day of July, 2007.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:   All Counsel of Record

---

[17]      Separate Orders shall issue.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 06-20734-CIV-SEITZ/MCALILEY

CARLOS PEREZ
     Plaintiff,

vs.

ASURION CORPORATION et al.

     Defendant,

_____/

### JOINT NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Dina Hill, Rita Cargana, Chad Simmerson, and Barbara Rose, Objectors in the above-styled cause, hereby appeal to the United States Court of Appeals for the Eleventh Circuit from the Order, entered on August 8, 2007, granting the motion (DE#132) for attorney fees.

Dated:  August 23, 2007        Respectfully submitted,

                     /s/ John C. Rayson
                     John C. Rayson, Esq.(204153)
                     The Law Offices of John C. Rayson
                     2400 E. Oakland Park Blvd.
                     Fort Lauderdale, FL  33306
                     (954) 566-8855
                     (954) 566-8902 fax
                     e-mail: rayson2000@aol.com

                     /s/Kenneth e. Nelson
                     Kenneth E. Nelson (Mo. Bar 31993)
                     Nelson Law Firm, P.C.
                     2900 City Center Square
                     1100 Main Street
                     Kansas City MO 64105
                     (816) 421-7225
                     (816) 421-3339 fax
                     e-mail:  kennelson@mclaw.com

**EXHIBIT**

H

Attorney for Objector Dina Hill


  /s/ Edward F. Siegel
Edward F. Siegel (0012912)
27600 Chagrin Blvd., Ste. 340
Cleveland, OH 44122
(216) 831-3424
(216) 831-6584 (fax)
e-mail: efsiegel@efs-law.com

Attorney for Objectors
Rita Cargana, Chad Simmerson,
and Barbara Rose


### CERTIFICATE OF SERVICE

    I certify that a copy of the foregoing was filed through the Court's electronic
system and was by that system served upon all counsel of record on August 23, 2007.


                                    By: _____/s/ John C. Rayson_____

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 06-20734-CIV-SEITZ/MCALILEY

CARLOS PEREZ, ERIC ZIMELMAN,
ANGELA D. RIEKE and DOROTHY
HAYS, individually and on behalf of
all others similarly situated,

        Plaintiffs,

vs.

ASURION CORPORATION; ASURION
INSURANCE SERVICES, INC.; ASURION
FLORIDA WARRANTY SERVICES, INC.;
LOCK\LINE, LLC; and LOCK\LINE
WARRANTY SERVICES OF FLORIDA, LLC,

        Defendants.

_____/

## CLASS PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE REGARDING OBJECTORS' NOTICES OF APPEAL

      In a class action case, objections may serve as an important check, helping the Court probe the fairness of a settlement. But objections, and appeals from objections, can also be designed as roadblocks to delay a settlement. Certain Objectors and their Counsel may have acted in bad faith by filing frivolous appeals designed only to stall the settlement. This Court has previously required objectors along with their counsel to personally appear and explain their motivations. *See In re Terazosin Hydrochloride*, 2005 WL 2451960 (S.D. Fla. July 8, 2005). Before the four Objectors and their three lawyers stall the recovery of 12 million class members, the Objectors and their counsel should appear to explain their conduct.[1]

---

[1] Class Counsel contacted Defendants, who also join in seeking the relief stated in this Motion.

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508



EXHIBIT

I

tabbies'

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

## I.     FACTUAL BACKGROUND

During its careful review of this settlement, the Court considered objections by several class members, including Dina Hill, Rita Cargana, Chad Simmerson, and Barbara Rose (the "Objectors") that are represented by Edward Siegel, Kenneth Nelson and John Rayson (the "Objectors' Counsel"). The Objectors' Counsel subsequently touted their activities in improving the Settlement, in an effort to receive fees. Despite that, recently the Objectors and Objectors' Counsel appealed from both the Court's final approval order and its order approving fees. [D.E. 176, 178.] As a result, the Defendants cannot complete the settlement process and distribute the recovery for many months until the appeals are resolved.[2] [D.E. 180, at 2.] Thus, these four Objectors and their counsel are now standing in the way of the approximately 12 million class members who must await the benefits from the approved class settlement.

Although the Objectors and Objectors' Counsel may have initially aided the Court with their objections, and those efforts might have been shrouded with good intentions, later events now reveal their true purpose. Despite touting the settlement as "improved" and their purported changes "enormous" to justify their request for a court-awarded fee, after their fee request was denied and limited, the Objectors' Counsel appealed the Court's approval of the Settlement. Three of the Objectors did not even participate in the claims process, and thus will not participate in the settlement's relief.

---

[2] For example, the final approval in *LiPuma v. American Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005), occurred in December 2005, and due to objectors' appeals, the class still has not received its benefits to date.

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508

2

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

### A.     Objectors and Their Counsel Previously Claimed Credit for Improving the Settlement They Now Seek to Assail on Appeal.

The Court is familiar with Objectors' Counsel, and has made specific findings regarding their involvement in this case:

> The Final Fairness Hearing was held on June 22, 2007. …
> The hearing lasted a full day, and the Court heard from all
> parties regarding every facet of the proposed Settlement.  The
> Court did not find any of the papers filed by Objectors to be
> particularly helpful or to have conferred a benefit on the
> Class, as they were generic compilations of well-known case
> law and lacked specific application to this case.  In short,
> they appeared to be standard form arguments filed in other
> cases.

[D.E. 167 ¶¶ 72, 73.]

