1           UNITED STATES OF AMERICA
         FOR THE NORTHERN DISTRICT OF OHIO
2                EASTERN DIVISION

3                  - - - - -

4

5     JAMES GEMELAS, et al.,          )
                                      )
6              Plaintiffs,            )
                                      )
7                vs.                  )  Case No. 1:08CV236
                                      )
8     THE DANNON COMPANY, Inc.,       )
                                      )
9              Defendants.            )

10

11                 - - - - -

12      TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE HONORABLE

13       JUDGE DAN A. POLSTER, JUDGE OF SAID COURT,

14      AND A JURY, ON WEDNESDAY, JUNE 23RD, 2010,

15         COMMENCING AT 12:00 O'CLOCK P.M.

16

17                 - - - - -

18

19    Court Reporter:            GEORGE J. STAIDUHAR
                                 801 W. SUPERIOR AVE.,
20                               SUITE 7-184
                                 CLEVELAND, OHIO 44113
21                               (216) 357-7128

22

23                 - - - - -

24

25

1    APPEARANCES:

2        Parties present on behalf of Plaintiffs:

3            Timothy Blood, Esq.
             Jayne Goldstein, Esq.
4            Jonathan Stein, Esq.
             John R. Climaco, Esq.
5            D. Scott Kalish, Esq.
             Thomas O'Reardon, Esq.
6            James Gemelas, Esq.
             Frank E. Piscitelli, Jr., Esq.

7

8        Parties present on behalf of Defendants:

9            Angel Garganta, Esq.
             Mike Ungar, Esq.
10           Bruce Friedman, Esq.
             Nancy Dowling, Esq.
11           David Yeagley, Esq.
             Ken Strick, Esq.

12

13       Parties present on behalf of Objectors:

14           Edward Cochran, Esq.
             Edward Siegel, Esq.

15

16                     - - - - - -

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2                THE COURT:  We are here on case 1:08CV236,

3        Gemelas, et al versus Dannon Yogurt.  We are here for a

4        Fairness Hearing.

5                        Counsel for Plaintiffs are here and counsel

6        for Dannon, and I believe we have some counsel for

7        objectors, and some of the objectors may be present.  So

8        the court reporter can hear, I would like anyone who

9        wants to speak to go to the podium where the microphone

10       is, please.

11                       Before the Court is a proposed judgment,

12       final order, and decree resolving this case.  I would say

13       by background the parties had done a considerable amount

14       of work on this case before it was filed in this

15       District.  It previously was in federal court in

16       California, and the parties did a great deal of

17       discovery.

18                       And then they mediated the case before a

19       retired Federal Judge and had a proposed settlement,

20       which was presented to me.  I had several issues.  I

21       engaged the parties in a lengthy process, which led to

22       some modifications of the proposed settlement, and they

23       are reflected in the current proposal.

24                       So this has been going on for a long period

25       of time, and I am intimately involved with the process

1       and the contents of the proposed — the amended

2       stipulation of settlement and the proposed judgment and

3       all the appropriate orders.  So for threshold matters, I

4       am formally certifying the following class pursuant to

5       Federal Rule of Civil Procedure 23(b)(3):

6                       "All persons who purchased in the

7       United States the food products marketed and distributed

8       by Dannon under the brand names of Activia or Danactive,

9       including any variations formats, or line extensions

10      thereof" — that's referred to as the, quote, products

11      unquote "at any time up to the day notice is provided to

12      the class.  Excluded from the class are Defendants,

13      officers, directors, and employees and those who

14      purchased the products for the purpose of resale."

15                      In other words, this includes consumer

16      purchasers other than defendants, officers, directors,

17      and employees.

18                      "Second, pursuant to Federal Rule of Civil

19      Procedure, Rule 23(a), I am finding that the Plaintiff in

20      this litigation, Mr. Gemelas, is a member of the class.

21      His claims are typical of the class, and he fairly and

22      adequately protected the interests of the class

23      throughout these proceedings in the litigation.

24      Accordingly, I am hereby appointing Mr. Gemelas as class

25      representative.

1          "Third, having considered the factors

2     setforth in Rule 23(g)(1) of the Federal Rules of Civil

3     Procedure, I am finding that class counsel have fairly

4     and adequately represented the class for purposes of

5     entering into and implementing this settlement, and

6     therefore, I appoint class counsel as counsel to

7     represent the settlement class members.