Despite these findings, in seeking fees, the Objectors have claimed in no uncertain terms that they believe their objections were useful to the Court, were adopted by the Court, assisted the Court in ensuring that the settlement was fair, adequate and reasonable, and substantially improved the settlement. *See* Nelson Motion [D.E. 153-1] at  p. 3, 6-7 (seeking $80,000 in fees and an incentive fee to Objector Hill because "the Objections have provided great value in identifying the critical issues *and resolving them*.") (emphasis added); Nelson Reply [D.E. 162] at 2 (Hill and her counsel "seek a fee and incentive to recognize substantial contributions to the process."); *id.* at 3 (claiming the benefits to the Class Members from his objections "are enormous because the proposed changes will assure the Settlement will work as presented, rather than permitting uncertainty about whether errors or other problems might permit the Settlement to be an unfulfilled promise"); Siegel Motion [D.E. 174] at 3 (seeking nearly $29,000 for having purportedly "contributed materially to the Fairness Hearing

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508

3

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

proceedings"). Based on these assertions, Objectors and their counsel sought over $100,000 in attorneys' fees and incentive payments for having assisted the Court and aiding the settlement classes, even after the Court already ruled that they could not seek these amounts. *Id.*

In fact, Attorney Nelson publicly touted his role in the final fairness determination, claiming that he significantly improved the settlement, and expressing surprise that he was not compensated for it. *See* August 23, 2007 Missouri Lawyers Weekly article, attached as Exhibit 1 ("Seitz did, however, adopt ideas that Nelson had proposed, such as setting a timetable for payouts, requiring oversight, and withholding some attorneys; fees until class members are compensated, Nelson said. Those ideas weren't in the settlement agreement, he said in an e-mail following a phone interview. 'I was puzzled that the judge could conclude my suggestions were not useful.'").

Now, only *after* Mr. Nelson's fee request was denied and Mr. Siegel was told his fee was limited, have the Objectors' Counsel appealed the approval of the very settlement that, in seeking fees, they touted. [D.E. 176, 178.]

This behavior is part of a pattern. The Court simply needs to review the current website for Objectors' Counsel Edward F. Siegel to judge his regular practice in these matters. The only practice area Mr. Siegel's website describes involves objecting to class actions:

**CLASS ACTION OBJECTIONS**

How many times have you received a notice in the mail that you May be a member of a class?
. . .

And most lawyers probably don't know how to read the documents. So … you "pitch" it. But you may be throwing money away. (picture). Don't do that. Next time, send the notice to us, we will do the following: …

If we are successful, the court MAY award this firm a fee for bringing the matter to their attention and award you a fee for hiring us. But in any event, there is no cost to you. All expenses are paid by us. There is no cost to you at all. And, you may even get some money. … The courts encourage us to do this and award us with fees for doing this job.

*See* Exhibit 2 (screen shot of Mr. Siegel's website).

Mr. Seigel represents objectors Chad Simmerson, Barbara Rose and Rita Carfagna. Mr. Seigel has represented Ms. Carfagna in previous cases. [D.E. 174-4 ¶ 29.] Ms. Carfagna was previously represented in this matter by Edward Cochran, Esq., another professional objector, who had worked as co-counsel with Kenneth Nelson, Esq. in previous objections such as *In re Wireless Telephone Federal Cost Recovery Fees Litigation*, MDL 1559 (W.D. Mo. 2003), Master Case No. 4:03-md-1559. Mr. Seigel joined with Mr. Nelson to object to the proposed settlement in *In re AT&T Corporation Securities Litigation*, MDL No. 1399 (D.N.J. 2005) raising some of the same objections he raised here.[3] In denying those objections the court ruled they he "implicitly suggests that Lead Counsel cannot be trusted with properly effectuating the terms of the settlement. The Court finds no basis; however, to suddenly distrust Lead Counsel after having witnessed them vigorously prosecute this action for four years without any guarantee of success. Throughout the entire litigation, Plaintiffs counsel represented the

---

[3]   Mr. Seigel raised similar objections in  *In re Electronic Data Systems Corp. Securities Litigation*, (E.D. Texas 2006);  *In re: Charter Communications, Inc. Securities Litigation*, 443 F.3d 987 (E.D. Mo. 2005); *In re: Williams Securities Litigation,*  Case No. 02-CV-72-SPF (FHM) (N.D. Okl. 2006) (objections overruled by Court).

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508

5

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

Class with zealous advocacy and utmost diligence". (Order at 16).[4]

Professional objector Kenneth Nelson, Esq., who often teams with Mr. Seigel, has filed similar objections in *Varacallo v. Massachusetts Mutual Life Insurance Company*, 226 F.R.D. 207 (D. N.J. 2005). (Case 04-2702 (JLL), *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935 (10th Cir. 2005), *In re Telephone Federal Cost Recovery Fees Litigation*, MDL 1559, Master Cases No. 4:03-md-01559 (W.D. Mo. 2003), and *In re AT&T Corporation Securities Litigation*, MDL No. 1399 (2005). Recently Mr. Nelson's history of serial objections-for-profit were exposed by pleadings in *Fielder v. Credit Acceptance Corp.*, Case No. CV96-24285 (Mo. Circ. Ct.). *See* Ex. 6, described *infra* § II.C.

### B. Objectors Hill, Cargana and Simmerson Did Not File Claims to be Included in the Settlement, So They Have No Legitimate Stake in the Appeal.

The claims period for the Class Settlement has already closed, and Objectors Hill Cargana and Simmerson decided not to file claims pursuant to the settlement.[5] Because they have not filed claims, these Objectors have no individual stake in the outcome of the filed appeal, calling into question their motivation for appealing the settlement approval.