8          "Fourth, Exhibit B sets forth several

9     individuals who have filed valid requests for exclusion,

10    also known as optouts."  These four individuals are

11    therefore excluded:  Patricia L. Marsheck,

12    M-a-r-s-h-e-c-k, Margate, Florida; Betty A. Darden,

13    D-a-r-d-e-n, in Osala, Florida; David W. Geist,

14    G-e-i-s-t, Sr., in Marifee, California; and Emojene,

15    E-m-o-j-e-n-e, Carver in Roxboro, North Carolina.  So

16    those four individuals will be excluded from the class

17    because they filed valid and timely requests for

18    exclusion.

19          Next, I am concluding that the distribution

20    of the class notice that was accomplished by counsel

21    constituted the best notice practicable under the

22    circumstances and fully satisfied the requirements of

23    Federal Rule of Civil Procedure 23, the requirements of

24    due process, and any other — Title 28 U.S.C. Section

25    1715 and any other applicable law.  All right.

1          There were a number of objections that were

2    filed by several objectors and their counsel.  There were

3    some briefs in opposition.  The Court has reviewed all of

4    them.  I don't think I need to take up everyone's time.

5    Going through that now, there may be a couple things I

6    want to address.

7          One of the things raised was whether it may

8    be appropriate to withhold some portion of the attorneys

9    fees, to wait for a couple of things:

10          First, to make sure that counsel completes

11    all of the work that is left to be done in the same

12    diligent and conscientious way they have performed their

13    duties so far and, second, to determine exactly how much

14    monetary relief will actually go to class members.  At

15    this point we don't know.  We have a very detailed claim

16    procedure set up.  I reviewed it.

17          I believe it is fair and appropriate, but no

18    one really knows how many claims and what the total

19    dollar amount will be, and certainly, one measure of

20    determining the fairness and appropriateness of attorneys

21    fees in a case like this is to measure it against the

22    monetary relief to the class.

23          It is a little more complicated because here

24    there is both monetary and non monetary relief, so I am

25    not suggesting that the only measure is the monetary

1  relief but certainly that is one measure.

2  So I guess my thought was the attorneys

3  fees, the settlement provides for attorneys fees up to

4  $10 million dollars, and my preliminary thought would be

5  to award $7 million dollars at this point and then

6  consider additional attorneys fees when I make sure,

7  first, everything has been concluded in the MDL and I am

8  able to see what — how much monetary relief was obtained

9  for the class, and then I will consider the balance.  So

10  I guess that was a tentative thought.

11  So that was one issue, and the second one

12  that was raised by the objectors in the stipulated

13  settlement, the parties have agreed that if the total

14  amount of defendants payments is less than $35 million

15  dollars — and that includes attorneys fees and, well, I

16  don't know, does that include the attorneys fees, or is

17  that exclusive of attorneys fees, that total amount of

18  payments?

19  MR. BLOOD:  That's inclusive.

20  THE COURT:  All right.  That was my thought.

21  The total amount is less than $35.  It could go as high

22  as $45 million, depending on the amount of claims, but if

23  this provision — and it is Roman Numeral IV, capital

24  A(3)(a), provides that "the total amount of payments is

25  less than $35 million dollars, then Defendant Dannon

1  shall donate products having a total value equal to the

2  difference between the $35 million and the amount of

3  payments, pursuant to the cy pres doctrine to be

4  distributed to one or more charities that help feed the

5  poor."

6           A question was raised as to how this product

7  would be valued, and I guess there are two ways:  We

8  could use the wholesale value or the retail value.  The

9  Court's preliminary inclination is to use the wholesale

10  value but, also, to credit Dannon with any distribution

11  or transportation expense incurred in transporting the

12  products from Dannon's facilities to the charities that

13  would receive the product.

14           So I guess I would like to hear from the

15  Plaintiffs, from Dannon, and from any of the objectors on

16  those two issues that I have raised.

17           MR. BLOOD:  Good afternoon.  Timothy Blood

18  for the Plaintiffs.

19           THE COURT:  Yes, Mr. Blood.

20           MR. BLOOD:  First of all, I think it is

21  perfectly appropriate for the Court to make an initial

22  award of attorneys fees and then determine the remaining

23  amount at a later time after the settlement concludes, we

24  certainly have no objection to that, your Honor.

25           And I assume that any later discussion of

1    the amount would be until — would wait until after the

2    process concludes.

3            THE COURT:  That's my suggestion, Mr. Blood,

4    that we wait until what we will call the claims process,

5    so we will be able to know the total value, the economic

6    value that is going to the class, certainly, along with

7    all the other factors.

8            MR. BLOOD:  Okay.  Then we will hold off

9    argument until then.

10           With regard to wholesale versus retail, if

11   the Court determines that it would be wholesale value, I

12   think the parties had an understanding they would be

13   retail value, but if it was wholesale value, then I

14   certainly think it would be appropriate to include costs

15   of distribution, transportation primarily because Dannon

16   doesn't distribute to these types of entities.