This Court has held that an objector's appeal should be limited to the portions of the district court order that affect him individually, and that a bond would be required for any appeal brought to purportedly benefit the class as a whole. *See Allapattah Services,*

---

[4] Mr. Seigel appealed the order to the Third Circuit which denied his objection. The Third Circuit noted that he "repeatedly refer to the percentage award as being 26.7%. But the attorneys' fee award was 21.25%. ... it is accordingly misleading to compare the 26.7% figure against the percentage fee awards granted in other cases." 455 F.3d 160, 172 n.8.

[5] Defendants' records indicate the Objectors were all members of the National Class, but none was a member of the Subclass, and therefore would not have standing to appeal regarding the Subclass's relief.

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

*Inc. v. Exxon Corp.*, 2006 WL 1132371, at *18 (S.D. Fla. 2006); *Rebney v. Wells Fargo Bank*, 220 Cal. App. 3d 1117, 1128 (1990).  Because Objectors Hill, Cargana and Simmerson have not filed claims as part of the settlement, there is nothing they can appeal that might affect them individually.  Accordingly, they should be required to file a bond for seeking a purported class-wide benefit on appeal.  Similarly, to the extent that Objector Rose seeks to appeal any matter beyond her own individual interest as a claimant, she too should be required to post a bond.

## II.  **ARGUMENT**

The Objectors' recent appeals, coupled with their other conduct, reveal that Objectors' Counsel are serial professional objectors.  As one district court observed:

> Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements.  The larger the settlement, the more cost-effective it is to pay the objectors rather than suffer the delay of waiting for an appeal to be resolved (even an expedited appeal).  Because of these economic realities, professional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors.  Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose behalf the appeal is purportedly raised, gains nothing.

*Barnes v. Fleet Boston Financial Corp.*, 2006 U.S. Dist. LEXIS 71702, at *1-2.  *See also Shaw v. Toshiba Am. Information Sys., Inc.*, 91 F. Supp. 2d 942, 973 (S.D. Tex. 2000).  *See generally* Federal Judicial Center, *Managing Class Action Litigated: A Pocket Guide for Judges* 11 (2005) (explaining that courts should "[w]atch out...for 'canned objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests.").

The Court, however, is not powerless to prevent the harm to the Class counsel by

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508

7

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

professional objectors.  Under Federal Rule of Appellate Procedure 7 and the Court's inherent powers, the Court may impose an appeal bond including both costs and attorney's fees.  *See Pedraza v. United Guaranty Corp.*, 313 F.3d 1323 (11th Cir. 2002); *Allapattah Servs., Inc. v. Exxon Corp.*, 2006 WL 1132371 (S.D. Fla. 2006).  Considering the circumstances of this case, the Court should order the Objectors and Objectors' Counsel to appeal personally and show cause why such a bond should not be required.

### A. The Court has the Authority to Require an Appeal Bond that Includes Anticipated Appellate Attorneys' Fees.

Where, as here, an objector's appeal is frivolous or filed in bad faith, the Court is empowered to require the objector to file an appeal bond that includes the amount of attorneys' fees and costs anticipated to be expended by the parties in seeking to uphold this Court's approval of their settlement. *Pedraza*, 313 F.3d at 1335-36; *Allapattah*, 2006 WL 1132371, at *18.

The Court's ability to require an appellate bond to protect the class from a frivolous appeal was squarely addressed by Judge Gold in *Allapattah Services Inc. v. Exxon Corp.*  In *Allapattah*, the Court, with copious citation to Eleventh Circuit Precedent, *sua sponte* ordered the objector and its counsel to show cause why an appeal bond should not be required, and ultimately ruled that a bond would be required.  *See generally* Exhibits 3-5, selected *Allapattah* orders: April 7, 2006 Order to Show Cause (Exhibit 3); April 5, 2006 Report and Recommendation on Westheimer's Objection to the Class Settlement ("R & R") (Exhibit 4); April 12, 2006 Order Affirming Report and Recommendation Concerning Westheimer's Objection to the Class Settlement (Exhibit

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508

8

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

5).[6]

In *Allapattah*, the Court was concerned that the objection filed by one of the members of the settlement class, Westheimer, was frivolous and without merit. The Court was also concerned that the objection – and any appeal of the denial of that objection – might unduly delay distribution of the settlement proceeds and increase the costs of the litigation. The objection issue was subsequently returned to Special Master Thomas E. Scott. *See* Exhibit 4, April 5, 2006 R & R, at 1. Special Master Scott rejected the objection entirely, issuing a lengthy R & R which was adopted by Judge Gold in both the April 7, 2006 Final Approval Order (2006 WL 1132371, *1), and in the separate April 12, 2006 Order Affirming Report and Recommendation Concerning Westheimer's Objection to the Class Settlement (Exhibit 5).

The key portion of the *Allapattah* R & R for this case is the ruling, adopted by Judge Gold, that the objector should be required to post an appeal bond for attorneys' fees and costs. *See* Exhibit 4 at 24-25. As the opinion explains, the law empowers the Court to protect class members through an appeal bond:

> Rule 7 points out that, "[i]n a civil case, the district court may require an appellant to file a bond or provide other security in any form or amount necessary to ensure payment of costs on appeal." Fed.R.App.P. 7. In the Eleventh Circuit, the District Courts have clear discretion to require appellants to post a bond to secure payment of appeal costs, including attorneys' fees. *Young v. New Process Steel, LLP*, 419 F.3d 1201 (11th Cir. 2005); *Pedraza v. United Guaranty Corp.*, 313 F.3d 1323 (11th Cir. 2002); *see also*, Fed.R.App.P. 7. A Rule 7 bond serves to protect Class members "from the burdens that stem from being forced to defend frivolous lawsuits." *Pedraza*, 313 F.3d at 1333. Ultimately, the Eleventh Circuit has concluded that "an appellant is less likely to bring a frivolous appeal if he is required to post a sizable bond to anticipated attorneys' fees

---

[6] No bond was ultimately filed, as the objector withdrew its objection and decided to forego any appeal instead. *See* Exhibit 5, April 12, 2006 Order Affirming Report and Recommendation, at 1.