17           THE COURT:  Right.  Well, I would definitely

18   include that.  The provision doesn't — it doesn't

19   specify it, so there may have been discussion among the

20   parties, but this was my preliminary thought, but I would

21   certainly include any distribution or delivery costs

22   entailed by Dannon in getting the food products to the

23   charities.

24           MR. BLOOD:  And with regard to sort of a

25   related issue of how that is all to be done, the parties

1  have been discussing it, and pursuant to the way in which

2  cy pres awards are distributed anyway, at the close of

3  the claims process, the parties intend to work on a

4  distribution plan, a detailed distribution plan in this

5  case and present it to the Court.

6          Obviously, that would detail based on how

7  much value there is, based on how much product has to be

8  distributed, who the awardees, the recipients will be,

9  the amount, the timing and a distribution plan in enough

10  detail to satisfy the Court, and that would obviously be

11  done later on after we know how much money we are dealing

12  with.

13          THE COURT:  Okay.  I guess I should have

14  said, I know the objectors raised an issue as to whether

15  this was an appropriate cy pres recipient.  I have

16  concluded that it is.  It is an appropriate use of

17  cy pres.  The claims process ensures, quite frankly, that

18  all the claimants, you know, even above the $35 million,

19  potentially up to $45 million, the claims would be

20  honored.

21          So we are only talking about the situation

22  where the claims don't reach the $35 million total

23  threshold, and at that point, the claimants will have

24  received whatever monetary relief they are entitled to,

25  and I think distribution of food products to those

1    individuals in this country who are hungry is

2    appropriate.  So I am making that finding.

3              MR. BLOOD:  And we would agree and certainly

4    more appropriate than sending yogurt product to the

5    Better Business Bureau, which is what the objectors seem

6    to suggest, which I think would be —

7              THE COURT:  Well, I don't think

8    they suggested sending yogurt to the Better Business

9    Bureau.  I think the idea was some sort of monetary

10   contribution to the Better Business Bureau or entities

11   like that that provide benefit to consumers, and there

12   would be nothing inappropriate about that.

13             I don't think they were suggesting sending

14   the yogurt there.  It was making a monetary compensation

15   to agencies, and there would be nothing wrong with that.

16   But there would be a great benefit to providing food to

17   people in need, and it would be appropriate.  So I am

18   making that finding.

19             MR. BLOOD:  And I have nothing else unless

20   your Honor — oh, expenses, also.

21             THE COURT:  Oh, I should — I am going to

22   award the expenses.  I find the amount set forth in the

23   filings is reasonable and appropriate.  It is

24   $598,578.44, and I shall order those paid.

25             MR. BLOOD:  And just to be clear, and those

1     are paid at the same time that the $7 million will be

2     paid?

3               THE COURT:  Yes.

4               MR. BLOOD:  Thank you, your Honor.

5               And I have nothing else unless you have

6     questions for us.

7               THE COURT:  No.  Yes, Mr. Ungar.

8               MR. UNGAR:  Thank you, your Honor.  I think

9     I will be the briefest I have ever been in this

10     courtroom.  First, I want to thank the Court for its

11     assistance throughout these matters.  We have no

12     objection or position with respect to the attorneys fees

13     issue.

14               With respect to the distribution of product,

15     we have no objection to the Court's suggestion that it be

16     valued at a wholesale price with full credit to Dannon

17     for all of the distribution costs and administration

18     costs that are associated with this process, which is

19     obviously out of the ordinary course of its normal

20     business.

21               And then, finally, I would just point out

22     that we will continue to work with Plaintiffs' counsel

23     under the continuing jurisdiction and supervision of this

24     Court with respect to the product distribution since it

25     is clear that is going to materialize, and we will report

1        to the Court on a timely basis with a distribution plan.

2                    And thank you.

3                    THE COURT:  Thank you, Mr. Ungar.

4                    MR. UNGAR:  Unless you have any questions.

5                    THE COURT:  No.  That's fine.

6                    Do any of the objectors or counsel for the

7        objectors wish to speak on any of these points?

8                    MR. COCHRAN:  Yes, your Honor.  Good

9        afternoon.  Edward Cochran for objectors Falkner,

10       Cochran, Cannata, Loeffler, Richey, Price, Henry, and

11       Lodwick.

12                   Your Honor's addressing some of the

13       objections will very much shorten what I have to say.

14       Obviously, we agree with the addressing the two issues,

15       your Honor.  I would have only three points to make

16       supplemental to that.

17                   One, I would ask the Court to consider that,

18       as this settlement is nothing but a claims made

19       settlement or insurance against what claims might be made

20       and that indeed there might be very few claims.  There

21       might be many more claims than I think as well.