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

prior to the filing of the appeal." *Id.*

*See* Exhibit 4 at 24-25.[7]   The opinion also noted that on several occasions other district courts have imposed substantial appeal bonds. *Id.* (citing *See Sckolnick v. Harlow*, 820 F.2d 13 (1st Cir. 1987); *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 2003 WL 22417252 (D. Me. 2003) (accord); *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 124 (S.D.N.Y. 1999).[8]

Also instructive is the *Pedraza* decision, relied upon by the Court in *Allapattah*. In *Pedraza*, the Eleventh Circuit engaged in a lengthy analysis of when it is proper under Rule 7 to require an appellant to post a bond that includes anticipated attorneys' fees, and concluded (among other things) that such a fee-shifting bond is entirely appropriate in common fund cases like the present litigation. *Pedraza*, 313 F.3d at 1335-36. Citing a court's inherent power to require cost bonds pursuant to Rule 7, the court ruled that attorneys' fees can be included as costs for bond purposes in common fund cases and in cases where a party has acted in bad faith or vexatiously. *Id.* at 1135.[9]

---

[7] In reaching his ruling, Special Master Scott noted that counsel for objector Westheimer had filed a number of objections in class action settlements, just like Attorneys Siegel and Nelson here.

[8] In approving the class settlement in *Allapattah*, Judge Gold also held that the objector's appeal should be limited to the aspects of the settlement that affect it individually, and not expanded to address the interests of the class as a whole. 2006 WL 1132371, at *18 ("Based upon the express language in *Devlin* and the dicta in *AAL Yiled Bond Fund*, I conclude that if Westheimer chooses to appeal this Order, Westheimer's appeal should be limited to those 'aspects of the District Court's order that affects him.'"). To the extent that the objector wanted an expanded appeal, a substantial appeal bond would be required. *Id.* at *18 and n.14. Plaintiffs note that because Objectors Hill, Cargana and Simmerson did not file claims under the settlement, there is no aspect of the Court's settlement approval order that affects them. This should likewise be considered when addressing the legitimacy of the pending appeal.

[9] Finding that none of the three exceptions, including the common fund exception, applied in that case, the *Pedraza* court vacated the bond to the extent it included attorneys' fees as "costs" to be bonded. *Id.* at 1336-37.

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

### B. The Court Should Exercise Its Power to Require an Appeal Bond Because the Objectors' Appeal is in Bad Faith.

Based on the reasoning of *Allapattah* and *Pedraza*, because the Objectors' appeal is plainly frivolous and was filed in bad faith, Objectors should be required to show cause why the Court should not impose a Rule 7 bond that includes appellate attorneys' fees. The fee applications of Objectors establish the frivolousness of their appeals. The Objectors and their counsel collectively sought over $100,000 in fee awards and incentive payments to compensate them for having allegedly improved the settlement and ensured that it was fair, adequate and reasonable.[10] Having taken the position that the settlement is fair, adequate and reasonable due to their efforts in filing and arguing their objections, Objectors cannot now legitimately argue that the settlement approval order and fee award order should be reversed on appeal as inadequate or objectionable.

There is no merit to Objectors' appeals. They are seeking to appeal for the bad faith purpose of delaying distribution of the settlement proceeds.

### C. Objectors as Well as Objectors' Counsel Should Appear Personally to Show Cause.

Objectors and their counsel should be required to personally appear before the Court to explain why they have appealed in light of their prior position that they improved the settlement and insured that it is fair, adequate and reasonable. Even where there has been no indication of bad faith, it has been this Court's practice in a prior class

---

[10] Incredibly, Attorney Siegel has sought far-ranging fees of almost $30,000, even though the Court *twice* ruled that he would only be eligible to petition for fees expended in actually attending the Final Fairness Hearing, and his travel expenses for the Hearing. *See* D.E. 167 at ¶ 73, D.E. 173 at 12, n.5. This further exposes the bad faith nature of Objectors' and their counsels' actions here. Moreover, Attorney Seigel correctly states in his Motion that he contacted undersigned counsel prior to filing his motion. What he did not inform the Court is that undersigned counsel reminded him that the Court's two orders permitted him to seek only his time and expense in attending the hearing and Attorney Siegel said he understood the ruling but was still going to seek almost $30,000 from the Court.

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508

11

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

action to require an objector to appear and answer regarding the motivations behind objections. *See In re Terazosin Hydrochloride*, 2005 WL 2451960 (S.D. Fla. July 8, 2005) (requiring objector and his counsel to appear personally and explain his understanding of the objection filed in his name, his motives for objecting, and the extent of authority he had given counsel to object). A personal appearance would not only be instructive on the appeal issue, it would resolve any lingering questions about champerty.