22                   I mean, frankly, I don't know any more than

23       anyone else in this room, but I do know from many other

24       cases I have been in of 1 percent claim rates and

25       2 percent claim rates and so on; that in light of that,

1    that the parties and the Court should consider some kind

2    of minimum cash payment, whatever it might be.  And I

3    know in our written suggestions we suggested $25 million

4    dollars, which is now zero.  There is no minimum payment

5    of cash whatsoever, other than $10 million to the

6    attorneys.  That is the only cash that we know that will

7    be paid.

8             THE COURT:  Well, to whom would the cash be

9    paid?

10            MR. COCHRAN:  Your Honor, if there were a

11   minimum you mean?

12            THE COURT:  If there were —

13            MR. COCHRAN:  If there was a minimum of

14   $10 million dollars, say, that should go to the cy pres,

15   Better Business Bureau, whoever it might be in lieu of

16   yogurt products, which would be of much more utility to

17   any charitable or public interest organization.  If such

18   recipients were in this room, I feel confident that they

19   would agree with me 110 percent.

20            The second suggestion, your Honor —

21            THE COURT:  Well, I would just say,

22   Mr. Cochran, I understand your point, but the only

23   charities that are going to be receiving Dannon's food

24   products are those that can use those products.  We are

25   not contemplating Dannon loading up their trucks full of

1    yogurt, driving around and leaving trailers full of

2    yogurt in places.  I mean it is going to be efficient and

3    effective, and they will distribute enough of their

4    product to reach the values required when we see what the

5    monetary claims are that are paid and to as many

6    charities as needed to make sure that all the food can be

7    received, stored, and distributed, so there is not going

8    to be any wasted food.

9              So in my view — presumably the charities —

10   if you give cash, you know some of us do to Cleveland

11   FoodBank, do, and they then purchase food, or they give

12   the money to the subentities that buy the food.  It is

13   all converted into food.  Here it is already in useful

14   food products.

15             It is just a question of making sure that

16   only so much is distributed because, of course, it is

17   perishable, that it can be used in a timely fashion, and

18   that is why there may be significant distribution

19   expenses because we are not talking about, you know,

20   canned foods that might have a shelf life of six months

21   or more.  So there will be a lot of mechanics, but I am

22   confident the food products will be used.

23             MR. COCHRAN:  I understand.  And of course,

24   that's a good point, your Honor.  I am only trying to

25   address what if, for example, there were not even a

1    million dollars claimed in money to the class.   There

2    should be some minimum in that event.

3              THE COURT:   Okay.

4              MR. COCHRAN:   And I continue — and we would

5    like the permission of the parties and the Court, if it

6    is available for the objectors, to stay involved in the

7    case so as to represent some other monitoring force in

8    addition to the Court of the details of what the Court

9    has outlined as what I think is the best intentions..

10             THE COURT:   Well, I don't think there is any

11   additional monitoring or oversight.   We have the lawyers,

12   but ultimately, the monitoring and oversight is me.   And

13   I think I can accomplish the oversight myself, but I

14   appreciate the offer.

15             MR. COCHRAN:   Your Honor, the second point,

16   in light of the Court having addressed my objections is

17   what would happen to the money, if any, if attorneys fees

18   ultimately are less than $10 million dollars.   We know

19   the Defendant is prepared to pay $10 million dollars, and

20   in the end were the claims, the amount claimed by the

21   class to be very low and possibly the Court were to order

22   that the fees would not exceed lodestar or $7 million,

23   whatever, we would like to address the issue of whether

24   that money should simply disappear back into the pockets

25   of the Defendant, whether it be $3 million or whatever or

1   whether that money should be addressed by the Court as a

2   potential settlement.

3             THE COURT:  Well, Mr. Cochran, as I

4   understand it, that differential, if there is one and if

5   it arises, would be converted into cy pres food

6   distribution because Dannon is committed to pay money

7   and/or food valued at the wholesale price up to $35

8   million dollars.

9             And at this point none of us know what the

10  components will be.  We don't the know — the agreement

11  contemplates possibly claims well over $25, $30 million.

12  We don't know.  They could be, they could be small, no

13  clue, but that's covered by the agreement.  Just say

14  hypothetically, if we have got $20 million dollars in

15  claims and the Court doesn't award any attorney fees

16  beyond the $7, you know, there is about $8 million

17  dollars of food.

18            If the Court orders $10 million dollars of

19  attorneys fees and we have got $20 million dollars of

20  claims, that's about $5 million of food.  If it is only a

21  small number of claims, well, we have many, many millions

22  of food that is distributed, but the money, under no

23  circumstances will any reduction in attorneys fees inure

24  to the benefit of Dannon.