With regard to Attorney Nelson, for example, a recent pleading in a consumer class action in Missouri state court raises serious questions about the legitimacy of objections filed by Nelson, including whether his purported objector "clients" have given him authority to represent their interests and whether they are even informed about the nature of the objection (and the litigation generally). *See* Exhibit 6 hereto, *Fielder v. Credit Acceptance Corp.*, Case No. CV96-24285 (Mo. Cir. Ct.), "Plaintiffs' Suggestions and Affidavits in Opposition to the 'Motion to Intervene' and 'Objection' Purportedly by Class Member Barbaro Manfredez (Hernandez)." The significance of this pleading on the present case is two-fold. First, in *Fielder*, Nelson's supposed "client" testified on deposition that he had never heard of Nelson, that he did not have any attorney-client agreement with Nelson, that he did not give Nelson any authority to represent his interest in court papers, and that he did not have even the most rudimentary knowledge about the facts of that case nor about the objection that was purportedly filed on his behalf. *Id.* at 2-4. Second, the *Fielder* memorandum provides a lengthy analysis of Nelson's history of class action objections, demonstrating an overwhelming number of meritless objections –

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 Phone 305.372.1800 Fax 305.372.3508

12

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

accompanied, of course, by demands for fees. *Id.* at 19-31.[11]

While Plaintiffs' counsel here has not deposed Nelson's client Objector Hill, Exhibit 6 strongly raises the question of champerty and supports Plaintiffs' request that Nelson and his client be required to appear before the Court to explain their decision to appeal. Similar champerty questions hang over Attorney Siegel and his clients given that he openly seeks potential objectors on his website. *See* Exhibit 2 (a screen shot of Attorney Siegel's website displaying his business model for class actions).

In light of the above, the Court would benefit from an opportunity in open court to directly address Objectors' decision to appeal.

## III. CONCLUSION

Based on the above, the Class Plaintiffs respectfully request that the Court: (1) order Objectors to show cause in writing why they should not be required to post a bond to cover the fees and costs associated with Objectors' frivolous and bad faith appeal; (2) order Objectors and their counsel to appear before the Court at the September 6th hearing to explain their decision to appeal in light of their claims that they have improved the

---

[11] Notably, Attorney Siegel joined Nelson in one of these rejected objections. *See* Exhibit 6, at 27.

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

Class Settlement through their own efforts; and (3) grant any other relief the Court deems appropriate in its discretion.

Respectfully submitted on August 31, 2007.

Lance A. Harke, P.A., FBN 863599
HARKE & CLASBY LLP
155 S. Miami Ave., Suite 600
Miami, Florida 33130

LEVINE,  STEINBERG,  MILLER  &
HUVER
550 West C Street, Suite 1810
San Diego, California 92101

KOZYAK TROPIN &
THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
T: 305-372-1800 / F: 305-372-3508

/s/ Adam M. Moskowitz
Adam M. Moskowitz, FBN 965723
Thomas A. Tucker Ronzetti, FBN 965723

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on August 31, 2007 upon all parties, and was filed with the Clerk of the Court using CM/ECF.

By: /s/Adam M. Moskowitz
Adam M. Moskowitz

279406.5

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

CARLOS PEREZ, ERIC ZIMELMAN,
ANGELA D. RIEKE, and DOROTHY
HAYS, individually and on behalf of
all others similarly situated,

      Plaintiffs,

v.

ASURION CORPORATION, *et al.*,

      Defendants.

_____/

## <u>ORDER TO SHOW CAUSE</u>

THIS MATTER is before the Court upon Class Plaintiff's Motion for an Order to Show

Cause Regarding Objectors' Notices of Appeal [DE-182]. By Order dated August 30, 2007 [DE-

181], this Court set "a status conference to discuss the impact of the pending appeals on the final

distribution of the settlement." That Order presumed that counsel for all parties, including

Objectors' counsel, would attend the hearing[1] and that all outstanding issues regarding distribution

of the settlement would be discussed at that time. The Court has reviewed Class Plaintiff's Motion

and finds that the pending appeals could substantially delay the settlement this Court approved on

August 2, 2007 [DE-172]. This Court has the authority to secure the rights of other parties to this

action pending Objectors' appeal by requiring Objectors' counsel to post a supersedeas bond. Fed.

R. Civ. P. 62. This Court also has authority to require Objectors' counsel to post an appeals bond

---

    [1]    Individual class members and objectors may attend the September 6 hearing but their
attendance is not required.



EXHIBIT

J

to cover attorney's fees and costs incurred by other parties to this action while Objectors' appeal is pending.  Fed. R. App. P. 7.  Accordingly, it is hereby

ORDERED that:

Objectors' counsel will SHOW CAUSE, at the **September 6, 2007, 10:00 a.m. hearing scheduled in this case,** why the Court should not require them to post a supersedeas bond and/or an appeals bond.

DONE AND ORDERED at Miami, Florida, this 4 day of September, 2007.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:     All Counsel of Record

-2-

Start Time: 10:40A
End Time: 11:45A 11:45A

## CIVIL MINUTES

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
HONORABLE PATRICIA A. SEITZ, JUDGE

Case No. ___06-20734___    Date ___Sept 6, 2007___

Clerk ___PH___    Reporter ___David Ehrlich___

Title of Case ___Perez v. Asurion___

P. Attorney ___Adam Moskowitz; Tucker Ranzetti; Michael Schwager; Lance Harke; David Marger___

D. Attorney ___Brett Barfield; David Walsh (via video); Sandra Miller___

Reason for Hearing ___OSC why not to require bond; outstanding issues re settlement___

Result of Hearing ___Absence of Objectors' counsel noted; Ct approval method of notification of class of delay; discussion of possible requirement of bond and grounds for same; counsel will file motions and affidavits as will be outlined in order to issue.___

Case continued to ___Sept. 12, 2007___    Time ___2:00 pm___ For ___Cont/Motions to be filed.___

Misc. _____

EXHIBIT
K
tabbies

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 06-20734-CIV-SEITZ/MCALILEY

CARLOS PEREZ
    Plaintiff,

vs.