25            If it would, that would have been a failure

1    of the process, and that isn't happening.

2              MR. COCHRAN:  Well, of course, your Honor is

3    correct, those are the terms of the settlement, but I

4    think Dannon is much more wanting to expend product than

5    they are cash, and I am just addressing the fact that

6    pursuant to the clear sailing provision, they are willing

7    to pay up to $10 million dollars in cash, and since they

8    are, I am simply interposing an objection, your Honor,

9    that would address whether any reduction in attorneys

10   fees would be conferred only into distribution of

11   additional product as your Honor has described or whether

12   the cy pres can be through objectors in this case, have

13   the opportunity to seek a cash contribution, that's all

14   and if your Honor disagrees —

15             THE COURT:  So it would be a cash cy pres

16   contribution —

17             MR. COCHRAN:  Correct.

18             THE COURT:  — to someone.

19             All right.  Well, that's sort of related to

20   your prior objection, Mr. Cochran.  I understand your

21   point, but I have concluded the mechanism the parties

22   have come to is fair and appropriate, but I understand

23   the objection.

24             MR. COCHRAN:  Thank you, your Honor.  The

25   final point is, as to the lodestar, your Honor has chosen

1    to distribute immediately $7 million dollars, which is

2    roughly the lodestar.  Mr. Seigel will address in a

3    moment our belief that the actual attorney time, as

4    compared to clerks and investigators and so forth that

5    are being included in the lodestar, the actual attorney

6    time that has been submitted in the lodestar is, at

7    least, a couple million dollars less than $7 million

8    dollars.

9              And we would like to put that into the

10   record, and if the Court would like to address that, but

11   I will let Mr. Seigel address the detailed numbers of

12   that lodestar.  With that, I shall sit down.

13             Thank you, your Honor.

14             THE COURT:  Thank you, Mr. Cochran.  All

15   right.

16             Mr. Seigel?

17             MR. SIEGEL:  Thank you, your Honor.

18   Edward Siegel representing the same parties that

19   Mr. Cochran represents and also acting as co-counsel to

20   Ken Nelson who represents Denise Fairbank and

21   Darrell Palmer representing Steven Cope.  Ms. Fairbank

22   and Ms. Cope are resting on their written objections and

23   have nothing further to add.

24             As Mr. Cochran indicated, in our objections,

25   we talk about the fact that under the recent Kenny A

1   decision by the Supreme Court, that the lodestar — and

2   only the lodestar — is the appropriate measure for

3   attorneys fees in class actions.

4           I did a quick analysis of the attorneys —

5   of the fee request and noted there was a case in Georgia,

6   which was the Carpenter's Health and Welfare Benefit

7   versus the Coca Cola Company, in which Kaufman Stoia,

8   which was the predecessor to Robbins Geller, was

9   involved.

10          In that case, the Court, Lois B. Hunt, said

11  that you cannot include in your lodestar investigators,

12  accountants, other people who are just staff.  These are

13  overhead, and they can not be included in lodestar.

14          And yet, in the affidavit that was submitted

15  by Jonathan Stein of the $4.6 million dollars claimed in

16  lodestar only $2.5 is for partners, associates, of

17  counsel, and paralegal.  That leaves $2.1 million dollars

18  for document clerks, interns, shareholder relations,

19  information tech, and investigators, forensic accountants

20  and others.  These, according to, as I said, the Coke

21  case, that's overhead.  That is the responsibility of the

22  law firm and should not be charged to the class.

23          If you subtract that from the $7

24  million—dollar lodestar, you take off $2.1 million for

25  these — and these are rough numbers — the Poiscitelli

1    firm added about $25,000 in similar non reimburseable

2    costs and Shepherd Finkelman had about $250,000 in such

3    costs, so you really get a lodestar of $4.5 million

4    dollars.

5              We believe that that should be the lodestar,

6    and that should be the amount that is awarded rather than

7    the $7 million dollars that they claim.  I have nothing

8    further, your Honor.

9              THE COURT:  Mr. Siegel, what document has

10   that?

11             MR. SIEGEL:  I am looking, your Honor, at

12   document 67-3 filed on June 9th.  It is 2 of 98.  It is a

13   declaration of Jonathan M. Stein in support of the

14   Plaintiffs motion for final approval of settlement for

15   attorneys fees and expenses and response to objections,

16   and it is page ID No. 1097 is where it begins, but I am

17   looking in particular at pages 1099, 1100, and 1101, and

18   54 percent of the $4.6 million dollars is for partners

19   associates of counsel and paralegals.  The rest is for

20   others.