ASURION CORPORATION et al.

    Defendant,

_____/

### JOINT NOTICE TO THE COURT
### AND REQUEST TO BE EXCUSED FROM HEARING

NOTICE IS HEREBY GIVEN that Dina Hill, Rita Cargana, Chad Simmerson, and Barbara Rose, Objectors in the above-styled cause, hereby intend to withdraw their objections and all notices of appeal forthwith, and respectfully request leave to be excused from the September 12 proceeding. In support of this notice and request, they state as follows:

In regard to the notices of appeal, recent developments persuade the Objectors that the interests of the class are best served by withdrawing their appeals both as to fees and as to the Settlement itself. A copy of a proposed notice of withdrawal was sent to Class Counsel on the morning of September 7. At approximately 12:30 PM that day, Class Counsel informed Mr. Siegel that the appeals had been docketed that morning and that the Notice of Withdrawal needed to follow a different format. Mr. Moskowitz stated that he was redrafting the Notice and would circulate it for signature within a few hours with the intention that it be filed before the end of the day.

**EXHIBIT**

L

In regard the hearing, counsel for Objectors first became aware of the Plaintiff's Motion for an Order to Show Cause (DE-182), and the Court's Orders of August 30 (DE-181), September 4 (DE-184) and September 6 (DE-190) at 5:20pm EDT September 6, upon checking the docket sheet in the PACER system. Prior to that time, Objectors' counsel outside Florida had no knowledge of the existence of those documents. Prior to that time, Objectors' local Counsel had not received any e-mail notices from the Court, the Clerk, or the other parties to the litigation and had no knowledge of the pendency of any motions, status conferences, or hearings. Obviously, had he received any such notice, he would have immediately conveyed such information to his out-of state co-counsel and he and/or they would have attended.

Because of the internal operating procedures and rules concerning the electronic filing system in the Southern District of Florida, Objectors' counsel were not on the Court's e-mail distribution list and have not received electronic notices of any kind in this case. Since neither local counsel in Florida, not Objectors' counsel outside of Florida received any notices, none of them was aware of the scheduled hearing.

Certainly Objectors' counsel are keenly aware that all parties and the Court would be disappointed and unhappy with them if they failed to appear as ordered and, knowing that, would not intentionally refrain from appearing. Just as certainly, Objectors' counsel means no disrespect for any party or the Court in failing to appear. Rather, Objectors' counsel simply did not know about the Orders, as amply illustrated by the total lack of response to them by Objectors' counsel.

The undersigned abjectly apologize to the Court for any inconvenience that they may have caused and also apologize for even the appearance of disrespect that their

failure to appear at the September 6 hearing may have conveyed. They assure the Court that they meant no disrespect and did not intentionally ignore the Court's order or intentionally refrain from appearing at the hearing.

In addition, Mr. Siegel, who is Jewish, urges the Court to take Judicial Notice of the fact that one of the holiest days of the Jewish year begins at sundown on September 12 and that if he were to attend a 2:00 P.M. hearing on that date, he probably would be unable to return to Cleveland in a timely manner to worship with his family.

Accordingly, and in light of the withdrawal of all objections and appeals, Objectors' counsel believe their attendance at the September 12 proceeding is no longer necessary and that they should be excused from attending.

WHEREFORE, Objectors' counsel respectfully requests leave of the Court to be excused from appearing on September 12.

Dated:  September 7, 2007                    Respectfully submitted,

                                             _/s/ John C. Rayson_____
                                             John C. Rayson, Esq.(204153)
                                             The Law Offices of John C. Rayson
                                             2400 E. Oakland Park Blvd.
                                             Fort Lauderdale, FL  33306
                                             (954) 566-8855
                                              (954) 566-8902 fax
                                             e-mail: rayson2000@aol.com

                                             /s/Kenneth e. Nelson_____
                                             Kenneth E. Nelson (Mo. Bar 31993)
                                             Nelson Law Firm, P.C.
                                             2900 City Center Square
                                             1100 Main Street
                                             Kansas City MO 64105
                                              (816) 421-7225
                                              (816) 421-3339 fax
                                             e-mail:  kennelson@mclaw.com

Attorney for Objector Dina Hill

__/s/ Edward F. Siegel__
Edward F. Siegel (0012912)
27600 Chagrin Blvd., Ste. 340
Cleveland, OH 44122
(216) 831-3424
(216) 831-6584 (fax)
e-mail: efsiegel@efs-law.com

Attorney for Objectors
Rita Cargana, Chad Simmerson,
and Barbara Rose

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed through the Court's electronic system and was by that system served upon all counsel of record on September 7, 2007.

By: ____/s/ John C. Rayson_____

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
### CASE NO. 06-20734-CIV-SEITZ/MCALILEY

CARLOS PEREZ, et al.,

        Plaintiffs,

vs.

ASURION CORPORATION, et al.

        Defendants.

_____/

## CLASS COUNSELS' NOTICE OF RECENT EVENTS

    Class Counsel was contacted last night by counsel for the objectors that filed appeals in this action ("Objector's Counsel"). Objector's Counsel stated that they desired to voluntarily dismiss with prejudice both appeals. Today, Class Counsel assisted Objector's Counsel prepare the appropriate "Stipulation of Dismissal of Appeal With Prejudice" in accordance with Fed.R.App.P. 42(b) and 11th Cir.R. 42-1(a) in that both appeals were docketed by the 11th Circuit. The Stipulation (attached as Exhibit A) has been signed by all parties and will be sent today to the Eleventh Circuit for filing.