21             THE COURT:  Well, project attorney sounds —

22   I assume those are attorneys.

23             MR. SIEGEL:  Your Honor, project attorneys

24   are probably — this is something that has been

25   criticized in many class action settlements — these are

1    contract employees who may get $35 to $50 an hour, and

2    some of them are billed out at $515 an hour.

3              The first one is Steven Allen, $515.  There

4    is no evidence as to how much these people are paid.

5    They basically review documents, and in the Xerox case,

6    Carlson versus Xerox in the Second Circuit and the Tyco

7    case in New Hampshire, several of these contract

8    attorneys submitted affidavits as part of the public

9    record saying they were not supervised.

10             They basically did objective coding.  They

11   did not do lawyer-like work for perhaps a third of their

12   time, and I think there are many cases that say just

13   because the lawyer does the work, if it is ministerial in

14   nature, he should not be rewarded at his full billable

15   rate, but the others —

16             THE COURT:  But the real issue is, what you

17   are suggesting is if they are ostensibly billed at $2,

18   $300 and more dollars an hour, they are getting paid a

19   fraction of that.  That would be inappropriate.  If they

20   are contract attorneys, this should be the contract

21   amount.

22             MR. SIEGEL:  Precisely, your Honor.

23             THE COURT:  So I assume it is.

24             MR. SIEGEL:  No, your Honor.  I don't

25   believe that these people are paid $515 an hour.  I have

1   no evidence — there was no evidence in the record

2   indicating how much these people were actually paid, but

3   I would be very surprised if they were actually paid at

4   between $290 and $515 an hour.

5              THE COURT:  I guess maybe I should find out

6   because there is a large — forensic accountants and

7   shareholder relations is really almost negligible

8   compared to the total, but there is a large item for

9   project attorney.  It looks like it may exceed a million

10  dollars if I add up all those entities.  Who can

11  enlighten me about project attorneys?

12             MR. BLOOD:  I can, your Honor.

13             THE COURT:  Yes, Mr. Blood.

14             MR. BLOOD:  The project attorneys were hired

15  because of the large number of documents that we had to

16  review for deposition and trial preparation in a very

17  short amount of time based on the schedule set by the

18  Central District of California.

19             Their lawyers, the rates are based on their

20  number of years in practice, and they are generally lower

21  rates than what an associate would be billed out at or a

22  partner would be billed out at a firm.  It depends on the

23  project lawyers.  Steve Allen is essentially a salaried

24  person.  He receives a salary amount like an associate

25  would, and then he is billed out at an hourly rate like

1    an associate or partner would.

2              And then some of the other people because of

3    the amount of documents we had to review in a very short

4    amount of time were people paid on an hourly basis.  I

5    don't recall what the amount of hourly rate was, but it

6    was certainly less than what the billable rate was

7    because that's how law firms make money, is they pay

8    their attorneys less money than what they bill them out

9    at, and that way it covers overhead and —

10             THE COURT:  Well, I understand and that's

11   for employees, but normally, if these are contract

12   employees, you have very little overhead for them.  You

13   may not pay benefits.  You may not have all the

14   associated overhead you have with an employee.

15             MR. BLOOD:  And with the Kaufman-Stoia

16   firm — well, it depends.  I mean, what happens,

17   particularly with a bad economy is at the Kaufman-Stoia

18   firm and then my new firm, there are people who will work

19   part-time but essentially year round on projects doing

20   document review.  The nature of our business is document

21   intensive.  It is subjective coding that needs lawyers to

22   look at, and those do have overhead costs.

23             We, of course, didn't brief this issue

24   because Mr. Siegel never raised it.  So we are a bit

25   sandbagged.  It is not like Mr. Siegel noticed this for

1    the first time.  His practice is to follow the

2    Kaufman-Stoia firm around and make the same objections

3    over and over again.  We were not expecting this to be

4    addressed, but if we had, we certainly would have

5    provided the Court with case law justifying the practice.

6              But some of these lawyers were hired just

7    for this project, but a number of these lawyers are

8    essentially on staff all the time and go from case to

9    case as needed.  So there are overhead costs associated

10   with those folks.  Steve Allen has a desk and phone and

11   e-mail and all those other types of things.

12             THE COURT:  All right.  Well, I am satisfied

13   they are lawyers.  The billing rates were quite high for

14   everyone, but I know the billing rates are quite high,

15   and they are higher outside of Cleveland than in

16   Cleveland, and a lot of this litigation was conducted in

17   California.  I think most of the actual litigation was in

18   California.

19             By the time it got to Ohio, we weren't

20   taking depositions, documents had already been gone

21   through, so this was primarily California.  I know rates

22   are much higher in California.