    Accordingly, Class Counsel and Defendants join in respectfully requesting the Court vacate the deadlines set forth in the Order dated September 6, 2007 [D.E. 190] in light of these events and set a Status Conference at the Court's convenience next week to discuss the amended deadlines for distribution to the Class. All of the parties sincerely appreciate all of the efforts by the Court in handling these matters and in assisting the parties resolve these matters so that the Class can receive the benefits of the Settlement.

**EXHIBIT**

tabbies

M

CASE NO. 06-20734-CIV-SEITZ/MCALILEY

Respectfully submitted on September 7, 2007.

Lance A. Harke, Esq., FBN 863599
David J. Maher,  Esq. FBN 993484
HARKE & CLASBY LLP
155 S. Miami Ave., Suite 600
Miami, Florida 33130

KOZYAK TROPIN &
 THROCKMORTON, P.A.
2525 Ponce de Leon , 9th Floor
Coral Gables, Florida 33134
T: 305-372-1800  / F: 305-372-3508

LEVINE,   STEINBERG,   MILLER   &
HUVER
550 West C Street, Suite 1810
San Diego, California 92101

/s/ Adam M. Moskowitz
Adam M. Moskowitz, FBN 965723
Thomas A. Tucker Ronzetti, FBN 965723

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on September 7, 2007 upon all parties, and was filed with the Clerk of the Court using CM/ECF and served via email on Objector's Counsel.

By: /s/Adam M. Moskowitz
Adam M. Moskowitz

279723

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: CHARTER COMMUNICATIONS, INC. ) | MDL DOCKET NO. 1506 (CAS) |
| SECURITIES LITIGATION ) | |
| ) | CONSOLIDATED CASE |
| ) | |
| This Document Relates To: All Cases ) | NO. 4 : 02 – CV-01186 -CAS |
| ) | |
| ) | <u>JUDGE: Hon. Charles A. Shaw</u> |
| ) | |

## AMENDED OBJECTIONS TO PROPOSED SETTLEMENT OF CLASS ACTION

Now comes SUSAN LOCKSHINE by and through the undersigned counsel, and hereby files these Objections to the proposed Settlement of this Class Action and, in support thereof, state as follows:

### PROOF OF MEMBERSHIP IN CLASS

As set forth in the attached Amended Affidavit, Objector Susan Lockshine resides at 3909 Beechmont Trail, Orange, Ohio 44122, purchased Charter Communication Inc. common stock on or about October 1, 2001 and still owns the stock.

### NOTICE OF INTENT TO APPEAR

Objector Susan Lockshine hereby gives notice that she intends to appear, through undersigned counsel, at the Settlement Hearing presently scheduled for May 23, 2005 at 10:00 A.M. at the United States Courthouse, 111 S. 10th Street, St. Louis, Missouri 63102.

1



EXHIBIT

N

## OBJECTIONS

The proposed Class Action Settlement Agreement is inadequate, unfair and unreasonable for the following reasons:

1. The Settlement Fund consists of cash and securities in the approximate amount of One Hundred and Forty-Six Million Dollars ($146,000,000) plus interest. The Notice indicates that, of this amount, Class Counsel intend to seek a fee of 20% plus reimbursement of up to Seven Hundred and Fifty Thousand Dollars ($750,000) in expenses. This will be approximately Thirty Million Dollars ($30,000,000) In addition, the Notice indicates that counsel in the Shareholder Derivative Action will be requesting fees and expenses of $2.25 Million Dollars. Therefore, a total of approximately Thirty Two Million Two Hundred and Twenty Five Thousand Dollars ($32,225,000) is being requested by counsel. This is slightly over Twenty Two (22%) Percent of the Settlement Fund.

2. Given the size of the Settlement Fund, the Court should award total fees and expenses to all counsel in an amount not exceeding approximately fifteen (15%) percent of the Settlement Fund. According to the study by the consulting firm of Logan, Moshman and Moore which analyzed over 1100 Common Fund cases, the average fee award for Class Action cases whose settlements were valued at over One Hundred Million was 15.1 percent. Stuart J. Logan, Jack Moshman and Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 169 (2003).

3. In addition to the size of the attorney's fees, the undersigned objects to the manner in which Class Counsel is receiving its compensation. The undersigned understands that

2

Class Counsel will be receiving 96.6% its money before Class Members have assurance that the proposed changes in corporate governance will have been effectively implemented and that the Warrants which are to be issued have been authorized, issued and registered on a National Market. This can easily be corrected by withholding a larger portion of Class Counsel's fee than is set forth in the Stipulation of Settlement. Although the language is not perfectly clear, it appears that Class Counsel is requesting that it receive 96.6% of the Fee Award allocable to the Settlement Cash within five (5) business days after the Court executes an order awarding fees. (See, Stipulation Paragraph 9.2). Objector respectfully suggests that a greater percentage, perhaps fifteen (15%) to twenty (20%) percent of the Fee award be withheld from Class Counsel's fees pending a final report on the fulfillment of all of defendants' undertakings. Class Counsel should get the full benefit of the settlement only when Class Members receive all of their benefits.

4. The Notice of Settlement of the Class Action does not disclose the amount of damages to which the Class would be entitled if it prevailed, nor does it disclose the percentage of that amount which is being proposed for settlement. Without knowing how many cents on the dollar the claims are being settled for, the Class members are unable to make a truly informed judgment as to the merits of the settlement amount.