23             Well, there is, you know, this small amount

24   for information techs and a total of maybe $10,000 for a

25   few interns, a little bit for document clerks.  I find

1    that it is a very, very, very small amount of the $7 plus

2    million dollars.  So I don't consider it a major issue in

3    awarding reasonable attorneys fees.

4              All right.  I guess lastly, the objectors

5    had made a motion or request for attorneys fees for them.

6    And the last thing I am interested in is sort of

7    satellite litigation over this but no amount was

8    suggested.  I mean, I have considered everything the

9    objectors have said.  I rejected most of it but

10   incorporated a couple of their points in some of the

11   modifications I have made.

12             So Mr. Siegel, Mr. Cochran, now, the

13   issue — you raised it — have you determined what you

14   would ask for.

15             MR. COCHRAN:  May I, your Honor.

16             THE COURT:  Yes?

17             MR. COCHRAN:  Your Honor, in my written

18   objections, I have not requested any fee.

19             THE COURT:  All right.  Okay.

20             Well, I guess, Mr. Siegel was?  I thought

21   from one of you, I guess it was Mr. Siegel.

22             MR. SIEGEL:  Yes, your Honor.  That was in

23   the objection filed by Ken Nelson, and I believe that our

24   feeling is that if we have contributed to the Court's

25   understanding of the entire case and have helped clarify

1    some things that were perhaps somewhat murky, that we

2    should be entitled to a fee based on the Court's — in

3    the Court's discretion.  There is no particular number

4    that we have thought of.  It could, of course, be

5    lodestar.  It could be —

6                    THE COURT:  Well, in terms of hours

7    expended, how many hours did you expend?  See, I wouldn't

8    know that, so it would be inappropriate for me to just

9    guess.

10                   MR. SIEGEL:  And, your Honor, rather than me

11   guess Mr. Nelson's time, with the Court's permission, I

12   would like to defer that for a few hours to call

13   Mr. Nelson and check.  I know what my time is, and I can

14   find out Mr. Palmer's.

15                   THE COURT:  I will tell you what,

16   Mr. Siegel, I am not saying what I will do.  I don't know

17   what I will do, but it is appropriate for me to

18   consider — I am not going to reject a request before it

19   is made or sort of guess what it is because that would be

20   appropriate.

21                   If you are requesting attorneys fees and now

22   that you know essentially what the Court has done, if you

23   want to make a request, you can make one and document it,

24   and I will consider it.  And I will let obviously the

25   Plaintiffs and Dannon file anything they wish, and we

1  will deal with it in an orderly fashion, and I will make

2  a decision on it.  I think that's the way to do it.

3              MR. SIEGEL:  Thank you, your Honor.

4              THE COURT:  Rather than having people do it

5  on the fly, it is better to do it orderly.

6              MR. SIEGEL:  How quickly would you like

7  that, your Honor?

8              THE COURT:  I would say within a week.

9              MR. SIEGEL:  Fine.  Within seven days I will

10  have something to you, your Honor.

11              THE COURT:  Okay.

12              MR. SIEGEL:  Thank you.

13              THE COURT:  All right.  Well, I think we are

14  pretty well concluded.

15              I have considered all of the objections,

16  most have been rejected, but I have incorporated some of

17  them in my rulings.  I would say this has been a very

18  complex class action because, first, the allegations were

19  very complex, and litigation was very uncertain.

20              I don't know how ultimately this would have

21  been decided had it been litigated because it had —

22  Dannon had made some claims about the — what I will call

23  the health benefits of some of its products, and the

24  Plaintiffs had challenged those representations, and

25  there has been a lot of scientific studies about the use

1    of Dannon's products.

2              The parties briefed me on this.  I read a

3    lot of material.  So the outcome was quite uncertain, and

4    that's why a lot of time, legal time was spent and why

5    the attorneys' are high, and the outcome was uncertain.

6    And so it made sense for the parties to settle this case.

7    It made sense for the Plaintiffs to settle it.

8              Again, because one of the complexities was

9    that Dannon had offered a moneyback guarantee for many of

10   its products that were the subject of the dispute if

11   within, I believe, two weeks Plaintiff didn't note some

12   improvement in his or her general feeling, wellbeing,

13   whatever, he or she could get his or her money-back.

14             So we had that, and it was never clear how

15   many Plaintiffs felt that their general health or comfort

16   or wellbeing was improved or how many didn't and exactly

17   what the science of Dannon's claims were, so that would

18   have been very protracted and uncertain.

19             Second, there is a very important part of

20   the relief, the — what I will call the injunctive

21   portion — that Dannon made some significant

22   modifications in its advertising and packaging for a

23   period up to three years, and the Court spent a lot of

24   time with the parties on that because I was concerned

25   about that and about how it would appear if a settlement

1    with a Federal District Court Judge's name on it approved

2    certain language, that someone might say, well, it is

3    essentially Court approved.  So we spent a lot of time

4    with that, and there was back and forth, and there were

5    compromises.