5. A compensatory award of Thirty Thousand Dollars ($30,000) to the Class Action Plaintiff has also been requested by Class Counsel, which amount is to be paid from the Settlement Fund. This Objector believes that such amount is excessive compared to other cases.

6.  Objector Susan Lockshine respectfully adopts and incorporates into these Objections all other well taken, timely filed Objections that are not inconsistent with these Objections.

7.  Class member Susan Lockshine has a legally protectable interest in this litigation. That interest will be impacted by the proposed settlement agreement, particularly the legal fees and Class Action Plaintiff fees that are proposed to be paid.

8.  These Objections, presented to the Court as a matter of right, are properly and timely filed by said Objector. All of the legally required prerequisites material to these Objections have been met.

WHEREFORE, Objector respectfully requests that this Court:

A.   Upon proper hearing, sustain these Objections;

B.   Continue the issue of attorneys' fees and Plaintiff's incentive award

C.   Upon proper hearing, enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the Notice and the requested attorneys' fees and Plaintiff's incentive award.

Respectfully submitted,

/s/Edward F. Siegel
_____

EDWARD F. SIEGEL (Ohio Bar No. 0012912)
5910 Landerbrook Dr. #200
Cleveland Ohio 44124
(440) 544-1107
(440) 446-1240  fax
efsiegel@apk.net --email

Counsel for Susan Lockshine

4

## CERTIFICATE OF SERVICE

I certify that these Amended Objections were sent by ordinary U.S. mail, postage pre-

paid on April _____ 2005, to the following:

IRELL & MANELLA LLP
David Siegel, Esq.
David Schwarz, Esq.
Craig Varnen, Esq.
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276

THOMPSON COBURN LLP
Roman P. Wuller, Esq.
Stanley Grossman, Esq.
Stephen B. Higgins, Esq.
One US Bank Plaza
St. Louis, MO. 63101

*Attorneys' for Defendant Charter Communications, Inc.*

MAYER, BROWN, ROWE & MAW LLP
Jonathan C. Medow, Esq.
John J. Tharp, Jr., Esq.
190 South LaSalle Street
Chicago, IL. 60603-3441
*Attorneys for Defendant*
*Arthur Anderson LLP*

POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
Stanley Grossman, Esq.
Marc Gross, Esq.
100 Park Avenue
New York, NY. 10017
*Lead Counsel for Plaintiff*
*StoneRidge Investment*
*Partners LLC*

_____/s/ Edward F. Siegel_____
EDWARD F. SIEGEL
Counsel for Susan Lockshine

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

IN RE: BRISTOL-MYERS SQUIBB      :      CIVIL ACTION NO. 00-1990 (SRC)
     SECURITIES LITIGATION         :
                                 :
                                 :
_____ :      JUDGE STANLEY R. CHESLER

### OBJECTIONS TO PROPOSED SETTLEMENT OF
### CLASS ACTION

COMES NOW   Rita Carfagna, by and through undersigned counsel, and hereby

files these Objections to the proposed Settlement of this Class Action and, in support

thereof, states as follows:

### PROOF OF MEMBERSHIP IN CLASS

Objector Rita Carfagna, Managing Member of Cascia II, LLC, who resides at

2881 South Park Boulevard, Shaker Heights, OH 44120, purchased 220 shares of

common stock of Bristol-Myers Squibb Company between October 19, 1999 and March

20, 2002. An account statement from Deutsche Bank evidencing such ownership is

attached hereto as Exhibit B and hereby incorporated by reference herein.

### NOTICE OF INTENT TO APPEAR

Objector Rita Carfagna hereby gives notice that she intends to appear, through

undersigned counsel, at the fairness hearing presently scheduled for May 11 2006 at

10:30 A.M. before the Honorable Stanley R. Chesler at the Clarkson S. Fisher Building &

United States Courthouse, Courtroom 5E, 402 East State Street, Trenton N.J. 08608.

**EXHIBIT**

O

## OBJECTIONS

The proposed Class Action Settlement Agreement is inadequate, unfair and unreasonable for the following reasons:

1.      The settlement fund consists of cash in the amount of One Hundred Eighty-Five Million Dollars ($185,000,000) plus interest. The Stipulation and Agreement of Settlement and the Notice indicate that, of this amount, class counsel intend to seek a fee not to exceed 20% of the Settlement Fund or approximately $37 million **PLUS** reimbursement of out-of-pocket expenses not to exceed $3.7 Million. The total monies to class counsel, therefore, might reach $40.7 Million. This is objected to because (a) the total aggregate requested by Lead Counsel is **22**% of the total recovery, which is far in excess of what is fair and reasonable; and (b) evidence has not yet been submitted to the Court concerning the total amount of time expended by counsel, by whom it was incurred (*i.e.* partner, associate, paralegal, or contract attorney) the providers' billing rates at the time that the services were incurred, and what multiple was used to arrive at the requested fee. The Objector requests an opportunity to, and the Court should, perform a cross-check on the reasonableness of the fee by investigating what multiple is used and how much of the time was incurred in matters that should be disallowed such as (i) how much was incurred in so-called "confirmatory discovery," (ii) how much time was incurred for reviewing another attorney's work, or (iii) how much time was expended in attempting to secure appointment as Lead Counsel. It is apparent from a review of the docket that a great deal of time was spent (and presumably expenses incurred) by Lead Counsel between the time of the initial filing of this case on April 26, 2000 and its appointment as Lead Counsel on July 24, 2000, in trying to secure the

2