6            So I am saying all of this to highlight,

7    one, the complexity of this case, the uncertainty, the

8    outcome had the case been litigated, and that's why I

9    think the settlement is fair and appropriate.  It does

10    provide monetary relief, and Plaintiffs can get a modest

11    monetary relief without just on their say so.

12            It certainly is appropriate to require some

13    proof of purchase for anything over a small base level.

14    I think any class action settlement I have ever seen has

15    required some proof of purchase.  That's to avoid fraud.

16    So I don't think the requirements here are onerous or any

17    different than the class action settlements I have seen.

18            So all that is by way of saying that I think

19    the settlement is fair and appropriate, and I am

20    approving it with a couple of modifications that we dealt

21    with today.

22            So I am also going to award that the

23    Plaintiff, Mr. Gemelas, and any Plaintiff who has been

24    deposed is entitled to an incentive award of $7,500, and

25    any Plaintiff who has not been deposed is entitled to an

1    incentive award of $1,000, and I am hereby dismissing

2    with prejudice this action and all released claims

3    against each and all released persons and entities and

4    without cost to any of the parties as against the others.

5              So I think I covered everything I need to

6    cover, but this is fairly complex.  So, Mr. Blood,

7    Mr. Ungar, any other counsel, is there anything that you

8    feel I need to cover on the record that I haven't

9    covered?

10             MR. BLOOD:  I don't believe so, your Honor.

11             MR. UNGAR:  Ditto.

12             THE COURT:  Mr. Cochran?

13             MR. COCHRAN:  There is one clarification,

14   your Honor, with respect to the request.

15             THE COURT:  Yes, Mr. Cochran.

16             MR. COCHRAN:  With reference to the decision

17   of future attorneys fees, is the Court requiring

18   disclosure of, A, the claims data and, B, the rates and

19   payments for project attorneys?

20             THE COURT:  Well, I had the rates for

21   project attorneys.

22             MR. COCHRAN:  I mean, the rates they are

23   actually paid.

24             THE COURT:  Well, I believe that many of

25   these people are actually employees.  All right?  They

1    are full or part-time employees.  So they are essentially

2    treated like associates.  So the rates seem to be in line

3    with associates.  They are actually in most cases less

4    than associates.

5              So considering it is California, that will

6    just — I will just go with that.  I am going to require

7    a report, and I think I would see it, a report as to the

8    total amount of claims, how that process has gone, and

9    then what the total amount is and what, if any, food

10   contribution.

11             So I would just expect class counsel to make

12   that report to me at the end of the claims process, and

13   then I will consider any future application for attorneys

14   fees.

15             MR. COCHRAN:  Your Honor, will that claims

16   data be made available to objectors?

17             THE COURT:  Well, it will be filed.  I will

18   ask Mr. Blood to file it, and at the end of the

19   process — I don't need every minute detail, but just say

20   we had X claims totaling X dollars.  And so those have

21   been paid, and Dannon is going to pay, you know,

22   distribute the amount of food.  So that's what we will

23   have.  And it will be filed, and anyone can see it.

24             MR. COCHRAN:  That's perfect, your Honor.

25   Thank you.

1    THE COURT:  Then I want to thank all counsel

2  who have appeared today and have worked very hard on

3  this.  I was glad I was able to assist the parties,

4  complete the complex settlement process you had

5  engaged in and with the substantial help of retired

6  Judge Tevrizian, and I am glad we were able to move

7  forward on this.  So I thank everyone for their hard work

8  and for appearing today.  So with that, we are adjourned.

9    MR. CLIMACO:  Thank you, hour Honor.

10    THE COURT:  And Mr. Climaco, I hope your

11  neck improves.

12    MR. CLIMACO:  Thank you, your Honor.  It is

13  improving considerably.

14    (Hearing concluded at 1:09 p.m.)

15    - - - - - -

1                    C E R T I F I C A T E

2              I, George J. Staiduhar, Official Court

3     Reporter in and for the United States District Court,

4     for the Northern District of Ohio, Eastern Division,

5     do hereby certify that the foregoing is a true

6     and correct transcript of the proceedings herein.

7

8

9

10                    s/George J. Staiduhar
                      George J. Staiduhar,
11                    Official Court Reporter

12                    U.S. District Court
                      801 W. Superior Ave., Suite 7-184
13                    Cleveland, Ohio 44113
                      (216) 357-7128
14

15

16

17

18

19

20

21

22

23

24

25